UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

KEY EQUIPMENT FINANCE INC., as successor
in interest to KEYCORP LEASING, a division of
KEY CORPORATE CAPITAL INC.,

                    Plaintiffs,

            - against -

CLARK CONSTRUCTION COMPANY, INC.,
CLARK CRANE L.L.C. and COLBERT F.
CLARK,

                    Defendants

**SUMMONS**

Civil Action No.: *05-CV-0604*
Assigned Judge:

To:    Clark Construction Company, Inc.
       Route 3
       Headland, Alabama 36345

       Clark Crane L.L.C.
       15 Middlefield Lane
       Dothan, Alabama 36301

       Colbert F. Clark
       123 Girard Drive
       Dothan, Alabama 36303

You are hereby summoned and required to serve upon Lemery Greisler LLC, Plaintiff's attorneys, whose address is 50 Beaver Street, Albany, New York 12207, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

_____          _____
Clerk                                                      Date

_____
(By) Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

KEY EQUIPMENT FINANCE, as successor in
interest to KEYCORP LEASING, a division of
KEY CORPORATE CAPITAL INC.,

Plaintiffs,

- against -

CLARK CONSTRUCTION COMPANY, INC.,
CLARK CRANE L.L.C., and COLBERT F.
CLARK,

Defendants

**COMPLAINT**

Civil Action No.:
Assigned Judge:

The Plaintiff, Key Equipment Finance, as successor in interest to KeyCorp Leasing, a division of Key Corporate Capital Inc., by its attorneys Lemery Greisler LLC, complains of the Defendants, Clark Construction Company, Inc., Clark Crane L.L.C., and Colbert F. Clark, as follows:

## PARTIES

1.      The Plaintiff, Key Equipment Finance, as successor in interest to KeyCorp Leasing, a division of Key Corporate Capital Inc., [*hereinafter* "Key"], is a corporation organized under the laws of the State of Michigan, with offices for the transaction of business located at 66 South Pearl Street, Albany, New York.

2.    Upon information and belief, Defendant Clark Construction Company, Inc., [*hereinafter* "Clark Construction"], is a corporation organized under the laws of the State of Alabama, with offices for the transaction of business located at Route 3, Headland, Alabama.

3.    Upon information and belief, Defendant Clark Crane, L.L.C., [*hereinafter* "Clark Crane"], is a limited liability company organized under the laws of the State of Alabama, with offices for the transaction of business located at 15 Middlefield Lane, Dothan, Alabama.

4.    Upon information and belief, Defendant Colbert F. Clark, [*hereinafter* "Clark"], is an individual and citizen of the State of Alabama, with a principal residence located at 123 Girard Drive, Dothan, Alabama.

## JURISDICTION AND VENUE

5.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the matter in controversy exceeds Seventy-Five Thousand and No/100 Dollars ($75,000.00), exclusive of interest, costs and attorney's fees.

6.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events and omissions giving rise to the claims occurred in this District. Furthermore, the lease agreements, equipment schedules and promissory notes upon which this action is based each provide that the lease, schedule or note "is being delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York."

## FACTS

7.     On or about November 1, 2000, Defendant Clark Construction and Key entered into Master Equipment Lease Agreement, [*hereinafter* the "Clark Construction Master Lease"], setting forth the terms and conditions  under which Key was, from time to time, to lease equipment to Defendant Clark Construction.  A copy of the Clark Construction Master Lease is attached hereto and incorporated herein as Exhibit "A."

8.     On or about November 1, 2000, pursuant to Equipment Schedule No. 1 (Lease Number 8800020034), [*hereinafter* "Lease No. 20034"], Defendant Clark Construction, through its President, Colby Clark, for good and valuable consideration, became obligated to pay Key the total sum of Four Hundred, Sixty Five Thousand and 00/100 Dollars ($465,000.00), to be paid in seventy-two (72) equal monthly installments of Seven Thousand, One Hundred One and 08/100 Dollars ($7,101.08).  A copy of Lease No. 20034 is attached hereto and incorporated herein as Exhibit "B."

9.     On or about November 3, 2000, Defendant Colbert Clark, in order to induce Key to enter into the Clark Construction Master Lease, executed a Personal Guaranty, pursuant to the terms of which Defendant Clark personally and unconditionally guaranteed the prompt payment of all of Defendant Clark Construction's obligations under the Clark Construction Master Lease, [*hereinafter* "Clark Construction Lease Guaranty"].  A copy of the Clark Construction Lease Guaranty is annexed hereto as Exhibit "C."

10.    On or about January 22, 2001, pursuant to Equipment Schedule No. 2 (Lease Number 8800020415), [*hereinafter* "Lease No. 20415"], Defendant Clark Construction, through its President, Colby Clark, for good and valuable consideration, became obligated to pay Key the

the terms and conditions under which Key was, from time to time, to lease equipment to Defendant Clark Crane. A copy of the Clark Crane Master Lease, with Amendment No. 01, dated February 22, 2001, is attached hereto and incorporated herein as Exhibit "H."

15.     On or about February 13, 2001, pursuant to Equipment Schedule No. 1 (Lease Number 8800020466), [*hereinafter* "Lease No. 20466"], Defendant Clark Crane, through Member Colby Clark, for good and valuable consideration, became obligated to pay Key the total sum of Four Hundred Seventy-One Thousand, Nine Hundred Thirty-Eight and 88/100 Dollars ($471,938.88), to be paid in eighty-four (84) equal monthly installments of Five Thousand, Six Hundred Eighteen and 32/100 Dollars ($5,618.32). A copy of Lease No. 20466 is attached hereto and incorporated herein as Exhibit "I."

16.     On or about February 21, 2001, Defendant Clark Construction, in order to induce Key to enter into the Clark Crane Master Lease, executed a Corporate Guaranty, pursuant to the terms of which Defendant Clark Construction agreed to unconditionally and irrevocably guarantee the prompt payment of all of Defendant Clark Crane's obligations under the Clark Crane Master Lease, [*hereinafter* the "Clark Crane Corporate Guaranty"]. A copy of the Clark Crane Corporate Guaranty is annexed hereto as Exhibit "J."

17.     On or about February 21, 2001, Defendant Colbert Clark, in order to induce Key to enter into the Clark Crane Master Lease, executed a Personal Guaranty, pursuant to the terms of which Defendant Clark personally and unconditionally guaranteed the prompt payment of all of Defendant Clark Crane's obligations under the Clark Construction Master Lease, [*hereinafter*

"Clark Crane Personal Guaranty"]. A copy of the Clark Crane Personal Guaranty is annexed hereto as "Exhibit K."

## COUNT I: BREACH OF CLARK CONSTRUCTION MASTER LEASE AND LEASE NOS. 8800020034 AND 8800020415

18.    The Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

19.    Defendant Clark Construction has defaulted in its obligation to make monthly lease payments to Key under Lease No. 20034 and Lease No. 20415.

20.    On or about February 18, 2005, Key provided Defendant Clark Construction with written notice of its default, which default has not been cured. A copy of the February 18, 2005 default notice is attached hereto and incorporated herein as Exhibit "L."

21.    Defendant Clark Construction's default and failure to cure the same constitute a breach of the Clark Construction Master Lease.

22.    Pursuant to paragraph "22(b)(7)" of the Clark Construction Master Lease, Key has elected or, in the alternative, does hereby elect to declare the entire balance of the unpaid lease payments for the full term of the lease immediately due and payable, at a discount rate of three percent (3%).

23.    As of April 21, 2005, the total amount due under the Lease No. 20034 and Lease No. 20415 is One Hundred Fourteen Thousand, Two Hundred Forty-Two and 91/100 Dollars ($114,242.91), which is immediately due and owing to Key.

24.    Pursuant to paragraph "22(b)(7)" of the Clark Construction Master Lease, interest is due on the entire unpaid lease balance from February 28, 2005 through the date of judgment at the default rate of interest of eighteen percent (18%) per annum.  Through April 21, 2005, the interest due to Key upon Defendant Clark Construction's default is Two Thousand, Seventy and 32/100 Dollars ($2,970.32).  Interest continues to accrue at the per diem rate of Fifty-Seven and 12/100 Dollars ($57.12) per day.

25.    Pursuant to paragraph "22(b)" of the Clark Construction Master Lease, in the event of default, Defendant Clark Construction is obligated to pay Key's fees and expenses incurred in connection with the enforcement of Key's rights under the Clark Construction, including, but not limited to, reasonable attorneys' fees, costs, and disbursements.

26.    As a result of Defendant Clark Construction's breach, Key has been damaged in the total amount of One Hundred Seventeen Thousand, Two Hundred Thirteen and 23/100 Dollars ($117,213.23), plus interest from April 21, 2005 at the per diem rate of Fifty-Seven and 12/100 ($57.12) per day through the entry of judgment, plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights under the Clark Construction Master Lease, for which Key is entitled to judgment against Defendant Clark Construction.

27.    As a result of Defendant Clark Construction's breach, and pursuant to the Clark Construction Lease Guaranty, Defendant Colbert Clark is personally and unconditionally liable to Key for any amount due to Key by Defendant Clark Construction under Lease No. 20034 and Lease No. 20415.

28.    Defendant Colbert Clark has defaulted under the terms of the Clark Construction Lease Guaranty by failing to pay all amounts due to Key by Defendant Clark Construction.

29.    By reason of the foregoing, Key is entitled to judgment, jointly and severally, against Defendants Colbert Clark and Clark Construction in the principal amount of One Hundred Seventeen Thousand, Two Hundred Thirteen and 23/100 Dollars ($117,213.23), plus interest from April 21, 2005 at the per diem rate of Fifty-Seven and 12/100 ($57.12) per day through the entry of judgment, plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein.

## COUNT II: BREACH OF CLARK CRANE
## PROMISSORY NOTE NO. 8800020414

30.    The Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

31.    Defendant Clark Crane has defaulted in its obligation to make monthly payments to Key under Note No. 20414.

32.    Pursuant to paragraph "7(b)" of Note No. 20414, Key has elected or, in the alternative, does hereby elect to declare the entire balance of the principal, together with all accrued and unpaid interest thereon immediately due and payable.

33.    As of April 21, 2005, the total amount due under Note No. 20414 is Ninety-One Thousand, Eight Hundred Fifteen and 46/100 Dollars ($91,815.46), which is immediately due and owing to Key.

34.    Pursuant to paragraph "8" of Note No. 20414, in the event of default, Defendant Clark Crane is obligated to pay Key's fees and expenses incurred in connection with the enforcement of Key's rights under Note No. 20414, including, but not limited to, reasonable attorneys' fees, costs, and disbursements.

35.    As a result of Defendant Clark Crane's breach, Key has been damaged in the total amount of Ninety-One Thousand, Eight Hundred Fifteen and 46/100 Dollars ($91,815.46), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights under Note No. 20414, for which Key is entitled to judgment against Defendant Clark Crane.

36.    By reason of the foregoing, Key is entitled to judgment, against Defendant Clark Crane in the principal amount of Ninety-One Thousand, Eight Hundred Fifteen and 46/100 Dollars ($91,815.46), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein.

## COUNT III: BREACH OF CLARK CONSTRUCTION
## PROMISSORY NOTE NO. 8800020416

37.    The Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

38.    Defendant Clark Construction has defaulted in its obligation to make monthly payments to Key under Note No. 20416.

($195,354.46), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein.

WHEREFORE, the Plaintiff demands judgment as follows:

(a)     Against Defendants Colbert Clark and Clark Construction, jointly and severally, in the principal amount of One Hundred Seventeen Thousand, Two Hundred Thirteen and 23/100 Dollars ($117,213.23), plus interest from April 21, 2005 at the per diem rate of Fifty-Seven and 12/100 ($57.12) per day through the entry of judgment, plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein; and

(b)     Against Defendant Clark Crane in the principal amount of Ninety-One Thousand, Eight Hundred Fifteen and 46/100 Dollars ($91,815.46), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein; and

(c)     Against Defendant Clark Construction in the principal amount of Thirty-Four Thousand, Eight Hundred Eighty-Eight and 76/100 Dollars ($34,888.76), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein; and

(d)     Against Defendant Clark Construction in the principal amount of One Hundred Thirteen Thousand, Two Hundred Seventy-Four and 69/100 Dollars ($113,274.69), plus Key's costs, expenses and reasonable attorneys' fees incurred in connection with the enforcements of its rights herein; and

(e)    Against Defendants Clark Crane, Colbert Clark and Clark Construction, jointly

and severally, in the principal amount of One Hundred Ninety-Five Thousand,

Three Hundred Fifty-Four and 46/100 Dollars ($195,354.46), plus Key's costs,

expenses and reasonable attorneys' fees incurred in connection with the

enforcements of its rights herein.

Dated: May 17, 2005                    Respectfully submitted,

                                       LEMERY GREISLER LLC


                                       _Gretchen M Greisler_____
                                       Paul A. Levine, Esq
                                       Bar No. 103758
                                       Gretchen M. Greisler, Esq.
                                       Bar No. 512784
                                       Attorneys for Plaintiff
                                       Key Equipment Finance, as successor in
                                       interest to KEYCORP LEASING, a division
                                       of KEY CORPORATE CAPITAL INC.
                                       50 Beaver Street
                                       Albany, New York 12207
                                       Telephone: (518)433-8800
                                       Facsimile: (518)433-8823

# VERIFICATION

STATE OF COLORADO    )
                             )SS.:
COUNTY OF _Boulder_   )

JONATHAN A. BRAUN, affirms under penalty of perjury, that:

1. I am a Vice President and Senior Workout Counsel for Key Equipment Finance Inc., the Plaintiff in the within action.

2. I have read the foregoing Complaint and know the contents thereof to be true except as to the matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

3. The grounds of my belief as to the matters stated upon information and belief are a review of the books and records of the Plaintiff and recorded documents concerning the transaction.

_____
Jonathan A. Braun

Sworn to before me this
_27th_ day of April 2005.

_____
Notary Public

Commission Expires 2/22/07



Customer Number: 32567
Lessee Number: 32568
Lease Number: 8800020034

# Master Equipment Lease Agreement

THIS MASTER EQUIPMENT LEASE AGREEMENT dated as of November 1, 2000 is made by and between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC., having an address at 54 State Street, Albany, New York 12207 ("Lessor"), and CLARK CONSTRUCTION COMPANY, INC., an Alabama corporation with its principal place of business at Route 3, Box 15, Headland, Alabama 36345 ("Lessee").

## TERMS AND CONDITIONS OF LEASE

1.    <u>Lease.</u> Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Equipment, subject to and upon the terms set forth herein. Each Equipment Schedule shall constitute a separate and enforceable lease incorporating all the terms of this Master Equipment Lease Agreement as if such terms were set forth in full in such Equipment Schedule. In the event that any term of any Equipment Schedule conflicts with or is inconsistent with any term of this Master Equipment Lease Agreement, the terms of the Equipment Schedule shall govern.

2.    <u>Disclaimer of Warranties.</u> LESSOR MAKES NO (AND SHALL NOT BE DEEMED TO HAVE MADE ANY) WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, OPERATION OR CONDITION OF, OR THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE STATE OF TITLE THERETO OR OF ANY COMPONENT THEREOF, THE ABSENCE OF LATENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AND LESSOR HEREBY DISCLAIMS THE SAME; IT BEING UNDERSTOOD THAT THE EQUIPMENT IS LEASED TO LESSEE "AS IS" AND ALL SUCH RISKS, IF ANY, ARE TO BE BORNE BY LESSEE. NO DEFECT IN, OR UNFITNESS OF, THE EQUIPMENT, OR ANY OF THE OTHER FOREGOING MATTERS, SHALL RELIEVE LESSEE OF THE OBLIGATION TO PAY RENT OR OF ANY OTHER OBLIGATION HEREUNDER. LESSEE HAS MADE THE SELECTION OF THE EQUIPMENT FROM THE SUPPLIER BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR. LESSOR IS NOT RESPONSIBLE FOR ANY REPAIRS, SERVICE, MAINTENANCE OR DEFECT IN THE EQUIPMENT OR THE OPERATION THEREOF. IN NO EVENT SHALL LESSOR BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES (WHETHER UNDER THE UCC OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, ANY LOSS, COST OR DAMAGE TO LESSEE OR OTHERS ARISING FROM ANY OF THE FOREGOING MATTERS, INCLUDING, WITHOUT LIMITATION, DEFECTS, NEGLIGENCE, DELAYS, FAILURE OF DELIVERY OR NON-PERFORMANCE OF THE EQUIPMENT. ANY WARRANTY BY THE SUPPLIER IS HEREBY ASSIGNED TO LESSEE BY LESSOR FOR THE TERM OF THE LEASE WITHOUT RECOURSE. SUCH WARRANTY SHALL NOT RELEASE LESSEE FROM ITS OBLIGATION TO LESSOR TO PAY RENT, TO PERFORM ALL OTHER OBLIGATIONS HEREUNDER AND TO KEEP, MAINTAIN AND SURRENDER THE EQUIPMENT IN THE CONDITION REQUIRED BY SECTIONS 12 AND 13 HEREOF. Lessee's execution and delivery of a Certificate of Acceptance shall be conclusive evidence as between Lessor and Lessee that the Items of Equipment described therein are in all of the foregoing respects satisfactory to Lessee, and Lessee shall not assert any claim of any nature whatsoever against Lessor based on any of the foregoing matters; <u>provided</u>, <u>however</u>, that nothing contained herein shall in any way bar, reduce or defeat any claim that Lessee may have against the Supplier or any other person (other than Lessor).

3.    <u>Non-Cancelable Lease.</u> THIS LEASE IS A NET LEASE AND LESSEE'S OBLIGATION TO PAY RENT AND PERFORM ITS OBLIGATIONS HEREUNDER ARE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL UNDER ANY AND ALL CIRCUMSTANCES WHATSOEVER (INCLUDING WITHOUT LIMITATION THE BANKRUPTCY OF LESSOR) AND SHALL NOT BE SUBJECT TO ANY RIGHT OF SET OFF, COUNTERCLAIM, DEDUCTION, DEFENSE OR OTHER RIGHT WHICH LESSEE MAY HAVE AGAINST THE SUPPLIER, LESSOR OR ANY OTHER PARTY. LESSEE SHALL HAVE NO RIGHT TO TERMINATE (EXCEPT AS EXPRESSLY PROVIDED HEREIN) OR CANCEL THIS LEASE OR TO BE RELEASED OR DISCHARGED FROM ITS OBLIGATION HEREUNDER FOR ANY REASON

WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DEFECTS IN, DESTRUCTION OF, DAMAGE TO OR INTERFERENCE WITH ANY USE OF THE EQUIPMENT (FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WAR, ACT OF GOD, STRIKE OR GOVERNMENTAL REGULATION), THE INVALIDITY, ILLEGALITY OR UNENFORCEABILITY (OR ANY ALLEGATION THEREOF) OF THIS LEASE OR ANY PROVISION HEREOF, OR ANY OTHER OCCURRENCE WHATSOEVER, WHETHER SIMILAR OR DISSIMILAR TO THE FOREGOING, WHETHER FORESEEN OR UNFORESEEN.

4.    **Definitions.**  Unless the context otherwise requires, as used in this Lease, the following terms shall have the respective meanings indicated below and shall be equally applicable to both the singular and the plural forms thereof:

"Applicable Law" shall mean all applicable Federal, state, local and foreign laws, ordinances, judgments, decrees, injunctions, writs, rules, regulations, orders, licenses and permits of any Governmental Authority.

"Appraisal Procedure" shall mean the following procedure for obtaining an appraisal of the Fair Market Sales Value or the Fair Market Rental Value. Lessor should provide Lessee with the names of three independent Appraisers. Within ten (10) business days thereafter, Lessee shall select one of such Appraisers to perform the appraisal. The selected Appraiser shall be instructed to perform its appraisal based upon the assumptions specified in the definition of Fair Market Sales Value or Fair Market Rental Value, as applicable, and shall complete its appraisal within twenty (20) business days after such selection. Any such appraisal shall be final, binding and conclusive on Lessee and Lessor and shall have the legal effect of an arbitration award. Lessee shall pay the fees and expenses of the selected Appraiser.

"Appraiser" shall mean a person engaged in the business of appraising property who has at least ten (10) years' experience in appraising property similar to the Equipment.

"Authorized Signer" shall mean any officer of Lessee, set forth on an incumbency certificate (in form and substance satisfactory to Lessor) delivered by Lessee to Lessor, who is authorized and empowered to execute the Lease Documents.

"Certificate of Acceptance" shall mean a certificate of acceptance, in form and substance satisfactory to Lessor, executed and delivered by Lessee in accordance with Section 7 hereof.

"Default" shall mean any event or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default.

"Default Rate" shall mean an annual interest rate equal to the lesser of 18% or the maximum interest rate permitted by Applicable Law.

"Equipment" shall mean an item or items of property designated from time to time by Lessee which are described on an Equipment Schedule and which are being or will be leased by Lessee pursuant to this Lease, together with all replacement parts, additions and accessories incorporated therein or affixed thereto including, without limitation, any software that is a component or integral part of, or is included or used in connection with, any Item of Equipment, but with respect to such software, only to the extent of Lessor's interest therein, if any.

"Equipment Group" shall consist of all Items of Equipment listed on a particular Equipment Schedule.

"Equipment Location" shall mean the location of the Equipment, as set forth on an Equipment Schedule, or such other location (approved in writing by Lessor) as Lessee shall from time to time specify in writing.

"Equipment Schedule" shall mean each equipment lease schedule from time to time executed by Lessor and Lessee with respect to an Equipment Group, pursuant to and incorporating by reference all of the terms of this Master Equipment Lease Agreement.

"Event of Default" shall have the meaning specified in Section 22 hereof.

"Fair Market Rental Value" or "Fair Market Sale Value" shall mean the value of each Item of Equipment for lease or sale, unless otherwise specified herein as determined between Lessor and Lessee, or, if Lessor and Lessee are unable to agree, pursuant to the Appraisal Procedure, which would be obtained in an arms-length transaction between an informed and willing lessor or seller (under no compulsion to lease or sell) and an informed and willing lessee or buyer (under no compulsion to lease or purchase). In determining the Fair Market Rental Value or Fair Market Sale Value of the Equipment, (a) such Fair Market Rental Value or Fair Market Sale Value shall be calculated on the assumption that the Equipment is in the condition and repair required by Sections 12 and 13 hereof, and (b) there shall be excluded from the calculation thereof the value of any Upgrade made pursuant to Section 14 hereof in which the Lessor does not hold an interest.

"GAAP" shall have the meaning specified in Section 31 hereof.

"Governmental Action" shall mean all authorizations, consents, approvals, waivers, filings and declarations of any Governmental Authority, including, without limitation, those environmental and operating permits required for the ownership, lease, use and operation of the Equipment.

"Governmental Authority" shall mean any foreign, Federal, state, county, municipal or other governmental authority, agency, board or court.

"Guarantor" shall mean any guarantor of Lessee's obligations hereunder.

"Initial Term Expiration Date" shall have the meaning set forth in the Equipment Schedule associated therewith.

"Item of Equipment" shall mean each Item of the Equipment.

"Lease", "hereof", "herein" and "hereunder" shall mean, with respect to an Equipment Group, this Master Equipment Lease Agreement and the Equipment Schedule on which such Equipment Group is described, including all addenda attached thereto and made a part thereof.

"Lease Documents" shall mean this Lease and all other documents prepared by Lessor and now or hereafter executed in connection therewith.

"Lessor Assignee" shall have the meaning specified in Section 15 hereof.

"Lessor Expense" shall have the meaning specified in Section 26 hereof.

"Lessor Transfer" shall have the meaning specified in Section 15 hereof.

"Liability" shall have the meaning specified in Section 24 hereof.

"Lien" shall mean all mortgages, pledges, security interests, liens, encumbrances, claims or other charges of any kind whatsoever.

"Loss" shall have the meaning specified in Section 16 hereof.

"Purchase Agreement" shall mean any purchase agreement or other contract entered into between the Supplier and Lessee for the acquisition of the Equipment to be leased hereunder.

"Related Equipment Schedule" shall have the meaning specified in Section 27 hereof.

"Remedy Date" shall have the meaning specified in Section 22 hereof.

"Rent" shall mean the periodic rental payments due hereunder for the leasing of the Equipment, as set forth on the Equipment Schedules, and, where the context hereof requires, all such additional amounts as may from time to time be payable under any provision of this Lease.

"Rent Commencement Date" shall mean, with respect to an Equipment Group, (a) the date on which Lessor receives an executed Certificate of Acceptance for such Equipment from Lessee or (b) the date on which Lessor disburses funds for the purchase of such Equipment Group, as determined by Lessor in its sole discretion.

"Rent Payment Date" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith.

"Required Alteration" shall have the meaning specified in Section 11 hereof.

"Stipulated Loss Value" shall mean, as of any Rent Payment Date and with respect to an Item of Equipment, the amount determined by multiplying the Total Cost for such Item of Equipment by the percentage specified in the applicable Stipulated Loss Value Supplement opposite such Rent Payment Date.

"Stipulated Loss Value Supplement" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith.

"Supplier" shall mean the manufacturer or the vendor of the Equipment, as set forth on each Equipment Schedule.

"Term" shall mean the Initial Term or any Renewal Term, each as defined in Section 8 hereof, and any Extended Lease Term or Interim Term as defined in an Equipment Schedule.

"Total Cost" shall mean, with respect to an Item of Equipment, (a) the acquisition cost of such Item of Equipment (including Lessor's capitalized costs), as set forth on the Equipment Schedule on which such Item of Equipment is described, or (b) if no such acquisition cost is specified, the Supplier's invoice price for such Item of Equipment plus Lessor's capitalized costs, or (c) if no such acquisition cost is specified and no such invoice price is obtainable, an allocated price for such Item of Equipment based on the Total Cost of all Items of Equipment set forth on the Equipment Schedule on which such Item of Equipment is described, as determined by Lessor in its sole discretion.

"Upgrade" shall have the meaning specified in Section 14 hereof.

5.    **Supplier Not an Agent.**  LESSEE UNDERSTANDS AND AGREES THAT (a) NEITHER THE SUPPLIER, NOR ANY SALES REPRESENTATIVE OR OTHER AGENT OF THE SUPPLIER, IS (1) AN AGENT OF LESSOR OR (2) AUTHORIZED TO MAKE OR ALTER ANY TERM OR CONDITION OF THIS

LEASE, AND (b) NO SUCH WAIVER OR ALTERATION SHALL VARY THE TERMS OF THIS LEASE UNLESS EXPRESSLY SET FORTH HEREIN.

6.    Ordering Equipment.  Lessee has selected and ordered the Equipment from the Supplier and, if appropriate, has entered into a Purchase Agreement with respect thereto.  Lessor may accept an assignment from Lessee of Lessee's rights, but none of Lessee's obligations, under any such Purchase Agreement.  Lessee shall arrange for delivery of the Equipment so that it can be accepted in accordance with Section 7 hereof.  If an Item of Equipment is subject to an existing Purchase Agreement between Lessee and the Supplier, Lessee warrants that such Item of Equipment has not been delivered to Lessee as of the date of the Equipment Schedule applicable thereto.  If Lessee causes the Equipment to be modified or altered, or requests any additions thereto prior to the Rent Commencement Date, Lessee (a) acknowledges that any such modification, alteration or addition to an Item of Equipment may affect the Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent with respect to such Item of Equipment,  and (b) hereby authorizes Lessor to adjust such Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent as appropriate.  Lessee hereby authorizes Lessor to complete each Equipment Schedule with the serial numbers and other identification data of the Equipment Group associated therewith, as such data is received by Lessor.

7.    Delivery and Acceptance.  Upon Lessee's acceptance for lease of any Equipment delivered to Lessee and described in any Equipment Schedule, Lessee shall execute and deliver to Lessor a Certificate of Acceptance. LESSOR SHALL HAVE NO OBLIGATION TO ADVANCE FUNDS FOR THE PURCHASE OF THE EQUIPMENT UNLESS AND UNTIL LESSOR SHALL HAVE RECEIVED A CERTIFICATE OF ACCEPTANCE RELATING THERETO EXECUTED BY LESSEE.  Such Certificate of Acceptance shall constitute Lessee's acknowledgment that such Equipment (a) was received by Lessee, (b) is satisfactory to Lessee in all respects and is acceptable to Lessee for lease hereunder, (c) is suitable for Lessee's purposes, (d) is in good order, repair and condition, (e) has been installed and operates properly, and (f) is subject to all of the terms  of this Lease (including, without limitation, Section 2 hereof).

8.    Term; Survival.  With respect to any Item of Equipment, unless otherwise specified on an Equipment Schedule, the initial term of this Lease (the "Initial Term") shall commence on the date on which such Item of Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on the Initial Term Expiration Date for such Item of Equipment.  With respect to an Item of Equipment, any renewal term of this Lease (individually, a "Renewal Term"), as contemplated hereby, shall commence immediately upon the expiration of the Initial Term or any prior Renewal Term, as the case may be, and, unless earlier terminated as provided herein, shall expire on the date on which the final payment of Rent is due and paid hereunder.  All obligations of Lessee hereunder shall survive the expiration, cancellation or other termination of the Term hereof.

9.    Rent.  Lessee shall pay the Rent set forth on the Equipment Schedule commencing on the Rent Commencement Date, and, unless otherwise set forth on such Equipment Schedule, on the same day of each payment period thereafter for the balance of the Term.  Rent shall be due whether or not Lessee has received any notice that such payments are due.  All Rent shall be paid to Lessor at its address set forth on the Equipment Schedule, or as otherwise directed by Lessor in writing.

10.    Location; Inspection; Labels.  The Equipment shall be delivered to the Equipment Location and shall not be removed therefrom without Lessor's prior written consent.  Lessor shall have the right to enter upon the Equipment Location and inspect the Equipment at any reasonable time.  Lessor may, without notice to Lessee, remove the Equipment if the Equipment is, in the opinion of Lessor, being used beyond its capacity or is in any manner improperly cared for, abused or misused.  At Lessor's request, Lessee shall affix permanent labels indicating Lessor's interest in the Equipment in a prominent place on the Equipment and shall keep such labels in good repair and condition.

11.    Use; Alterations.  Lessee shall use the Equipment lawfully and only in the manner for which it was designed and intended and so as to subject it only to ordinary wear and tear.  Lessee shall comply with all Applicable Law.  Lessee shall immediately notify Lessor in writing of any existing or threatened investigation,

claim or action by any Governmental Authority in connection with any Applicable Law or Governmental Action which could adversely affect the Equipment or this Lease. Lessee, at its own expense, shall make such alterations, additions or modifications or improvements (each, a "Required Alteration") to the Equipment as may be required from time to time to meet the requirements of Applicable Law or Governmental Action. All such Required Alterations shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens. Except as otherwise permitted herein, Lessee shall not make any alterations to the Equipment without Lessor's prior written consent.

12.    **Repairs and Maintenance.**  Lessee, at Lessee's own cost and expense, shall (a) keep the Equipment in good repair, good operating condition and working order and in compliance with the manufacturer's specifications and Lessee's standard practices (but with respect to the latter, in no event less than industry practices), and (b) enter into and keep in full force and effect during the Term hereof a maintenance agreement with the manufacturer of the Equipment, or a manufacturer-approved maintenance organization, to maintain, service and repair the Equipment as otherwise required herein. Upon Lessor's request, Lessee shall furnish Lessor with an executed copy of any such maintenance agreement. An alternate source of maintenance may be used by Lessee with Lessor's prior written consent. Lessee, at its own cost and expense and within a reasonable period of time, shall replace any part of any Item of Equipment that becomes unfit or unavailable for use from any cause (whether or not such replacement is covered by the aforesaid maintenance agreement), with a replacement part of the same manufacture, value, remaining useful life and utility as the replaced part immediately preceding the replacement (assuming that such replaced part was in the condition required by this Lease). Such replacement part shall immediately, and without further act, be deemed to constitute an Item of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens.

13.    **Return of Equipment.**  Upon the expiration (subject to Section 32 hereof and except as otherwise provided in an Equipment Schedule) or earlier termination of this Lease, Lessee, at its sole expense, shall assemble and return the Equipment to Lessor by delivering such Equipment F.A.S. or F.O.B. to such location or such carrier (packed for shipping) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be in the condition required by Section 12 hereof. All components of the Equipment shall have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any Item of Equipment fails to meet the standards set forth above, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing such Item of Equipment and restoring it so as to meet such standards. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

14.    **Equipment Upgrades/Attachments.**  In addition to the requirements of Section 11 hereof, Lessee, at its own expense, may from time to time add or install upgrades or attachments (each an "Upgrade") to the Equipment during the Term; provided, that such Upgrades (a) are readily removable without causing material damage to the Equipment, (b) do not materially adversely affect the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of the Equipment, and (c) do not cause such Equipment to become "limited use property" within the meaning of Revenue Procedure 76-30, 1976-2 C.B. 647 (or such other successor tax provision), as of the date of installation of such Upgrade. Any such Upgrades which can be removed without causing damage to or adversely affecting the condition of the Equipment, or reducing the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of the Equipment shall remain the property of Lessee; and upon the expiration or earlier termination of this Lease and provided that no Event of Default exists, Lessee may, at its option, remove any such Upgrades and, upon such removal, shall restore the Equipment to the condition required hereunder.

15.   <u>Sublease and Assignment</u>. (a) WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, LESSEE SHALL NOT (1) ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT OR ANY INTEREST THEREIN, OR (2) SUBLET OR LEND THE EQUIPMENT TO, OR PERMIT THE EQUIPMENT TO BE USED BY, ANYONE OTHER THAN LESSEE.

(b) Lessor, at any time with or without notice to Lessee, may sell, transfer, assign and/or grant a security interest, in all or any part of Lessor's interest in this Lease, any Equipment Schedule or any Item of Equipment (each, a "Lessor Transfer"), provided that no such Lessor Transfer will materially increase Lessee's burdens or risks hereunder. In the event of a Lessor Transfer, any purchaser, transferee, assignee or secured party (each a "Lessor Assignee") shall have and may exercise all of Lessor's rights hereunder with respect to the items to which any such Lessor Transfer relates, and LESSEE SHALL NOT ASSERT AGAINST ANY SUCH LESSOR ASSIGNEE ANY DEFENSE, COUNTERCLAIM OR OFFSET THAT LESSEE MAY HAVE AGAINST LESSOR. Lessee acknowledges that no such sale, transfer, assignment and/or security interest will materially change Lessee's duties hereunder or materially increase its burdens or risks hereunder. Lessee agrees that upon written notice to Lessee of any such sale, transfer, assignment and/or security interest, Lessee shall acknowledge receipt thereof in writing and shall comply with the directions and demands of any such Lessor Assignee.

16.   <u>Risk of Loss; Damage to Equipment</u>.  (a) Lessee shall bear the entire risk of loss (including without limitation, theft, destruction, disappearance of or damage to any and all Items of Equipment ("Loss") from any cause whatsoever), whether or not insured against, during the Term hereof until the Equipment is returned to Lessor in accordance with Section 13 hereof.  No Loss shall relieve Lessee of the obligation to pay Rent or of any other obligation under this Lease.

(b) In the event of Loss to any Item of Equipment, Lessee shall immediately notify Lessor of same, and at the option of Lessor, Lessee shall within thirty (30) days following such Loss: (1) place such Item of Equipment in good condition and repair, in accordance with the terms hereof; (2) replace such Item of Equipment with replacement equipment (acceptable to Lessor) in as good condition and repair, and with the same value, remaining useful economic life and utility, as such replaced Item of Equipment immediately preceding the Loss (assuming that such replaced Item of Equipment was in the condition required by this Lease), which replacement equipment shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder and shall be free and clear of all Liens; or (3) pay to Lessor the sum of (i) all Rent due and owing hereunder with respect to such Item of Equipment (at the time of such payment) plus (ii) the Stipulated Loss Value as of the Rent Payment Date next following the date of such Loss with respect to such Item of Equipment.  Upon Lessor's receipt of the payment required under subsection (3) above, Lessee shall be entitled to Lessor's interest in such Item of Equipment, in its then condition and location, "as is" and "where is", without any warranties, express or implied.

17.   <u>Insurance</u>.  (a) Lessee shall, at all times during the Term hereof (until the Equipment shall have been received by Lessor) and at Lessee's own cost and expense, maintain (1) insurance against all risks of physical loss or damage to the Equipment (which shall include theft and collision for Equipment consisting of motor vehicles, but shall not exclude loss resulting from flood or earthquake) in an amount not less than the greater of the full replacement value thereof or the Stipulated Loss Value thereof if applicable, and (2) commercial general liability insurance (including blanket contractual liability coverage and products liability coverage) for personal and bodily injury and property damage in an amount satisfactory to Lessor.

(b) All insurance policies required hereunder shall (1) require thirty (30) days' prior written notice of cancellation or material change in coverage to Lessor (any such cancellation or change, as applicable, not being effective until the thirtieth (30th) day after the giving of such notice); (2) name "KeyCorp and its subsidiaries and affiliated companies, including Key Corporate Capital Inc., their successors and assigns" as an additional insured under the public liability policies and name Lessor as sole loss payee under the property insurance policies; (3) not require contributions from other policies held by Lessor; (4) waive any right of subrogation against Lessor; (5) in respect of any liability of Lessor, except for the insurers' salvage rights in the event of a loss, waive the right of such insurers to set-off, to counterclaim or to any other deduction, whether by attachment or otherwise, to the extent of any monies due Lessor under such policies; (6) not require that Lessor pay or be liable for any premiums with respect to such insurance covered thereby; (7) be in full force and effect throughout any geographical areas at any time traversed by any Item of Equipment; and (8) contain breach of warranty provisions providing that, in

respect of the interests of Lessor in such policies, the insurance shall not be invalidated by any action or inaction of Lessee or any other person (other than Lessor) and shall insure Lessor regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee or by any other person (other than Lessor). Prior to the first date of delivery of any Item of Equipment hereunder, and thereafter not less than 15 days prior to the expiration dates of the expiring policies theretofore delivered pursuant to this Section, Lessee shall deliver to Lessor a duplicate original of all policies (or in the case of blanket policies, certificates thereof issued by the insurers thereunder) for the insurance maintained pursuant to this Section.

18.    General Tax Indemnification.  Lessee shall pay when due and shall indemnify and hold Lessor harmless from and against (on an after-tax basis) any and all taxes, fees, withholdings, levies, imposts, duties, assessments and charges of any kind and nature arising out of or related to this Lease (together with interest and penalties thereon and including, without limitation, sales, use, gross receipts, personal property, real property, real estate excise, ad valorem, business and occupational, franchise, value added, leasing, leasing use, documentary, stamp or other taxes) imposed upon or against Lessor, any Lessor Assignee, Lessee or any Item of Equipment by any Governmental Authority with respect to any Item of Equipment or the manufacturing, ordering, sale, purchase, shipment, delivery, acceptance or rejection, ownership, titling, registration, leasing, subleasing, possession, use, operation, removal, return or other dispossession thereof or upon the rents, receipts or earnings arising therefrom or upon or with respect to this Lease, excepting only all Federal, state and local taxes on or measured by Lessor's net income (other than income tax resulting from making any alterations, improvements, modifications, additions, upgrades, attachments, replacements or substitutions by Lessee).  Whenever this Lease terminates as to any Item of Equipment, Lessee shall, upon written request by Lessor, advance to Lessor the amount estimated by Lessor to be the personal property or other taxes on said item which are not yet payable, but for which Lessee is responsible. Lessor shall, at Lessee's request, provide Lessee with Lessor's method of computation of any estimated taxes.

19.    Lessor's Right to Perform for Lessee.  If Lessee fails to perform  any of its obligations contained herein, Lessor may (but shall not be obligated to) perform such obligations, and the amount of the reasonable costs and expenses of Lessor incurred in connection with such performance, together with interest on such amount at the Default Rate, shall be payable by Lessee to Lessor upon demand.  No such performance by Lessor shall be deemed a waiver of any rights or remedies of Lessor, or be deemed to cure the default of Lessee hereunder .

20.    Delinquent Payments.  If Lessee fails to pay any Rent or other sums under this Lease on or before the date when the same becomes due, Lessee shall pay to Lessor a late charge equal to the lesser of five percent (5%) of such delinquent amount or the maximum amount permitted under Applicable Law. Such late charge shall be payable by Lessee upon demand by Lessor and shall be deemed Rent hereunder.

21.    Personal Property; Liens.  Lessor and Lessee hereby agree that the Equipment is, and shall at all times remain, personal property notwithstanding the fact that any Item of Equipment may now be, or hereafter become, in any manner affixed or attached to real property or any improvements thereon.  Lessee shall at all times keep the Equipment free and clear from all Liens.  Lessee shall (a) give Lessor immediate written notice of any such Lien, (b) promptly, at Lessee's sole cost and expense, take such action as may be necessary to discharge any such Lien, and (c) indemnify and hold Lessor, on an after-tax basis, harmless from and against any loss or damage caused by any such Lien.

22.    Events of Default; Remedies.  (a) As used herein, the term "Event of Default" shall mean any of the following events:  (1) Lessee fails to pay any Rent within ten (10) days after the same shall have become due; (2) Lessee or any Guarantor becomes insolvent or makes an assignment for the benefit of its creditors; (3) a receiver, trustee, conservator or liquidator of Lessee or any Guarantor of all or a substantial part of Lessee's or such Guarantor's assets is appointed with or without the application or consent of Lessee or such Guarantor, respectively; (4) a petition is filed by or against Lessee or any Guarantor under any bankruptcy, insolvency or similar legislation; (5) Lessee or any Guarantor violates or fails to perform any provision of either this Lease or any other loan, lease or credit agreement or any acquisition or purchase agreement with Lessor or any other party;

(6) Lessee violates or fails to perform any covenant or representation made by Lessee herein; (7) any representation or warranty made herein or in any certificate, financial statement or other statement furnished to Lessor (or Lessor's parent, subsidiaries or affiliates) shall prove to be false or misleading in any material respect as of the date on which the same was made; (8) Lessee makes a bulk transfer of furniture, furnishings, fixtures or other equipment or inventory; (9) there is a material adverse change in Lessee's or any Guarantor's financial condition since the first Rent Commencement Date of any Equipment Schedule executed in connection herewith; (10) Lessee merges or consolidates with any other corporation or entity, or sells, leases or disposes of all or substantially all of its assets without the prior written consent of Lessor; (11) a change in control occurs in Lessee or any Guarantor; or (12) the death or dissolution of Lessee or any Guarantor. An Event of Default with respect to any Equipment Schedule hereunder shall, at Lessor's option, constitute an Event of Default for all Equipment Schedules hereunder and any other agreements between Lessor and Lessee.

(b) Upon the occurrence of an Event of Default, Lessor may do one or more of the following as Lessor in its sole discretion shall elect: (1) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof; (2) sell any Item of Equipment at public or private sale; (3) hold, keep idle or lease to others any Item of Equipment as Lessor in its sole discretion may determine; (4) by notice in writing to Lessee, cancel or terminate this Lease, without prejudice to any other remedies hereunder; (5) demand that Lessee, and Lessee shall, upon written demand of Lessor and at Lessee's expense forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 13 hereof, provided, however, that Lessee shall remain and be liable to Lessor for any amounts provided for herein or other damages resulting from the Equipment not being in the condition required by Section 12 hereof, and otherwise in accordance with all of the provisions of this Lease, except those provisions relating to periods of notice; (6) enter upon the premises of Lessee or other premises where any Item of Equipment may be located and, without notice to Lessee and with or without legal process, take possession of and remove all or any such Items of Equipment without liability to Lessor by reason of such entry or taking possession, and without such action constituting a cancellation or termination of this Lease unless Lessor notifies Lessee in writing to such effect; (7) by written notice to Lessee specifying a payment date (the "Remedy Date"), demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Remedy Date, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Rent due prior to the Remedy Date plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice (together with interest on such amount at the Default Rate from the Remedy Date to the date of actual payment): (i) an amount, with respect to an Item of Equipment, equal to the Rent payable for such Item of Equipment for the remainder of the then current Term thereof, after discounting such Rent to present worth as of the Remedy Date on the basis of a per annum rate of discount equal to three percent (3%) from the respective dates upon which such Rent would have been paid had this Lease not been canceled or terminated; or (ii) the Stipulated Loss Value, computed as of the Remedy Date or, if the Remedy Date is not a Rent Payment Date, the Rent Payment Date next following the Remedy Date (provided, however, that, with respect to any proceeds actually received by Lessor for any Item of Equipment returned to or repossessed by Lessor, Lessor agrees that it shall first apply such proceeds to satisfy Lessee's obligation to pay the Stipulated Loss Value or, if Lessor has received payment in full of the Stipulated Loss Value from Lessee, Lessor shall remit such proceeds to Lessee (after first deducting any Lessor Expense) up to the amount of the Stipulated Loss Value; (8) cause Lessee, at its expense, to promptly assemble any and all Items of Equipment and return the same to Lessor at such place as Lessor may designate in writing; and (9) exercise any other right or remedy available to Lessor under Applicable Law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof or to rescind this Lease. In addition, Lessee shall be liable, except as otherwise provided above, for any and all unpaid Rent due hereunder before or during the exercise of any of the foregoing remedies, and for reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies with respect thereto. If an Event of Default occurs, Lessee hereby agrees that ten (10) days prior notice to Lessee of (A) any public sale or (B) the time after which a private sale may be negotiated shall be conclusively deemed reasonable and, to the extent permitted by Applicable Law, Lessee waives all rights and defenses with respect to such disposition of the Equipment. None of Lessor's rights or remedies hereunder are intended to be exclusive of, but each shall be cumulative and in addition to any other right or remedy referred to hereunder or otherwise available to Lessor at

law or in equity, and no express or implied waiver by Lessor of any Event of Default shall constitute a waiver of any other Event of Default or a waiver of any of Lessor's rights.

23.   **Notices.** All notices and other communications hereunder shall be in writing and shall be transmitted by hand, overnight courier or certified mail (return receipt requested), postage prepaid. Such notices and other communications shall be addressed to the respective party at the address set forth above or at such other address as any party may from time to time designate by notice duly given in accordance with this Section. Such notices and other communications shall be effective upon the earlier of receipt or three (3) days after mailing if mailed in accordance with the terms of this Section.

24.   **General Indemnification.** (a) Lessee shall pay, and shall indemnify and hold Lessor harmless on an after-tax basis from and against, any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, liabilities, demands and judgments, and Liens, of any nature whatsoever (collectively, a "Liability") arising out of or in any way related to: (1) the Lease Documents, (2) the manufacture, purchase, ownership, selection, acceptance, rejection, possession, lease, sublease, operation, use, maintenance, documenting, inspection, control, loss, damage, destruction, removal, storage, surrender, sale, use, condition, delivery, nondelivery, return or other disposition of or any other matter relating to any Item of Equipment or any part or portion thereof (including, in each case and without limitation, latent or other defects, whether or not discoverable, any claim for patent, trademark or copyright infringement) and any and all Liabilities in any way relating to or arising out of injury to persons, properties or the environment or any and all Liabilities based on strict liability in tort, negligence, breach of warranties or violations of any regulatory law or requirement, (3) a failure to comply fully with Applicable Law and (4) Lessee's failure to perform any covenant, or Lessee's breach of any representation or warranty, hereunder; _provided_, that the foregoing indemnity shall not extend to the Liabilities to the extent resulting solely from the gross negligence or willful misconduct of Lessor.

  (b) Lessee shall promptly deliver to Lessor (1) copies of any documents received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency and (2) copies of any documents submitted by Lessee or any of its subsidiaries to the United States Environmental Protection Agency or to any state, county or municipal environmental or health agency concerning the Equipment or its operation.

25.   **Severability; Captions.** Any provision of this Lease or any Equipment Schedule which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction. Captions are intended for convenience or reference only, and shall not be construed to define, limit or describe the scope or intent of any provisions hereof.

26.   **Lessor's Expense.** Lessee shall pay all costs and expenses of Lessor, including, without limitation, reasonable attorneys' fees and other professional fees, the fees of any collection agencies and appraisers and all other costs and expenses related to any sale or re-lease of the Equipment (including storage costs), incurred by Lessor in enforcing any of the terms, conditions or provisions hereof or in protecting Lessor's rights hereunder (each a "Lessor Expense").

27.   **Related Equipment Schedules.** In the event that any Item of Equipment covered under any Equipment Schedule hereunder may become attached or affixed to, or used in connection with, Equipment covered under another Equipment Schedule hereunder (a "Related Equipment Schedule"), Lessee agrees that, if Lessee elects to exercise a purchase or renewal option under any such Equipment Schedule, or if Lessee elects to return the Equipment under any such Equipment Schedule pursuant to Section 13 hereof, then Lessor, in its sole discretion, may require that all Equipment leased under all Related Equipment Schedules be similarly disposed of.

28.   **Financial and Other Data.** During the Term hereof, Lessee shall furnish Lessor (a) as soon as available, and in any event within 120 days after the last day of each fiscal year, financial statements of Lessee and each

Guarantor and (b) from time to time as Lessor may reasonably request, other financial reports, information or data (including federal and state income tax returns) and quarterly or interim financial statements of Lessee and each Guarantor. All such information shall be audited (or if audited information is not available, compiled or reviewed) by an independent certified public accountant.

29.     [RESERVED]

30.     [RESERVED]

31.     <u>Representations and Warranties of Lessee</u>. Lessee represents and warrants that: (a) Lessee is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation; (b) the execution, delivery and performance of this Lease and all related instruments and documents: (1) have been duly authorized by all necessary corporate action on the part of Lessee, (2) do not require the approval of any stockholder, partner, trustee, or holder of any obligations of Lessee except such as have been duly obtained, and (3) do not and will not contravene any law, governmental rule, regulation or order now binding on Lessee, or the charter or by-laws of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien or encumbrance upon the property of Lessee under, any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its property is bound; (c) the Lease Documents, when entered into, will constitute legal, valid and binding obligations of Lessee enforceable against Lessee in accordance with the terms thereof; (d) there are no actions or proceedings to which Lessee is a party, and there are no other threatened actions or proceedings of which Lessee has knowledge, before any Governmental Authority, which, either individually or in the aggregate, would adversely affect the financial condition of Lessee, or the ability of Lessee to perform its obligations hereunder; (e) Lessee is not in default under any obligation for the payment of borrowed money, for the deferred purchase price of property or for the payment of any rent under any lease agreement which, either individually or in the aggregate, would have the same such effect; (f) under the laws of the state(s) in which the Equipment is to be located, the Equipment consists solely of personal property and not fixtures; (g) the financial statements of Lessee (copies of which have been furnished to Lessor) have been prepared in accordance with generally acceptable accounting principles consistently applied ("GAAP"), and fairly present Lessee's financial condition and the results of its operations as of the date of and for the period covered by such statements, and since the date of such statements there has been no material adverse change in such conditions or operations; (h) the address stated above is the chief place of business and chief executive office, or in the case of individuals, the primary residence, of Lessee; (i) Lessee does not conduct business under a trade, assumed or fictitious name; (j) the Equipment is being leased hereunder solely for business purposes and that no item of Equipment will be used for personal, family or household purposes; and (k) except as previously disclosed in writing to Lessor, neither Lessee nor any of its officers or directors (if a corporation), partners (if a partnership) or members (if a limited liability company) has, directly or indirectly, any financial interest in the Supplier.

32.     <u>Renewal And Purchase Options.</u> With respect to an Equipment Schedule and the Equipment Group set forth thereon, Lessee shall have the purchase and renewal options set forth in such Equipment Schedule.

33.     <u>Lessee's Waivers</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE (a) WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY SECTIONS 2A-508 THROUGH 2A-522 OF THE UNIFORM COMMERCIAL CODE AND (b)   ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE TO RECOVER INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM LESSOR FOR ANY BREACH OF WARRANTY OR FOR ANY OTHER REASON OR TO SETOFF OR DEDUCT ALL OR ANY PART OF ANY CLAIMED DAMAGES RESULTING FROM LESSOR'S DEFAULT, IF ANY, UNDER THIS LEASE *PROVIDED, HOWEVER*, THAT NO SUCH WAIVER SHALL PRECLUDE LESSEE FROM ASSERTING ANY SUCH CLAIM AGAINST LESSOR IN A SEPARATE CAUSE OF ACTION INCLUDING ANY CLAIM ARISING AS A RESULT OF LESSOR'S BREACH OF SECTION 38 HEREOF.

34.    **UCC Filings**. LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE DEEMED NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

35.    **Miscellaneous**. Time is of the essence with respect to this Lease. ANY FAILURE OF LESSOR TO REQUIRE STRICT PERFORMANCE BY LESSEE OR ANY WAIVER BY LESSOR OF ANY PROVISION HEREIN SHALL NOT BE CONSTRUED AS A CONSENT OR WAIVER OF ANY PROVISION OF THIS LEASE. This Lease and each Equipment Schedule shall be binding upon, and inure to the benefit of, the parties hereto, their permitted successors and assigns. This Lease will be binding upon Lessor only if executed by a duly authorized officer or representative of Lessor at Lessor's address set forth above. The Lease Documents shall be executed on Lessee's behalf by an Authorized Signer of Lessee. THIS LEASE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

36.    **Jury Trial Waiver**. LESSOR AND LESSEE HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THE LEASE, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH LESSOR OR LESSEE MAY BE PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. LESSEE AND LESSOR AGREE THAT THEIR RESPECTIVE RIGHT TO JURY TRIAL IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THIS AGREEMENT OR THE OTHER LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY LESSOR AND LESSEE WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE LEASE AND THE LEASE DOCUMENTS.

37.    **More than One Lessee**. If more than one person or entity executes the Lease Documents as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

38.    **Quiet Enjoyment**. So long as no Default or Event of Default has occurred and is continuing, Lessee shall peaceably hold and quietly enjoy the Equipment without interruption by Lessor or any person or entity claiming through Lessor.

39.    **Entire Agreement**.    This Lease, together with all other Lease Documents constitute the entire understanding or agreement between Lessor and Lessee with respect to the leasing of the Equipment, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. Neither this Lease nor any Equipment Schedule may be amended except by a writing signed by Lessor and Lessee.

Lessee's Initials: _____

40.    **Execution in Counterparts**. This Master Equipment Lease Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

---

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease as of the day and year first above written.

Lessor:                                                    Lessee:

KEYCORP LEASING,                                           CLARK CONSTRUCTION COMPANY, INC.
A DIVISION OF KEY CORPORATE CAPITAL INC.

By: _____                             X _____
Name:                                                      Name: Colby CLARK
Title:    SANDRA L. COSTANZO                               Title: PResid  ent
          REGIONAL LEASE CONTRACTS MANAGER

File No: 94-100.800



# Equipment Schedule No. 1

EQUIPMENT SCHEDULE NO. 1 dated as of November 1, 2000 (this "Schedule") between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Lessor"), and CLARK CONSTRUCTION COMPANY, INC., an Alabama corporation ("Lessee").

## INTRODUCTION:

Lessor and Lessee have heretofore entered into that certain Master Equipment Lease Agreement dated as of November 1, 2000 (the "Master Lease"; the Master Lease and this Schedule are hereinafter collectively referred to as, this "Lease"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings specified in the Master Lease. The Master Lease provides for the execution and delivery of a Schedule substantially in the form hereof for the purpose of confirming the acceptance and lease of the Equipment under this Lease as and when this Lease is delivered by Lessor to Lessee in accordance with the terms thereof and hereof.

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows:

## EQUIPMENT & INVOICING TERMS

1.    **EQUIPMENT.** Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the equipment listed on <u>Exhibit A</u> attached hereto (the "Equipment"). The aggregate Total Cost of such Equipment is $465,000.00.

2.    **TERM.** The Initial Term of this Lease with respect to the Equipment described on this Schedule shall commence on the date on which such Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on a date which is seventy-two (72) months after the Rent Commencement Date (the "Initial Term Expiration Date").

3.    **RENT PAYMENT DATES; RENT.** Lessee hereby agrees to pay Rent for the Equipment throughout the Initial Term in seventy-two (72) consecutive monthly installments payable in advance on the Rent Commencement Date and on the same day each month thereafter (each, a "Rent Payment Date"). Each such installment of Rent shall be in an amount equal to $7,101.08. In addition, Lessee hereby agrees to pay Rent for the period commencing on the Interim Rent Commencement Date (as defined below) and ending on the day before the Rent Commencement Date in an amount equal to $236.70 per day, and agrees that, with respect to the Equipment described on this Schedule, the following modifications are hereby made to the Master Lease: (a) "Rent Commencement Date" shall mean, with respect to an Equipment Group, the first (1st) day of the first month following the date of the Certificate of Acceptance for such Equipment Group, (b) "Interim Rent Commencement Date" shall mean, with respect to an Equipment Group, the date of the Certificate of Acceptance for such Equipment Group, or such later date (prior to the Rent Commencement Date) as determined by Lessor in its sole discretion, (c) Section 6 of the Master Lease ("Ordering Equipment") is hereby amended to delete the term "Rent Commencement Date" and to substitute the term "Interim Rent Commencement Date" in its place and (d) Section 22(a)(9) of the Master Lease ("Events of Default; Remedies") is hereby amended to delete the term "Rent Commencement Date" and to substitute the phrase "Rent Commencement Date or Interim Rent Commencement Date, as the case may be," in its place.

4.    EQUIPMENT LOCATION; BILLING ADDRESS.  The Equipment described on this Schedule shall be located at, and except as otherwise provided in this Lease, shall not be removed from, the following address:  Route 3, Box 15, Headland, AL 36345.  The billing address of Lessee is as follows:  CLARK CONSTRUCTION COMPANY, INC., P.O. Box 190, Headland, AL 36345.

**TRANSACTION TYPE TERMS**

5.    PURCHASE, RENEWAL AND OPTION TERMS.

(a) FMV Cap.  With respect to the Equipment described on this Schedule, Section 32 of the Master Lease ("Renewal and Purchase Options") is hereby deleted in its entirety and the following is substituted in its place:

So long as no Default or Event of Default shall have occurred and is continuing, then, upon not less than two hundred seventy (270) days but not more than three hundred sixty (360) days prior written notice to Lessor (the "Option Notice"), Lessee shall have the following purchase and renewal options at the expiration of the Initial Term, or any Renewal Term, to:

(i) purchase all, but not less than all, Items of the Equipment for a purchase price (the "Purchase Option Price") equal to the Fair Market Sale Value of such Items of Equipment, which shall not exceed eighteen and seventy-five hundredths percent (18.75%) of the Total Cost of the Equipment, plus applicable sales taxes; (ii) at the expiration of the Initial Term, to renew this Lease on a month to month basis at the same Rent payable at the expiration of the Initial Term, (iii) at the expiration of the Initial Term, to renew this Lease for a minimum period of not less than twelve (12) consecutive months at the then current Fair Market Rental Value; or (iv) return such Equipment to Lessor pursuant to, and in the condition required, by the Lease.  If Lessee fails to give Lessor the Option Notice at least ninety (90) days before the expiration of the Initial Term, Lessee shall be deemed to have chosen option (ii) above.

If Lessee exercises option (i) above, then payment of the Purchase Option Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) on or before the last day of the Initial Term or any Renewal Term, as the case may be, shall be made on the last day of the Initial Term or any Renewal Term, as the case may be, in immediately available funds against delivery of a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES.

6.    NATURE OF TRANSACTION; TRUE LEASE.  (a) It is the express intent of the parties that this Lease constitute a true lease and not a sale of the Equipment. Title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, title, property, right, equity, or interest in the Equipment other than its leasehold interest solely as Lessee subject to all the terms and conditions hereof. To the extent that Article 2A ("Article 2A") of the Uniform Commercial Code ("UCC") applies to the characterization of this Lease, the parties hereby agree that this Lease is a "Finance Lease" as defined therein. Lessee acknowledges: (i) that Lessee has selected the "Supplier" (as defined in the UCC) and has directed Lessor to purchase the Equipment from the Supplier in connection with this Lease, and (ii) that Lessee has been informed in writing in this Lease, before Lessee's execution of this Lease, that Lessee is entitled under Article 2A to the promises and warranties, including those of any third party, provided to Lessor by the Supplier in connection with or as part of the Purchase Agreement, and that Lessee may communicate with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies. The filing of UCC financing statements pursuant to Section 34 of the Master Lease is precautionary and shall not be deemed to have any effect on the characterization of this Lease. NOTWITHSTANDING THE FOREGOING, LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS ANY ADVICE, REPRESENTATIONS, WARRANTIES AND COVENANTS, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO ANY LEGAL, ECONOMIC,

ACCOUNTING, TAX OR OTHER EFFECTS OF THE LEASE AND THE TRANSACTION(S) CONTEMPLATED THEREBY, AND LESSEE HEREBY DISCLAIMS ANY RELIANCE ON ANY SUCH WARRANTIES, STATEMENTS OR REPRESENTATIONS MADE BY LESSOR WITH RESPECT THERETO.

(b) Notwithstanding the express intent of Lessor and Lessee that this agreement constitute a true lease and not a sale of the Equipment, should a court of competent jurisdiction determine that this agreement is not a true lease, but rather one intended as security, then solely in that event and for the expressly limited purposes thereof, Lessee shall be deemed to have hereby granted Lessor a security interest in the Equipment and all accessions, substitutions and replacements thereto and therefor, and proceeds (cash and non-cash), including, without limitation, insurance proceeds thereof (but without power of sale), to secure the prompt payment and performance as and when due of all obligations and indebtedness of Lessee, now existing or hereafter created, to Lessee pursuant to this Lease or otherwise. In furtherance of the foregoing, Lessee shall execute and deliver to Lessor, to be filed at Lessee's expense, Uniform Commercial Code financing statements, statements of amendment and statements of continuation as reasonably may be required by Lessor to perfect and maintain perfected such security interest.

(c) In the event that the Supplier erroneously invoices Lessee for the Equipment, Lessee agrees to forward said invoice to Lessor immediately. Lessee acknowledges that the Equipment is, and shall at all times remain, the property of Lessor, and that Lessee has no right, title or interest therein or thereto except as expressly set forth in this Lease.

7.    TAX INDEMNIFICATION. (a) Lessee acknowledges that Lessor has executed this Lease, and that the Rent payable by Lessee under this Lease has been computed, upon the assumptions that Lessor will (i) be entitled to depreciation or cost recovery deductions ("MACRS Deductions") for Federal income tax purposes under the Modified Accelerated Cost Recovery System provided for in Section 168 of the Internal Revenue Code of 1986, as amended (the "Code"), and depreciation or cost recovery deductions ("State Depreciation Deductions") for state income tax purposes for the Equipment Location, in each case on the basis that (1) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (2) the initial tax basis for each Item of Equipment will be equal to the Total Cost, (3) deductions for each Item of Equipment will be computed by using the method specified in Section 168(b)(1) of the Code over the 5-year recovery period described in Section 168(c) of the Code, and (4) the applicable convention for each Item of Equipment under Section 168(d) of the Code is the half-year convention; (ii) be entitled to deductions for Federal income tax purposes (available in the manner and as provided by Section 163 of the Code) for interest payable with respect to any indebtedness incurred by Lessor in connection with any financing by Lessor of any portion of the Total Cost of each Item of Equipment ("Interest Deductions"); and (iii) be subject to tax for each year at a composite Federal and New York corporate income tax rate equal to the then highest marginal rate for corporations provided for under the Code and the laws of New York (the "Highest Marginal Tax Rate"). The MACRS Deductions, State Depreciation Deductions and Interest Deductions are hereinafter collectively referred to as the "Tax Benefits".

(b) Lessee represents and warrants to Lessor that (i) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (ii) Lessee shall not attempt to claim such Tax Benefits, (iii) at and after the time of delivery of the Equipment to Lessee pursuant to this Lease the Lessee shall not claim any ownership or title in and to the Equipment, and (iv) Lessee has not, and will not, at any time after such delivery throughout the Term of this Lease, take any action or omit to take any action (whether or not the same is permitted or required hereunder) which will result in the loss by Lessor of all or any part of such Tax Benefits.

(c) If, as a result of any act, omission or misrepresentation of Lessee, (x) the Tax Benefits are lost, disallowed, deferred, eliminated, reduced, recaptured, compromised or otherwise unavailable to Lessor, (y) for Federal, foreign, state or local income tax purposes, any item of income, loss or deduction with respect to any Item of Equipment is treated as derived from, or allocable to, sources outside the United States, or (z) there shall be included in the gross income of Lessor for Federal, state or local income tax purposes any amount on account of any addition, modification, substitution or improvement to or in respect of any Item of Equipment made or paid for by Lessee (any of the foregoing being hereinafter a "Tax Loss"), then, within thirty (30) days of Lessee's receipt

of written notice from Lessor that such a Tax Loss has occurred, Lessee shall pay to Lessor an amount which, after deduction therefrom of all taxes to be paid in respect of the receipt thereof, will enable Lessor to receive the same Net Economic Return (as hereinafter defined) that Lessor would have realized on this Lease had such Tax Loss (together with any interest, penalties or additions to tax) not occurred. Any event which, by the terms of this Lease, requires payment by Lessee to Lessor of the Stipulated Loss Value of the Equipment shall not constitute the act of Lessee for purpose of the foregoing sentence.

(d) As used in this Section, the term "Net Economic Return" shall mean Lessor's net after-tax yield, aggregate after-tax cash flow and return on assets, based on (i) the assumptions used by Lessor in originally calculating Rent and Stipulated Loss Value percentages, including the assumptions set forth above (as such assumptions may have been revised pursuant to the last sentence of this subsection) and (ii) the Highest Marginal Tax Rate actually in effect during each year from the date of such original calculations to the date of such Tax Loss, both dates inclusive. In the event Lessor shall suffer a Tax Loss with respect to which Lessee is required to pay an indemnity hereunder, and the full amount of such indemnity has been paid or provided for hereunder, the aforesaid assumptions, without further act of the parties hereto, shall thereupon be and be deemed to be amended, if and to the extent appropriate, to reflect such Tax Loss.

(e) For purposes of this Section, the term "Lessor" shall include the entity or entities, if any, with which Lessor consolidates any tax return. Lessee acknowledges that it has neither sought nor received tax advice from Lessor as to the availability to Lessee of any tax benefits with respect to the Equipment. All of Lessor's rights and privileges arising from the indemnities contained in this Lease will survive the expiration or other termination or cancellation of this Lease. Such indemnities are expressly made for the benefit of, and are enforceable by, Lessor and its successors and assigns.

8.    **STIPULATED LOSS VALUE; DISCOUNT RATE.** (a) The Stipulated Loss Values applicable to the Equipment and this Lease are as set forth on a supplement (the "Stipulated Loss Value Supplement") prepared by Lessor.

(b) Any provision of this Lease to the contrary notwithstanding, all present value calculations to be made with respect to the Equipment described on this Schedule shall be made using a discount rate equal to three percent (3%).

9.    **PERSONAL PROPERTY TAX.** Unless otherwise directed in writing by Lessor or required by Applicable Law, Lessee will not list itself as owner of any Item of Equipment for property tax purposes. Upon receipt by Lessee of any property tax bill pertaining to such Item of Equipment from the appropriate taxing authority, Lessee will promptly forward such property tax bill to Lessor. Upon receipt by Lessor of any such property tax bill (whether from Lessee or directly from the taxing authority), Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

10.    **MODIFICATIONS TO MASTER LEASE.** With respect to the Equipment described on this Schedule, the Master Lease shall be modified as follows:

(a)    [RESERVED]

(b) Section 22(b)(7) of the Master Lease ("Events of Default; Remedies"), is hereby amended by adding the following after the first parenthetical "demand that Lessee forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 22(b)(5) hereof and in addition".

---

## MISCELLANEOUS TERMS & CONDITIONS

**11.    ADDITIONAL MAINTENANCE REQUIREMENTS.** Section 13 of the Master Lease ("Return of Equipment") shall be deleted in its entirety and the following substituted in its place:

**Return of Equipment.** (a)  Upon the expiration of the Term of any Lease or upon demand by Lessor pursuant to Section 22 hereof, Lessee, at its sole expense, shall return all of the Equipment leased under the Lease by delivering it in a manner consistent with the manufacturer's recommendations and practices to such place or on board such carrier (packed properly and in accordance with the manufacturer's instructions) as Lessor shall specify.  Lessee agrees that the Equipment, when returned, shall be free and clear of all Liens, and in the same condition as when delivered to Lessee, reasonable wear and tear excepted.  Reasonable wear and tear shall mean that each item of the Equipment has been maintained by Lessee in "Average Saleable Condition" (as hereinafter defined) and that all components of the Equipment have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment.  If, in the opinion of Lessor, any item of the Equipment fails to meet the standards set forth in this Section 13, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing the Equipment, restoring it to such condition so as to meet such standards and assembling and delivering such Item of Equipment pursuant to Lessor's instructions.  If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

(b)  Lessee shall give Lessor at least two hundred seventy (270), but not more than three hundred sixty (360) days written notice that Lessee is returning the Equipment as provided for above (the "Return Notice") and shall include with such notice, all of the following:

(i)     a detailed inventory of all components of the Equipment including without limitation all of the model and serial numbers of any components;

(ii)     a complete set of current and up to date service and operating manuals for each Item of Equipment;

(iii)    a complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment;

(iv)    an in-depth field service report (the "Report") detailing the results of an inspection conducted by a representative of the manufacturer or a qualified equipment maintenance provider acceptable to Lessor certifying that the Equipment has been properly inspected, examined, tested and is operating within the manufacturer's specifications and addressing, at a minimum the following areas:

(A)    comprehensive physical inspection;

(B)    testing of all material and workmanship of the Equipment; and

(C)    conformation of all Equipment operations to Applicable Law and confirming that the Equipment is otherwise in Average Saleable Condition (as hereinafter defined).

If the Report discloses that any of the material, workmanship or Equipment does not meet or, does not operate within, the manufacturer's specifications or any Applicable Law, Lessee shall, at its sole expense, take all necessary corrective measures and submit a second Report from the same inspector evidencing that the Equipment has been brought into conformity with the manufacturer's specifications and Applicable Law.

(c)  "Average Saleable Condition" shall mean that all of the following minimum standards have been met:

*Construction Equipment*

(i) The Equipment has been, or will be, disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, including the proper blueprinting, mapping, tagging and labeling of each individual part including cables, electrical components and wires, all process fluids and/or any hazardous materials have been removed from the Equipment and disposed of in accordance with Applicable Law.

(ii) The Equipment is complete with all manuals, maintenance records, log books, plans, drawings and schematics, inspection and overhaul records, operating requirements or other materials pertinent to the Equipment's operation, maintenance, assembly and disassembly.

(iii) There is no structural or mechanical damage, frame, and the structural members and accessories are structurally sound without breaks or cracks, in compliance with Applicable Law and the engine, hydraulics and transmission all operate properly at fully rated loads.

(iv) Transmissions shift properly at full rated loads and speeds, the mechanical drive train, differentials and final drives are in good condition and operate quietly without vibrations or leaks.

(v) Tires are matched by generic type and tread design and have at least 50% of tread life remaining with no flats, contain no dry rot on sidewalls, rims or disc wheels have no split base rims and are in recappable condition; track components have at least 50% wear remaining.

(vi) Equipment with predictable or scheduled replacements or overhaul lives including but not limited to tires, track components, power train assembly, transmissions, converters, engines hydraulics, axles, wheels, brakes, pumps, diggers, buckets, blades, rippers and other attachments (including cutting edges) have not less than 50% useful life remaining before the next such replacement or overhaul and all cutting edges and other wear points have at least 50% of their respective material design lives remaining.

(vii) All ground engaging tools (buckets, blades, rippers) and cabs, canopies, enclosures, lights and other accessories are in good condition and appearance. Drill to be in good operable condition, ready for immediate use.

(viii) Periodic adjustments and inspections have been performed, and all lubricants and hydraulic oils have been changed, Lessee has maintained written records of preventative maintenance and repairs indicating date and hour meter readings verified by parts invoices, copies of these records are available to Lessor on demand and all oil and hydraulic fluid samples are clean and with no dirt or other foreign substances in either the oil or any other operating fluids.

(ix) A complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment are available to be returned with the Equipment.

(x) All Equipment has been cleaned and treated with respect to rust, corrosion and appearance in accordance with the manufacturer's recommendations and consistent with the best practices of dealers in similar used equipment, and the Equipment is painted in the same color scheme as when it was originally delivered to the Lessee. Equipment upon its return, shall have been pressure-washed.

(xi) Annual hour usage has not exceeded two thousand two hundred (2,200) hours, but Lessee agrees that additional hours used will be chargeable to Lessee at the rate of Twenty Five Dollars ($25.00) per hour.

(d) In addition to all other rights of Lessor under the Lease, Lessor shall have the right to attempt to resell or auction the Equipment from Lessee's facility with the Lessee's full cooperation and assistance, for a period commencing with Lessor's receipt of the Return Notice and ending one hundred eighty (180) days after the Initial Term Expiration Date. Lessee agrees to pay the reasonable costs and expenses of such sale or auction (and all storage prior thereto), and agrees that the Equipment shall remain capable of operation during this period. Lessee

Form No: 96-102.800

shall provide adequate electrical power, lighting, heat, water and all other requirements sufficient to allow for normal maintenance and for demonstrations of the Equipment to any potential buyer.

12.      **GOVERNING LAW.** This Schedule is being delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance without giving effect to any choice of law or conflict of laws provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

13.      **COUNTERPARTS.** This Schedule may be executed in any number of counterparts, each executed counterpart constituting an original but all together one and the same instrument.

14.      **MORE THAN ONE LESSEE.** If more than one person or entity executes this Schedule, or any other Lease Documents executed in connection herewith, as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

15.      **RELATIONSHIP TO MASTER LEASE; FURTHER ASSURANCES.** This Schedule shall be construed in connection with and as part of this Lease, and all terms contained in the Master Lease are hereby incorporated herein by reference with the same force and effect as if such terms were fully stated herein. By execution of this Schedule, Lessee and Lessor reaffirm all terms of the Master Lease except as they may be modified hereby. To the extent that any of the terms of this Schedule are contrary to or inconsistent with any terms of the Master Lease, the terms of this Schedule shall govern. **LESSEE HEREBY CERTIFIES TO LESSOR THAT THE REPRESENTATIONS AND WARRANTIES MADE BY LESSEE IN THE MASTER LEASE (INCLUDING, WITHOUT LIMITATION, SECTION 31 THEREOF) ARE TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS SCHEDULE WITH THE SAME EFFECT AS THOUGH MADE ON AND AS OF SUCH DATE.** Lessee shall take such additional actions and execute and deliver such additional documents as Lessor shall deem necessary from time to time to effectuate the terms of this Lease.

*(Signature page to follow)*

---

16.    POWER OF ATTORNEY.  LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Schedule to be duly executed and delivered on the day and year first above written.

Lessor:                                              Lessee:

KEYCORP LEASING,                                    CLARK CONSTRUCTION COMPANY, INC.
A DIVISION OF KEY CORPORATE CAPITAL INC.
By:                                                 X
Name:  SANDRA L. COSTANZO                           Name: COLBY CLARK
Title:  REGIONAL LEASE CONTRACTS MANAGER            Title: President

COUNTERPART NO. 1 OF 1 SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

# Exhibit A

## EQUIPMENT DESCRIPTION

**Lessor:**  KEYCORP LEASING,
A DIVISION OF KEY CORPORATE CAPITAL INC.

**Lessee:**  CLARK CONSTRUCTION COMPANY, INC.

**Lease:**  Equipment Schedule No. 1 dated as of November 1, 2000
Master Equipment Lease Agreement Dated as of November 1, 2000

---

**Vendor:**  WATSON, INCORPORATED
4015 S. FREEWAY, P.O. BOX 11098
FORT WORTH, TX 76110

| Quantity: | Description: | Serial No. | Invoice No. |
|---|---|---|---|
| 1 | 1998 WATSON MODEL 3100 CM CRAWLER MOUNTED DRILL UNIT | 37 | 20774 |
| 1 | ENGINE: CUMMINS 6CT8.3 LITER 201HP | 45638658 | 20774 |
| 1 | TRANSMISSION: CLARK POWERSHIFT, MODEL 13.7HR 28470-1, KELLEY: 8" OUTER (1/2' WALL) 6" INNER (5/8" WALL) X 80' DRILL DEPTH | YUSA 128302 | 20774 |

Form No: 96-102.500

# EXHIBIT "C"



Customer Number: 32567
Lessee Number: 32568

# Personal Guaranty
(Lease)

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in order to induce KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("KCL") to make loans and extend credit to CLARK CONSTRUCTION COMPANY, INC. ("Lessee"), with its principal place of business at Route 3, Box 15, Headland, Alabama 36345 providing for the financing of certain equipment (the "Equipment") the undersigned, MR. COLBERT F. CLARK ("Guarantor"), residing at the address listed below, hereby absolutely unconditionally and irrevocably guarantees to KCL the full and prompt payment and performance by Lessee of all Obligations (as that term is defined below), on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

1.    **Definitions:** The following words shall have the following meanings in this Guaranty:

"Guaranty" means this Personal Guaranty made by Guarantor for the benefit of KCL.

"Lease Documents" shall have the meaning set forth in the Master Lease, or if not defined in the Master Lease, as used herein the term Lease Documents shall mean all documents prepared by Lessor and now or hereafter executed in connection with the Master Lease.

"Obligations" means the liability of Guarantor hereunder for the obligations of Lessee under the Lease Documents, including, without limitation, the payment when due of all Rent and all other sums currently or hereafter owing by Lessee to KCL thereunder, including costs, expenses and attorneys fees incurred by KCL in connection therewith.

"Other Guarantor" means any other guarantor of the Obligations.

"Other Guarantees" means any guaranty by any Other Guarantor.

Capitalized terms not otherwise defined herein have the meaning given in the Master Equipment Lease Agreement between KCL as Lessor and Lessee dated as of November 1, 2000 (the "Master Lease").

2.    **Nature of Guaranty.** Guarantor's liability under this Guaranty shall be absolute, primary and direct. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Obligations. KCL shall not be required to pursue any right or remedy it may have against Lessee under the Lease Documents or otherwise (and shall not be required first to commence any action or obtain any judgment against Lessee) before enforcing this Guaranty against Guarantor.

3.    **Guarantor's Representations and Warranties.** Guarantor warrants and represents to KCL that (a) the execution, delivery and performance of this Guaranty will not result in a breach of, or constitute a default under, or result in the creation of any security interest, lien, charge or encumbrance upon any property or assets of Guarantor pursuant to any loan agreement, indenture or contract to which Guarantor is a party or by or under which it is bound; (b) this Guaranty is executed at Lessee's request and not at the request of KCL; (c) Guarantor is a owner of Lessee and the lease of the Equipment to be made by KCL to Lessee will result in a direct or indirect material economic benefit to Guarantor; (d) KCL has made no representation to Guarantor as to the creditworthiness of Lessee; (e) Guarantor has means to and shall keep adequately informed regarding Lessee's financial condition and KCL shall have no obligation to disclose to Guarantor any information regarding Lessee.

4.    **Guarantor Waivers.** Guarantor expressly waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor or both, in any action or proceeding, in any court, arising on, out of, under, by virtue of, or in any way relating to the Lease Documents, this Guaranty or the transactions contemplated thereby or hereby. Guarantor agrees that this Guaranty shall be valid, enforceable and unconditionally binding upon Guarantor regardless of: (a) the reorganization, merger or consolidation of Lessee into or with another entity, corporate or otherwise, or the sale or

other disposition of all or substantially all of the capital stock, business or assets of Lessee to any other person or party; (b) the death or dissolution of Lessee, Guarantor or any Other Guarantor; (c) the voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of Lessee, Guarantor or any Other Guarantor; (d) the granting by KCL of any indulgences or extensions to Lessee, Guarantor or any Other Guarantor; (e) the assertion by KCL against Lessee, Guarantor or any Other Guarantor of any of KCL's rights and remedies provided for under the Lease Documents or existing in its favor in law, equity or bankruptcy; (f) the release of Lessee, Guarantor or any Other Guarantor from any Obligations under the Lease Documents, this Guaranty or any Other Guarantees by KCL or by operation of law or otherwise; (g) any invalidity, irregularity, defect or unenforceability of any provision of any of the Lease Documents, this Guaranty or any Other Guarantees; (h) any defenses given to guarantors at law or in equity other than actual payment and performance of the Obligations; or (i) the destruction, sale, modification or alteration of any item of the Equipment.

Guarantor hereby waives notice of and consents to (a) the financing by Lessee of the Equipment, and to any subleasing or other use of the Equipment permitted by KCL (regardless of who any such sublessee or user may be), (b) all of the provisions of the Lease Documents, and any amendments, qualifications and extensions thereof, and any actions taken thereunder, and (c) the execution by Lessee of the foregoing documents and of any other agreements, documents and instruments executed by Lessee in connection therewith. Guarantor further waives notice of KCL's acceptance of this Guaranty, of any default and non-payment and/or non-performance by Lessee under the Lease Documents, of presentment, protest and demand, and of all other matters to which Guarantor might otherwise be entitled. Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any renewal, modification or extension of the term of the Lease Documents or of the terms and conditions of the Lease Documents. Guarantor hereby expressly waives all notice of and consents to any such renewal, modification or extension, and to the execution by Lessee of any documents pertaining to any such renewal, modification or extension. GUARANTOR CONFIRMS THAT THE FOREGOING WAIVER IS INFORMED AND VOLUNTARY.

5.    KCL Waiver.  KCL shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by KCL. No delay or omission on the part of KCL in exercising any right shall operate as a waiver of such right or any other right. Guarantor hereby agrees that the failure of KCL to insist in any one or more instances upon a strict performance or observance of any of the terms, provisions or covenants of this Guaranty or the Lease Documents, or to exercise any of its rights thereunder or hereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants or rights, but such terms, provisions, covenants and rights shall continue and remain in full force and effect and shall be enforceable under this Guaranty. No delay or failure by KCL to exercise any right or remedy against Lessee or any Other Guarantor will be construed as a waiver of that right or remedy or as a waiver of any right or remedy against Guarantor. All remedies of KCL against the Lessee, Guarantor and the Other Guarantors are cumulative. Receipt by KCL of any payments or other sums payable under the Lease Documents with knowledge that Lessee has breached any of the terms, provisions or covenants of the Lease Documents shall not be deemed to be a waiver by KCL of such breach, or a release or relinquishment of any claim for future performance under the Lease Documents or this Guaranty.

6.    Subordination/Subrogation.    Guarantor specifically waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Lessee or any other person or entity directly or contingently liable for the Obligations guaranteed hereunder, or against or with respect to the Lessee's property (including, without limitation, property collateralizing the Lease Documents), arising from the existence or performance of this Guaranty.

The liability of Guarantor under this Guaranty, and of any Other Guarantors, if any, under Other Guarantees given in favor of KCL in connection with the Lease Documents, shall be joint and several and shall be irrevocable, unconditional and absolute, continuing in full force and effect according to its terms, until all of the Obligations hereby guaranteed have been fully satisfied. Guarantor covenants and agrees that any indebtedness of Lessee to Guarantor is hereby subordinated to the obligations of Lessee to KCL, and that after any default under the Lease Documents or any of the other documents evidencing the transactions contemplated hereby, Guarantor shall hold

any funds received from Lessee in trust for KCL to satisfy the obligations of Lessee to KCL and shall forthwith deliver such funds to KCL in the form received. This subordination of the indebtedness and other obligations shall continue until all of the Obligations have been paid, performed and satisfied in full.

7.    <u>Assignment</u>. This Guaranty is assignable by KCL without notice to Guarantor and Guarantor consents thereto. Guarantor's obligations under this Guaranty may not be delegated to any other person or entity without the prior written consent of KCL. Any assignee of KCL shall have all of the rights of KCL hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to such assignee in the first instance. This Guaranty shall inure to the benefit of KCL, and its successors and assigns, and shall be binding upon Guarantor and its heirs, administrators, successors and assigns.

8.    <u>Severability/Governing Law</u>. If any provision of this Guaranty is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent that it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be construed liberally in favor of KCL in order to effect the provisions hereof. This Guaranty shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflicts of laws principles of such state. Guarantor agrees to pay upon demand all of KCL's costs and expenses, including reasonable attorneys' fees and court costs, in enforcing payment under this Guaranty, or in the prosecution or defense of any action or proceeding by or against KCL or the Guarantor concerning any matter arising out of or connected herewith, including without limitation any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code.

9.    <u>Jury Trial Waiver</u>. GUARANTOR HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR MAY BE A PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THE LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY GUARANTOR WHO ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE THIS GUARANTY OR THE LEASE DOCUMENTS.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the _3_ (Day) day of _November_ (Month), _2000_ (Year).

MR. COLBERT F. CLARK

_Colbert F Clark_

Guarantor's Residence Address: _147 Marshfield Lane_

_Dothan, AL 36305_

Guarantor's SS#: _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_

STATE OF _ALABAMA_ )
COUNTY OF _BARBOUR_ ) ss.:
)

On this _3 Rd_ (Day) day of _November_ (Month), _2000_ (Year), before me the subscriber personally appeared _Colbert F. Clark_ who being by me duly sworn, did depose and say; that he/she resides at _____, that he/she is the person described in and who executed the foregoing instrument; and that he/she signed his name thereto freely and of his/her own volition.

_Jolene Gothard_
NOTARY PUBLIC

My Commission Expires:
:: _12-10-03_



Customer Number: 32567
Lease Number: 32568
Lease Number: 8800020034

# Certificate of Authority

**Definitions:**  "Company" shall mean CLARK CONSTRUCTION COMPANY, INC., an Alabama corporation.

"Governing Body" shall mean the Company's Board of Directors.

"Organizational Documents" shall mean the Company's Certificate of Incorporation, Articles of Incorporation or By-laws.

"Transaction Documents" shall mean all documents relating to the financing of certain items of personal property described in a Master Equipment Lease Agreement, any Security Agreement or Guaranty and various equipment schedules, promissory notes and other documents (including master security agreements, progress payment documents, assignment and assumption agreements and bills of sale) from time to time entered into with respect thereto between KeyCorp Leasing, a Division of Key Corporate Capital Inc. ("KCL") and Company.

A. The undersigned hereby certifies (a) that (s)he is a duly elected, qualified and serving officer or representative of the Company, (b) that (s)he [ ] is [X] is not the Company's sole elected corporate officer and owner of 100% of the issued and outstanding stock of Company and (c) that:

1.  The execution, delivery and performance of the Transaction Documents have been duly authorized by the Company and have been or will be duly and validly executed and delivered on behalf of Company if executed by the persons whose names, titles and signatures appear below (the "Authorized Signers"); the Authorized Signers have been duly elected, qualified and are acting officers and/or authorized signatories of the Company holding the offices indicated and that the signatures appearing opposite their names are the genuine signatures of such Authorized Signers.

2.  The Company's execution, delivery and performance of the Transaction Documents (a) do not conflict with or result in the breach of any provisions of the Organizational Documents of the Company, or of any agreement or other instrument to which the Company is a party or by which it is bound, or, to its knowledge, any applicable law, judgment, order, writ, injunction decree, rule or regulation of any court, administrative agency or other governmental authority or constitute a default under any thereof, (b) do not require the consent, approval or other authorization of or by any court, administrative agency or other authority or person and (c) have been duly authorized by all necessary action on the part of the Company, including its adoption of the following resolutions on  December 1 , 2000 .

BE IT RESOLVED, that any one (1) of the following named officers or agents of this Company, whose actual signatures are shown below:

| NAME OF SIGNATORY | TITLE OF SIGNATORY | SIGNATURE |
|---|---|---|
| Colby Clark | Pres., Sec. Treas. | *[signature]* |
| Marcus A. Davis Jr | V P | *[signature]* |

acting for and on behalf of the Company, and as its act and deed be, and they hereby are, authorized and empowered to:

Form No: 98-105.800

Customer Number: 32567
Lease Number: 32568
Lease Number: 8800020034

*One.*  Lease equipment or borrow money from and/or create or incur liability to, KCL upon such terms and conditions as may be agreed, and to execute such leases, notes, loan agreements, security agreements, guarantys or other evidence of indebtedness and renewals thereof; and to sell, assign, transfer, mortgage or pledge any and all personal property of the Company as security for any monies borrowed or any liability incurred to KCL under any Transaction Documents; and

*Two:*  Execute and deliver the Transaction Documents or other papers as may be necessary or desirable in order to consummate the transactions therein contemplated, and that all actions heretofore taken or taken hereinafter by an Authorized Signer of the Company in furtherance of the actions herein authorized are ratified, confirmed, adopted and approved in all respects.

BE IT FURTHER RESOLVED, that as to any guaranty given to KCL by the Company, the Company shall, and hereby does, acknowledge that the financing of the Equipment so guaranteed will result in a direct or indirect material economic benefit to the Company.

3.  KCL and its successors and assigns are authorized to rely on this Certificate of Authority until forty five (45) days after the receipt by KCL of written notice from an Authorized Signer of the Company expressly advising KCL that this Certificate may no longer be relied upon. Any such notice shall be mailed or hand delivered to KeyCorp Leasing, 54 State Street, PO Box 1865, Albany, NY 12201-1865.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company on the date set forth below.

[AFFIX SEAL]

By: *Leigh Hughes*
Do **NOT** sign both here and above unless you checked "is" in item A above.
Name: Leigh Hughes
Title: Admin- Asst.

Date: December    1    , 20 00



## Equipment Schedule No. 02

EQUIPMENT SCHEDULE NO. 02 dated as of January 22, 2001 (this "Schedule") between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Lessor"), and Clark Construction Company, Inc., an Alabama corporation ("Lessee").

### INTRODUCTION:

Lessor and Lessee have heretofore entered into that certain Master Equipment Lease Agreement dated as of November 1, 2000 (the "Master Lease"; the Master Lease and this Schedule are hereinafter collectively referred to as, this "Lease"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings specified in the Master Lease. The Master Lease provides for the execution and delivery of a Schedule substantially in the form hereof for the purpose of confirming the acceptance and lease of the Equipment under this Lease as and when this Lease is delivered by Lessor to Lessee in accordance with the terms thereof and hereof.

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows:

### EQUIPMENT & INVOICING TERMS

1.      EQUIPMENT. Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the equipment listed on Exhibit A attached hereto (the "Equipment"). The aggregate Total Cost of such Equipment is $217,189.00.

2.      TERM. The Initial Term of this Lease with respect to the Equipment described on this Schedule shall commence on the date on which such Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on a date which is 84 months after the Rent Commencement Date (the "Initial Term Expiration Date").

3.      RENT PAYMENT DATES; RENT. Lessee hereby agrees to pay Rent for the Equipment throughout the Initial Term in eighty-four (84) consecutive monthly installments payable in advance on the Rent Commencement Date and on the same day each month thereafter (each, a "Rent Payment Date"). Each such installment of Rent shall be in an amount equal to $2,911.58. In addition, Lessee hereby agrees to pay Rent for the period commencing on the Interim Rent Commencement Date (as defined below) and ending on the day before the Rent Commencement Date in an amount equal to $97.05 per day, and agrees that, with respect to the Equipment described on this Schedule, the following modifications are hereby made to the Master Lease: (a) "Rent Commencement Date" shall mean, with respect to an Equipment Group, the first (1st) day of the first month following the date of the Certificate of Acceptance for such Equipment Group, (b) "Interim Rent Commencement Date" shall mean, with respect to an Equipment Group, the date of the Certificate of Acceptance for such Equipment Group, or such later date (prior to the Rent Commencement Date) as determined by Lessor in its sole discretion, (c) Section 6 of the Master Lease ("Ordering Equipment") is hereby amended to delete the term "Rent Commencement Date" and to substitute the term "Interim Rent Commencement Date" in its place and (d) Section 22(a)(9) of the Master Lease ("Events of Default; Remedies") is hereby amended to delete the term "Rent Commencement Date" and to substitute the phrase "Rent Commencement Date or Interim Rent Commencement Date, as the case may be," in its place.

---

4.    EQUIPMENT LOCATION; BILLING ADDRESS. The Equipment described on this Schedule shall be located at, and except as otherwise provided in this Lease, shall not be removed from, the following address: Route 3, Box 15, Headland, AL 36345. The billing address of Lessee is as follows: Clark Construction Company, Inc., P.O. Box 190, Headland, AL 36345.

## TRANSACTION TYPE TERMS

5.    PURCHASE, RENEWAL AND OPTION TERMS.

(a) FMV. With respect to the Equipment described on this Schedule, Section 32 of the Master Lease ("Renewal and Purchase Options") is hereby deleted in its entirety and the following is substituted in its place:

So long as no Default or Event of Default shall have occurred and be continuing and Lessee shall have given Lessor at least ninety (90) days but not more than one hundred eighty (180) days prior written notice (the "Option Notice"), Lessee shall have the following purchase and renewal options at the expiration of the Initial Term, or any Renewal Term, to:

(i) purchase all, but not less than all, Items of Equipment for a purchase price (the "Purchase Option Price") equal to the then Fair Market Sale Value thereof; (ii) renew this Lease on a month to month basis at the same Rent payable at the expiration of such Initial Term or Renewal Term, as the case may be; (iii) renew this Lease for a minimum period of not less than twelve (12) consecutive months at the then current Fair Market Rental Value; or (iv) return such Equipment to Lessor pursuant to, and in the condition required by, the Lease. If Lessee fails to give Lessor the Option Notice, Lessee shall be deemed to have chosen option (ii) above.

Payment of the Purchase Option Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) during such Initial Term and Renewal Term shall be made on the last day of the Initial Term or Renewal Term, as the case may be, in immediately available funds against delivery of a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.    LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES.

(b) Early Buyout Option. So long as no Default or Event of Default shall have occurred and be continuing, Lessee shall have the option to purchase all, but not less than all, Items of Equipment on the date which is seventy-two (72) months after the Rent Commencement Date (the "EBO Date") at a price (the "EBO Price") equal to thirty-two and seventy-five hundredths percent (32.75%) of the Total Cost of the Equipment, plus any applicable sales taxes. For Lessee to exercise its option hereunder, Lessee shall notify Lessor in writing of its desire to effect such option at least ninety (90) days (but not more than one hundred eighty (180) days) prior to the EBO Date. Such notice shall be irrevocable. The EBO Price represents the parties present best estimate of the fair market value of the Equipment on the EBO Date determined by using commercially reasonable methods which are standard in the industry. Payment of the EBO Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) on or before the EBO Date, shall be made on the EBO Date in immediately available funds. Thereafter, upon Lessee's written request, Lessor shall deliver to Lessee a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER. If Lessee shall fail to pay all amounts required to be paid under the Lease on the EBO Date, the Lease shall continue in full force and effect and Lessee agrees to reimburse Lessor for all reasonable costs, expenses and liabilities incurred in connection therewith.

6.    NATURE OF TRANSACTION; TRUE LEASE.  (a) It is the express intent of the parties that this Lease constitute a true lease and not a sale of the Equipment.  Title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, title, property, right, equity, or interest in the Equipment other than its leasehold interest solely as Lessee subject to all the terms and conditions hereof.  To the extent that Article 2A ("Article 2A") of the Uniform Commercial Code ("UCC") applies to the characterization of this Lease, the parties hereby agree that this Lease is a "Finance Lease" as defined therein.  Lessee acknowledges: (i) that Lessee has selected the "Supplier" (as defined in the UCC) and has directed Lessor to purchase the Equipment from the Supplier in connection with this Lease, and (ii) that Lessee has been informed in writing in this Lease, before Lessee's execution of this Lease, that Lessee is entitled under Article 2A to the promises and warranties, including those of any third party, provided to Lessor by the Supplier in connection with or as part of the Purchase Agreement, and that Lessee may communicate with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.  The filing of UCC financing statements pursuant to Section 34 of the Master Lease is precautionary and shall not be deemed to have any effect on the characterization of this Lease. NOTWITHSTANDING THE FOREGOING, LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS ANY ADVICE, REPRESENTATIONS, WARRANTIES AND COVENANTS, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO ANY LEGAL, ECONOMIC, ACCOUNTING, TAX OR OTHER EFFECTS OF THE LEASE AND THE TRANSACTION(S) CONTEMPLATED THEREBY, AND LESSEE HEREBY DISCLAIMS ANY RELIANCE ON ANY SUCH WARRANTIES, STATEMENTS OR REPRESENTATIONS MADE BY LESSOR WITH RESPECT THERETO.

(b) Notwithstanding the express intent of Lessor and Lessee that this agreement constitute a true lease and not a sale of the Equipment, should a court of competent jurisdiction determine that this agreement is not a true lease, but rather one intended as security, then solely in that event and for the expressly limited purposes thereof, Lessee shall be deemed to have hereby granted Lessor a security interest in the Equipment and all accessions, substitutions and replacements thereto and therefor, and proceeds (cash and non-cash), including, without limitation, insurance proceeds thereof (but without power of sale), to secure the prompt payment and performance as and when due of all obligations and indebtedness of Lessee, now existing or hereafter created, to Lessee pursuant to this Lease or otherwise.  In furtherance of the foregoing, Lessee shall execute and deliver to Lessor, to be filed at Lessee's expense, Uniform Commercial Code financing statements, statements of amendment and statements of continuation as reasonably may be required by Lessor to perfect and maintain perfected such security interest.

(c) In the event that the Supplier erroneously invoices Lessee for the Equipment, Lessee agrees to forward said invoice to Lessor immediately.  Lessee acknowledges that the Equipment is, and shall at all times remain, the property of Lessor, and that Lessee has no right, title or interest therein or thereto except as expressly set forth in this Lease.

7.    TAX INDEMNIFICATION.  (a) Lessee acknowledges that Lessor has executed this Lease, and that the Rent payable by Lessee under this Lease has been computed, upon the assumptions that Lessor will (i) be entitled to depreciation or cost recovery deductions ("MACRS Deductions") for Federal income tax purposes under the Modified Accelerated Cost Recovery System provided for in Section 168 of the Internal Revenue Code of 1986, as amended (the "Code"), and depreciation or cost recovery deductions ("State Depreciation Deductions") for state income tax purposes for the Equipment Location, in each case on the basis that (1) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (2) the initial tax basis for each Item of Equipment will be equal to the Total Cost, (3) deductions for each Item of Equipment will be computed by using the method specified in Section 168(b)(1) of the Code over the 5-year recovery period described in Section 168(c) of the Code, and (4) the applicable convention for each Item of Equipment under Section 168(d) of the Code is the half-year convention; (ii) be entitled to deductions for Federal income tax purposes (available in the manner and as provided by Section 163 of the Code) for interest payable with respect to any indebtedness incurred by Lessor in connection with any financing by Lessor of any portion of the Total Cost of each Item of Equipment ("Interest Deductions"); and (iii) be subject to tax for each year at a composite Federal and New York corporate income tax rate equal to the then highest marginal rate for corporations provided for

under the Code and the laws of New York (the "Highest Marginal Tax Rate"). The MACRS Deductions, State Depreciation Deductions and Interest Deductions are hereinafter collectively referred to as the "Tax Benefits".

(b) Lessee represents and warrants to Lessor that (i) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (ii) Lessee shall not attempt to claim such Tax Benefits, (iii) at and after the time of delivery of the Equipment to Lessee pursuant to this Lease the Lessee shall not claim any ownership or title in and to the Equipment, and (iv) Lessee has not, and will not, at any time after such delivery throughout the Term of this Lease, take any action or omit to take any action (whether or not the same is permitted or required hereunder) which will result in the loss by Lessor of all or any part of such Tax Benefits.

(c) If, as a result of any act, omission or misrepresentation of Lessee, (x) the Tax Benefits are lost, disallowed, deferred, eliminated, reduced, recaptured, compromised or otherwise unavailable to Lessor, (y) for Federal, foreign, state or local income tax purposes, any item of income, loss or deduction with respect to any Item of Equipment is treated as derived from, or allocable to, sources outside the United States, or (z) there shall be included in the gross income of Lessor for Federal, state or local income tax purposes any amount on account of any addition, modification, substitution or improvement to or in respect of any Item of Equipment made or paid for by Lessee (any of the foregoing being hereinafter a "Tax Loss"), then, within thirty (30) days of Lessee's receipt of written notice from Lessor that such a Tax Loss has occurred, Lessee shall pay to Lessor an amount which, after deduction therefrom of all taxes to be paid in respect of the receipt thereof, will enable Lessor to receive the same Net Economic Return (as hereinafter defined) that Lessor would have realized on this Lease had such Tax Loss (together with any interest, penalties or additions to tax) not occurred. Any event which, by the terms of this Lease, requires payment by Lessee to Lessor of the Stipulated Loss Value of the Equipment shall not constitute the act of Lessee for purpose of the foregoing sentence.

(d) As used in this Section, the term "Net Economic Return" shall mean Lessor's net after-tax yield, aggregate after-tax cash flow and return on assets, based on (i) the assumptions used by Lessor in originally calculating Rent and Stipulated Loss Value percentages, including the assumptions set forth above (as such assumptions may have been revised pursuant to the last sentence of this subsection) and (ii) the Highest Marginal Tax Rate actually in effect during each year from the date of such original calculations to the date of such Tax Loss, both dates inclusive. In the event Lessor shall suffer a Tax Loss with respect to which Lessee is required to pay an indemnity hereunder, and the full amount of such indemnity has been paid or provided for hereunder, the aforesaid assumptions, without further act of the parties hereto, shall thereupon be and be deemed to be amended, if and to the extent appropriate, to reflect such Tax Loss.

(e) For purposes of this Section, the term "Lessor" shall include the entity or entities, if any, with which Lessor consolidates any tax return. Lessee acknowledges that it has neither sought nor received tax advice from Lessor as to the availability to Lessee of any tax benefits with respect to the Equipment. All of Lessor's rights and privileges arising from the indemnities contained in this Lease will survive the expiration or other termination or cancellation of this Lease. Such indemnities are expressly made for the benefit of, and are enforceable by, Lessor and its successors and assigns.

8.    STIPULATED LOSS VALUE; DISCOUNT RATE. (a) The Stipulated Loss Values applicable to the Equipment and this Lease are as set forth on a supplement (the "Stipulated Loss Value Supplement") prepared by Lessor.

(b) Any provision of this Lease to the contrary notwithstanding, all present value calculations to be made with respect to the Equipment described on this Schedule shall be made using a discount rate equal to three percent (3%).

9.    PERSONAL PROPERTY TAX. Unless otherwise directed in writing by Lessor or required by Applicable Law, Lessee will not list itself as owner of any Item of Equipment for property tax purposes. Upon receipt by Lessee of any property tax bill pertaining to such Item of Equipment from the appropriate taxing

authority, Lessee will promptly forward such property tax bill to Lessor. Upon receipt by Lessor of any such property tax bill (whether from Lessee or directly from the taxing authority), Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

10.    **MODIFICATIONS TO MASTER LEASE.** With respect to the Equipment described on this Schedule, the Master Lease shall be modified as follows:

(a) [RESERVED]

(b) Section 22(b)(7) of the Master Lease ("Events of Default; Remedies"), is hereby amended by adding the following after the first parenthetical "demand that Lessee forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 22(b)(5) hereof and in addition".

## MISCELLANEOUS TERMS & CONDITIONS 

11.    **ADDITIONAL MAINTENANCE REQUIREMENTS.** Section 13 of the Master Lease ("Return of Equipment") shall be deleted in its entirety and the following substituted in its place:

**Return of Equipment.** (a) Upon the expiration of the Term of any Lease or upon demand by Lessor pursuant to Section 22 hereof, Lessee, at its sole expense, shall return all of the Equipment leased under the Lease by delivering it in a manner consistent with the manufacturer's recommendations and practices to such place or on board such carrier (packed properly and in accordance with the manufacturer's instructions) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be free and clear of all Liens, and in the same condition as when delivered to Lessee, reasonable wear and tear excepted. Reasonable wear and tear shall mean that each item of the Equipment has been maintained by Lessee in "Average Saleable Condition" (as hereinafter defined) and that all components of the Equipment have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any item of the Equipment fails to meet the standards set forth in this Section 13, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing the Equipment, restoring it to such condition so as to meet such standards and assembling and delivering such Item of Equipment pursuant to Lessor's instructions. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

(b). Lessee shall give Lessor at least ninety (90), but not more than one hundred eighty (180) days written notice that Lessee is returning the Equipment as provided for above (the "Return Notice") and shall include with such notice, all of the following:

(i)    a detailed inventory of all components of the Equipment including without limitation all of the model and serial numbers of any components;
(ii)    a complete set of current and up to date service and operating manuals for each Item of Equipment;
(iii)    a complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment;
(iv)    an in-depth field service report (the "Report") detailing the results of an inspection conducted by a representative of the manufacturer or a qualified equipment maintenance provider

acceptable to Lessor certifying that the Equipment has been properly inspected, examined, tested and is operating within the manufacturer's specifications and addressing, at a minimum the following areas:

(A)    comprehensive physical inspection;
(B)    testing of all material and workmanship of the Equipment; and
(C)    conformation of all Equipment operations to Applicable Law and confirming that the Equipment is otherwise in Average Saleable Condition (as hereinafter defined).

If the Report discloses that any of the material, workmanship or Equipment does not meet or, does not operate within, the manufacturer's specifications or any Applicable Law, Lessee shall, at its sole expense, take all necessary corrective measures and submit a second Report from the same inspector evidencing that the Equipment has been brought into conformity with the manufacturer's specifications and Applicable Law.

(c)  "Average Saleable Condition" shall mean that all of the following minimum standards have been met:

*Construction Equipment*

(i)    The Equipment has been, or will be, disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, including the proper blueprinting, mapping, tagging and labeling of each individual part including cables, electrical components and wires, all process fluids and/or any hazardous materials have been removed from the Equipment and disposed of in accordance with Applicable Law.

(ii)    The Equipment is complete with all manuals, maintenance records, log books, plans, drawings and schematics, inspection and overhaul records, operating requirements or other materials pertinent to the Equipment's operation, maintenance, assembly and disassembly.

(iii)    There is no structural or mechanical damage, frame, and the structural members and accessories are structurally sound without breaks or cracks, in compliance with Applicable Law and the engine, hydraulics and transmission all operate properly at fully rated loads.

(iv)    Transmissions shift properly at full rated loads and speeds, the mechanical drive train, differentials and final drives are in good condition and operate quietly without vibrations or leaks.

(v)    Tires are matched by generic type and tread design and have at least 50% of tread life remaining with no flats, contain no dry rot on sidewalls, rims or disc wheels have no split base rims and are in recappable condition; track components have at least 50% wear remaining.

(vi)    Equipment with predictable or scheduled replacements or overhaul lives including but not limited to tires, track components, power train assembly, transmissions, converters, engines hydraulics, axles, wheels, brakes, pumps, diggers, buckets, blades, rippers and other attachments (including cutting edges) have not less than 50% useful life remaining before the next such replacement or overhaul and all cutting edges and other wear points have at least 50% of their respective material design lives remaining.

(vii)    All ground engaging tools (buckets, blades, rippers) and cabs, canopies, enclosures, lights and other accessories are in good condition and appearance.

(viii)    Periodic adjustments and inspections have been performed, and all lubricants and hydraulic oils have been changed, Lessee has maintained written records of preventative maintenance and repairs indicating date and hour meter readings verified by parts invoices, copies of these records are available to Lessor on demand and all oil and hydraulic fluid samples are clean and with no dirt or other foreign substances in either the oil or any other operating fluids.

(ix)    A complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment are available to be returned with the Equipment.

(x)    All Equipment has been cleaned and treated with respect to rust, corrosion and appearance in accordance with the manufacturer's recommendations and consistent with the best practices of dealers in similar used equipment, and the Equipment is painted in the same color scheme as when it was originally delivered to the Lessee.

(xi)    Annual hour usage has not exceeded two thousand two hundred (2,200) hours, but Lessee agrees that additional hours used will be chargeable to Lessee at the rate of Twenty Five Dollars ($25.00) per hour.

(d)  In addition to all other rights of Lessor under the Lease, Lessor shall have the right to attempt to resell or auction the Equipment from Lessee's facility with the Lessee's full cooperation and assistance, for a period commencing with Lessor's receipt of the Return Notice and ending one hundred eighty (180) days after the Initial Term Expiration Date. Lessee agrees to pay the reasonable costs and expenses of such sale or auction (and all storage prior thereto), and agrees that the Equipment shall remain capable of operation during this period. Lessee shall provide adequate electrical power, lighting, heat, water and all other requirements sufficient to allow for normal maintenance and for demonstrations of the Equipment to any potential buyer.

12.    GOVERNING LAW. This Schedule is being delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance without giving effect to any choice of law or conflict of laws provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

13.    COUNTERPARTS.  This Schedule may be executed in any number of counterparts, each executed counterpart constituting an original but all together one and the same instrument.

14.    MORE THAN ONE LESSEE. If more than one person or entity executes this Schedule, or any other Lease Documents executed in connection herewith, as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

15.    RELATIONSHIP TO MASTER LEASE; FURTHER ASSURANCES. This Schedule shall be construed in connection with and as part of this Lease, and all terms contained in the Master Lease are hereby incorporated herein by reference with the same force and effect as if such terms were fully stated herein. By execution of this Schedule, Lessee and Lessor reaffirm all terms of the Master Lease except as they may be modified hereby. To the extent that any of the terms of this Schedule are contrary to or inconsistent with any terms of the Master Lease, the terms of this Schedule shall govern. LESSEE HEREBY CERTIFIES TO LESSOR THAT THE REPRESENTATIONS AND WARRANTIES MADE BY LESSEE IN THE MASTER LEASE (INCLUDING, WITHOUT LIMITATION, SECTION 31 THEREOF) ARE TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS SCHEDULE WITH THE SAME EFFECT AS THOUGH MADE ON AND AS OF SUCH DATE. Lessee shall take such additional actions and execute and deliver such additional documents as Lessor shall deem necessary from time to time to effectuate the terms of this Lease.

16.    POWER OF ATTORNEY. LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Schedule to be duly executed and delivered on the day and year first above written.

Lessor:                                              Lessee:

KEYCORP LEASING,                                     Clark Construction Company, Inc.
A DIVISION OF KEY CORPORATE CAPITAL INC.

By: _____                        x _____
Name:                                                Name: COLBERT F. CLARK
Title:    SANDRA L. COSTANZO                          Title: PRESIDENT
          REGIONAL LEASE CONTRACTS MANAGER


COUNTERPART NO. 1 OF 1 SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

# Exhibit A

## EQUIPMENT DESCRIPTION

**Lessor:**     KEYCORP LEASING,
          A DIVISION OF KEY CORPORATE CAPITAL INC.

**Lessee:**     Clark Construction Company, Inc.

**Lease:**      Equipment Schedule No. 02 dated as of January 22, 2001 to
          Master Equipment Lease Agreement Dated as of November 1, 2000

**Vendor:**     Thompson Tractor Co., Inc.
          2401 Pinson Highway
          Birmingham, AL 35202

| Quantity: | Description: | Serial No. | Invoice No. |
|---|---|---|---|
| 1 | MODEL D6R IG CATERPILLAR TRACK TYPE TRACTOR, ARRANGEMENT 107-8275, EQUIPPED WITH BACK UP ALARM, ROPS CANOPY, SWEEPS, SCREENS, ROOT RAKE, 30" TRACK, FUEL TANK GUARD AND HINGED RADIATOR GUARD | 5LN02875 | 76742 |

Form No: 96-102.500



Customer #: 32567
Lessee #: 34415
Lease #: 8800020414

## Promissory Note

$165,000.00          Funding Date: 1 25 , 01 (Year)

**FOR VALUE RECEIVED**, Clark Crane L.L.C., an Alabama limited liability company ("Maker"), promises to pay to the order of KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Holder"), the sum of one hundred sixty-five thousand dollars and zero cents ($165,000.00) in lawful money of the United States of America (the "Principal"), with interest thereon as hereafter provided ("Interest"), to be paid in the manner set forth herein. This Note is executed pursuant to that certain security agreement (the "Security Agreement") dated as of January 19, 2001 between Maker and Holder. Capitalized terms used herein without definition shall have the meaning given them in the Security Agreement.

1.    <u>Interest Rate; Place of Payment</u>.  Interest on the balance of the Principal outstanding on this Note shall accrue from the Funding Date of this Note and shall be due and payable at a fixed rate of eight and thirty hundredths percent (8.30%) per annum (the "Interest Rate") which rate shall be immediately and correspondingly adjusted (pursuant to 2(b) hereof) with each change in the Actual Index (as hereinafter defined).  Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.  Payment of the Principal and Interest hereunder shall be made to Holder at P.O. Box 1865, Albany, New York 12201-1865, or at such other place as Holder may designate from time to time in writing. Holder reserves the right to require payment on this Note to be made by wired federal funds or other immediately available funds.

2.    <u>Repayment Terms</u>.        (a) The Principal and Interest shall be due and payable as follows:

(1)  On the first Note Payment Date, an amount equal to $38.04 per day as interim interest for the period from the Funding Date through and including the last day of the month following the Funding Date, which interim interest was calculated by Holder using the Assumed Index (as hereinafter defined) minus 70 basis points and is expressly not subject to adjustment pursuant to Section 2(b) hereof; *plus*

(2)  Sixty (60) consecutive monthly installments payable in arrears each in an amount equal to $2,923.73 commencing and payable on the first day of the second month following the Funding Date and on the same day each month thereafter (each, a "Note Payment Date"), and on the sixtieth (60) Note Payment Date, an amount equal to the sum of (i) the monthly Installment, *plus* (ii) a balloon payment (the "Balloon Payment") equal to $33,000.00.  In addition, Maker will pay a late payment charge of five percent (5%) of any payment due hereunder that is not paid on or before the date due hereunder.

(b)  Maker and Holder agree that each Note payment hereunder shall be increased or decreased (but not below zero), as the case may be, by the Rate Differential (as hereinafter defined) as follows: if, as of any Note Payment Date, (i) the Rate Differential is greater than zero, the amount due on such Note Payment Date shall be increased by such Rate Differential, and (ii) the Rate Differential is less than zero, the amount of the Note Payment due on such Note Payment Date shall be decreased by such Rate Differential.

(c)  As used herein, the following terms shall have the respective meanings indicated below:

(1)  "Assumed Index" shall mean nine percent (9.00%).

---

Form No: 96-500.500

direct the application of such payments and proceeds and acknowledges and agrees that Holder shall have the continuing and exclusive right to apply any and all such payments and proceeds in the Holder's sole discretion, notwithstanding any entry to the contrary upon any of its books and records.

7.    Events of Default. (a) Maker shall be in default if any of the following happens (an "Event of Default"): (1) Maker fails to make any installment of the Principal or Interest, or any other payment due and owing, under this Note within ten (10) days after the same becomes due and payable; or (2) Maker fails to perform any other obligation required to be performed by Maker under this Note, the Security Agreement or any of the other Loan Documents for thirty (30) days after written notice from Holder of such failure; or (3) any representation, warranty or other statement by or on behalf of Maker in connection with this Note is false or misleading in any material respect; or (4) an Event of Default has occurred and is continuing under the Security Agreement.
    (b) Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default, Holder may declare the entire outstanding balance of the Principal, together with all accrued and unpaid Interest thereon, immediately due and payable without notice or demand which amounts shall, together with all other sums due hereunder, accrue interest from such acceleration until the date of actual payment at the Default Rate (provided, however, that should there occur an Event of Default, and if a voluntary or involuntary petition under the United States Bankruptcy Code is filed by or against Maker while such default remains uncured, the entire outstanding balance of the Principal automatically shall be accelerated and due and payable with interest thereon at the Default Rate), and Holder may exercise any and all of its remedies hereunder, under the other Loan Documents and under Applicable Law. The remedies of Holder provided herein, in the Security Agreement and under Applicable Law shall be cumulative and concurrent and may be pursued singly, successively or concurrently at the sole discretion of Holder and may be exercised as often as occasion therefor shall occur. The failure to exercise, or any delay in the exercise of, any right or remedy shall in no event be construed as a waiver, release or exhaustion of any such remedies.

8.    Collection Costs. In addition to the Principal, Interest, Prepayment Premium (if any), and late payment charges (if any), Maker shall pay Holder on demand, and Holder shall be entitled to collect all costs and expenses of collection, including, without limitation, reasonable attorneys' fees, incurred in connection with enforcement of its rights and remedies hereunder and under the other Loan Documents, the protection or realization of the Collateral or in connection with Holder's collection efforts, or in connection with any bankruptcy or other judicial proceeding, whether or not suit on this Note or any foreclosure proceeding is filed. All such costs and expenses shall be payable on demand and, until paid, shall be Secured Obligations secured by the security interest granted under the Security Agreement and all other collateral, if any, held by Holder as security for Maker's obligations under this Note.

9.    Governing Law; Binding Agreement. The provisions of this Note shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. THIS NOTE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

10.    More than One Signer. If more than one person or entity signs this Note as a Maker, the obligations contained herein shall be deemed joint and several and all references to "Maker" shall apply both jointly and severally.

11.    General. Maker represents and warrants that this Note evidences a loan for business or commercial purposes. Prior to signing this Note, Maker read and understood the provisions hereof, and agrees to all terms and conditions contained herein.

STATE OF Alabama    )
                    ) ss.:
COUNTY OF Henry     )

On this 21 (Day) day of January (Month) 2000 (Year), before me the subscriber personally appeared Colby Clark who being by me duly sworn, did depose and say that (s)he is a Member or Manager of the limited liability company described in and which executed the foregoing instrument; and (s)he signed his/her name thereto on behalf of said company and was duly authorized to do so by the members.

Jolene Gathard
NOTARY PUBLIC

My Commission Expires: 12-10-03

# EXHIBIT "F"



<div align="right">

Customer #: 32567
Lessee #: 32568
Lease #: 8800020416

## Promissory Note

</div>

$202,501.76                               Funding Date: January 31 , 01 (Year)

     FOR VALUE RECEIVED, Clark Construction Company, Inc, an Alabama corporation ("Maker"), promises to pay to the order of KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Holder"), the sum of two hundred two thousand five hundred one dollars and seventy-six cents ($202,501.76) in lawful money of the United States of America (the "Principal"), with interest thereon as hereafter provided ("Interest"), to be paid in the manner set forth herein. This Note is executed pursuant to that certain security agreement (the "Security Agreement") dated as of January 22, 2001 between Maker and Holder. Capitalized terms used herein without definition shall have the meaning given them in the Security Agreement.

1.    <u>Interest Rate; Place of Payment</u>. Interest on the balance of the Principal outstanding on this Note shall accrue from the Funding Date of this Note and shall be due and payable at a fixed rate of eight and thirty hundredths percent (8.30%) per annum (the "Interest Rate") which rate shall be immediately and correspondingly adjusted (pursuant to 2(b) hereof) with each change in the Actual Index (as hereinafter defined). Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. Payment of the Principal and Interest hereunder shall be made to Holder at P.O. Box 1865, Albany, New York 12201-1865, or at such other place as Holder may designate from time to time in writing. Holder reserves the right to require payment on this Note to be made by wired federal funds or other immediately available funds.

2.    <u>Repayment Terms</u>.    (a) The Principal and Interest shall be due and payable as follows:

     (1) On the first Note Payment Date, an amount equal to $46.69 per day as interim interest for the period from the Funding Date through and including the last day of the month following the Funding Date, which interim interest was calculated by Holder using the Assumed Index (as hereinafter defined) minus 70 basis points and is expressly not subject to adjustment pursuant to Section 2(b) hereof; *plus*

     (2) Sixty (60) consecutive monthly installments payable in arrears each in an amount equal to $3,588.24 commencing and payable on the first day of the second month following the Funding Date and on the same day each month thereafter (each, a "Note Payment Date"), and on the sixtieth (60) Note Payment Date, an amount equal to the sum of (i) the monthly Installment, *plus* (ii) a balloon payment (the "Balloon Payment") equal to $40,500.35. In addition, Maker will pay a late payment charge of five percent (5%) of any payment due hereunder that is not paid on or before the date due hereunder.

    (b) Maker and Holder agree that each Note payment hereunder shall be increased or decreased (but not below zero), as the case may be, by the Rate Differential (as hereinafter defined) as follows: if, as of any Note Payment Date, (i) the Rate Differential is greater than zero, the amount due on such Note Payment Date shall be increased by such Rate Differential, and (ii) the Rate Differential is less than zero, the amount of the Note Payment due on such Note Payment Date shall be decreased by such Rate Differential.

    (c) As used herein, the following terms shall have the respective meanings indicated below:

     (1) "Assumed Index" shall mean nine percent (9.00%).

(2) "Actual Index" shall mean, as of the date of determination, the "prime rate" appearing in *The Wall Street Journal* published on the business day on, or immediately prior to, the 28th day of the month immediately preceding the calendar month to which any Note Payment Date relates or, if *The Wall Street Journal* is not published on such day, then the "prime rate" announced in the most recently published edition of *The Wall Street Journal*. If the Actual Index is no longer available, Holder will choose a new index which is based upon comparable information and will give Maker notice of such new "Actual Index".

(3) "Net Investment Balance" shall mean, as of the date of determination, the outstanding balance (calculated using the Assumed Index minus 70 basis points) reflected on Holder's accounting system (which assumes a 360 day year consisting of twelve 30 day months), for the Note Payment Date immediately preceding such day or, if such day is a Note Payment Date, for such Note Payment Date.

(4) "Rate Differential" shall mean, with respect to any Note Payment Date, the product of the following formula:

$$\text{Rate Differential} = \frac{\text{Actual Index} - \text{Assumed Index}}{12} \times \text{Net Investment Balance}$$

3.     **Security**. Payment of the Principal and Interest hereunder, and the performance and observance by Maker of all agreements, covenants and provisions contained herein, is secured by a first priority security interest in the Collateral.

4.     **Prepayment**.
Except as contemplated by clause (3) of section 10 of the Security Agreement, Maker may not prepay, in whole or in part, the principal outstanding hereunder; *provided*, *however*, that commencing on the date following the twelve month anniversary of the Funding Date, Maker may prepay, in whole but not in part, the principal outstanding hereunder by paying to Holder such outstanding principal including the Balloon Payment, together with all accrued and unpaid interest thereon at the Interest Rate in effect on the Funding Date, plus a prepayment premium ("Prepayment Premium") equal to a percentage of the outstanding principal (including the Balloon Payment) calculated as follows:

| Months | Prepayment Premium |
|--------|--------------------|
| 1-12 | No prepayment permitted |
| 13-24 | 4% |
| 25-36 | 3% |
| 37-48 | 1% |
| 49-60 | 0% |

5.     **Transfer or Assignment**. Holder may at any time assign or otherwise transfer or negotiate this Note in whole or in part, without any notice to Maker. The rights and obligations of Maker may not be assigned or delegated.

6.     **Application of Payments**. Prior to an Event of Default, each payment received on this Note shall be applied first to all costs of collection, then to unpaid late payment charges (if any) and Prepayment Premium (if any) hereunder, then to Interest as of the payment due date and the balance, if any, to the outstanding Principal as of the date received. Upon the occurrence, and during the continuance, of an Event of Default, any payments in respect of the Secured Obligations and any proceeds of the Collateral when received by Holder in cash or its equivalent, will be applied first to costs of collection and, thereafter, in reduction of the Secured Obligations in such order and manner as Holder may direct in its sole discretion, and Maker irrevocably waives the right to

direct the application of such payments and proceeds and acknowledges and agrees that Holder shall have the continuing and exclusive right to apply any and all such payments and proceeds in the Holder's sole discretion, notwithstanding any entry to the contrary upon any of its books and records.

7.    Events of Default. (a) Maker shall be in default if any of the following happens (an "Event of Default"): (1) Maker fails to make any installment of the Principal or Interest, or any other payment due and owing, under this Note within ten (10) days after the same becomes due and payable; or (2) Maker fails to perform any other obligation required to be performed by Maker under this Note, the Security Agreement or any of the other Loan Documents for thirty (30) days after written notice from Holder of such failure; or (3) any representation, warranty or other statement by or on behalf of Maker in connection with this Note is false or misleading in any material respect; or (4) an Event of Default has occurred and is continuing under the Security Agreement.

(b) Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default, Holder may declare the entire outstanding balance of the Principal, together with all accrued and unpaid Interest thereon, immediately due and payable without notice or demand which amounts shall, together with all other sums due hereunder, accrue interest from such acceleration until the date of actual payment at the Default Rate (provided, however, that should there occur an Event of Default, and if a voluntary or involuntary petition under the United States Bankruptcy Code is filed by or against Maker while such default remains uncured, the entire outstanding balance of the Principal automatically shall be accelerated and due and payable with interest thereon at the Default Rate), and Holder may exercise any and all of its remedies hereunder, under the other Loan Documents and under Applicable Law. The remedies of Holder provided herein, in the Security Agreement and under Applicable Law shall be cumulative and concurrent and may be pursued singly, successively or concurrently at the sole discretion of Holder and may be exercised as often as occasion therefor shall occur. The failure to exercise, or any delay in the exercise of, any right or remedy shall in no event be construed as a waiver, release or exhaustion of any such remedies.

8.    Collection Costs. In addition to the Principal, Interest, Prepayment Premium (if any), and late payment charges (if any), Maker shall pay Holder on demand, and Holder shall be entitled to collect all costs and expenses of collection, including, without limitation, reasonable attorneys' fees, incurred in connection with enforcement of its rights and remedies hereunder and under the other Loan Documents, the protection or realization of the Collateral or in connection with Holder's collection efforts, or in connection with any bankruptcy or other judicial proceeding, whether or not suit on this Note or any foreclosure proceeding is filed. All such costs and expenses shall be payable on demand and, until paid, shall be Secured Obligations secured by the security interest granted under the Security Agreement and all other collateral, if any, held by Holder as security for Maker's obligations under this Note.

9.    Governing Law; Binding Agreement. The provisions of this Note shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. THIS NOTE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

10.    More than One Signer. If more than one person or entity signs this Note as a Maker, the obligations contained herein shall be deemed joint and several and all references to "Maker" shall apply both jointly and severally.

11.    General. Maker represents and warrants that this Note evidences a loan for business or commercial purposes. Prior to signing this Note, Maker read and understood the provisions hereof, and agrees to all terms and conditions contained herein.

12.    <u>Waiver</u>. MAKER AND ALL ENDORSERS, SURETIES, AND GUARANTORS HEREOF HEREBY JOINTLY AND SEVERALLY WAIVE PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NON-PAYMENT OR DISHONOR, NOTICE OF INTENTION TO ACCELERATE THE MATURITY, NOTICE OF PROTEST AND PROTEST OF THIS NOTE. HOLDER AND MAKER HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH HOLDER OR MAKER MAY BE PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THIS NOTE OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY HOLDER AND THE MAKER WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE AND THE OTHER LOAN DOCUMENTS.

13.    <u>Usury; Partial Invalidity</u>. (a)  At no time shall the Interest Rate (or the Default Rate or other amounts paid or collected hereunder) exceed the highest rate allowed by applicable law for this type of loan.  Should Holder ever collect interest at a rate that exceeds such applicable legal limit, such excess will be credited to the Principal.

(b) Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under the laws of any applicable jurisdiction, such provision, as to such jurisdiction, shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note in any other jurisdiction.

14.    <u>Notices</u>.  All notices and other communications under this  Note shall be in writing and shall be addressed: (a) if to Maker, Route 3 Box 15, Headland, Alabama 36345; and (b) if to Holder, KeyCorp Leasing, a Division of Key Corporate Capital Inc., 54 State Street, Albany, New York 12207, Attention: Account Manager, or such other address as either party hereto shall communicate to the other party at its address specified above. All such notices and other communications shall be deemed to have been duly given if delivered by hand, overnight courier or if sent by certified mail, return receipt requested, to the party to whom such notice is intended to be given, and shall be effective upon receipt.

15.    <u>Funding Date</u>. The Funding Date for this  Note shall be the date on which Holder disburses funds hereunder. TO THE EXTENT THE FUNDING DATE IS LEFT BLANK ABOVE, OR DOES NOT REFLECT THE ACTUAL DATE THAT HOLDER DISBURSES FUNDS HEREUNDER, MAKER HEREBY AUTHORIZES HOLDER TO WRITE IN THE CORRECT DATE AT THE TIME OF DISBURSEMENT.

IN WITNESS WHEREOF, Maker, intending to be legally bound, has caused this  Note to be duly executed on the day and year first above written.

MAKER:

Clark Construction Company, Inc

X _/s/ Colby Clark_____

Name: Colby Clark
Title: President

STATE OF _Alabama_ )
                                                ) ss.:
COUNTY OF _Henry_ )

On this _26_ _(Day)_ day of _January_ _(Month)_, _2001_ _(Year)_, before me the subscriber personally appeared _Colby Clark_, who being by me duly sworn, did depose and say; that (s)he resides at _Houston_ County, State of _Alabama_: that (s)he is a _President_ of _Clark Construction Co., Inc._ the corporation described in and which executed the foregoing instrument; and that (s)he signed his/her name thereto by order of the Board of Directors of said corporation.

_Jolene Gathard_
NOTARY PUBLIC

My Commission Expires: _12-10-03_

EXHIBIT "G"



C#: 32567
L#: 32568
Ls#: 8800020447

## Promissory Note

$188,181.70                    Funding Date: *February 9*_____, *2001* (Year)

    FOR VALUE RECEIVED, Clark Construction Company, Inc., an Alabama corporation ("Maker"), promises to pay to the order of KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Holder"), the sum of one hundred eighty-eight thousand one hundred eighty-one dollars and seventy cents($188,181.70) in lawful money of the United States of America (the "Principal"), with interest thereon as hereafter provided ("Interest"), to be paid in the manner set forth herein. This Note is executed pursuant to that certain security agreement (the "Security Agreement") dated as of February 4, 2001 between Maker and Holder. Capitalized terms used herein without definition shall have the meaning given them in the Security Agreement.

1.    <u>Interest Rate; Place of Payment</u>. Interest on the balance of the Principal outstanding on this Note shall accrue from the Funding Date of this Note and shall be due and payable at a fixed rate of eight and seventeen hundredths percent(8.17%) per annum (the "Interest Rate"). Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. Payment of the Principal and Interest hereunder shall be made to Holder at P.O. Box 1865, Albany, New York 12201-1865, or at such other place as Holder may designate from time to time in writing. Holder reserves the right to require payment on this Note to be made by wired federal funds or other immediately available funds.

2.    <u>Repayment Terms</u>. The Principal and Interest shall be due and payable in forty-eight (48) consecutive monthly installments payable in arrears, each in an amount equal to $3,943.52 commencing and payable on the same date which is one month after the Funding Date and on the same day of each month thereafter (each, a "Payment Date"), and on the forty-eighth (48) Payment Date, an amount equal to the sum of (i) the monthly installment of $3,943.52, *plus* (ii) a balloon payment (the "Balloon Payment") equal to $37,636.34. In addition, Maker will pay a late payment charge of five percent (5%) of any payment due hereunder that is not paid on or before the date due hereunder.

3.    <u>Security</u>. Payment of the Principal and Interest hereunder, and the performance and observance by Maker of all agreements, covenants and provisions contained herein, is secured by a first priority security interest in the Collateral.

4.    <u>Prepayment</u>. Except as contemplated by clause (3) of section 10 of the Security Agreement, Maker may not prepay, in whole or in part, the principal outstanding hereunder; provided, however, that commencing on the date following the twelve month anniversary of the Funding Date, Maker may prepay, in whole but not in part, the principal outstanding hereunder by paying to Holder such outstanding principal including the Balloon Payment, together with all accrued and unpaid interest thereon, plus a prepayment premium ("Prepayment Premium") equal to a percentage of the outstanding principal (including the Balloon Payment) calculated as follows:

| Months | Prepayment Premium |
|--------|--------------------|
| 1-12 | No prepayment permitted |
| 13-24 | 3% |
| 25-36 | 2% |
| 37-48 | 1% |

5.    <u>Transfer or Assignment</u>.  Holder may at any time assign or otherwise transfer or negotiate this Note in whole or in part, without any notice to Maker.  The rights and obligations of Maker may not be assigned or delegated.

6.    <u>Application of Payments</u>.  Prior to an Event of Default, each payment received on this Note shall be applied first to all costs of collection, then to unpaid late payment charges (if any) and Prepayment Premium (if any) hereunder, then to Interest as of the payment due date and the balance, if any, to the outstanding Principal as of the date received.  Upon the occurrence, and during the continuance, of an Event of Default, any payments in respect of the Secured Obligations and any proceeds of the Collateral when received by Holder in cash or its equivalent, will be applied first to costs of collection and, thereafter, in reduction of the Secured Obligations in such order and manner as Holder may direct in its sole discretion, and Maker irrevocably waives the right to direct the application of such payments and proceeds and acknowledges and agrees that Holder shall have the continuing and exclusive right to apply any and all such payments and proceeds in the Holder's sole discretion, notwithstanding any entry to the contrary upon any of its books and records.

7.    <u>Events of Default</u>.  (a)  Maker shall be in default if any of the following happens (an "Event of Default"): (1) Maker fails to make any installment of the Principal or Interest, or any other payment due and owing, under this Note within ten (10) days after the same becomes due and payable; or (2) Maker fails to perform any other obligation required to be performed by Maker under this Note, the Security Agreement or any of the other Loan Documents for thirty (30) days after written notice from Holder of such failure; or (3) any representation, warranty or other statement by or on behalf of Maker in connection with this Note is false or misleading in any material respect; or (4) an Event of Default has occurred and is continuing under the Security Agreement.
        (b)  Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default, Holder may declare the entire outstanding balance of the Principal, together with all accrued and unpaid Interest thereon, immediately due and payable without notice or demand which amounts shall, together with all other sums due hereunder, accrue interest from such acceleration until the date of actual payment at the Default Rate (provided, however, that should there occur an Event of Default, and if a voluntary or involuntary petition under the United States Bankruptcy Code is filed by or against Maker while such default remains uncured, the entire outstanding balance of the Principal automatically shall be accelerated and due and payable with interest thereon at the Default Rate), and Holder may exercise any and all of its remedies hereunder, under the other Loan Documents and under Applicable Law.  The remedies of Holder provided herein, in the Security Agreement and under Applicable Law shall be cumulative and concurrent and may be pursued singly, successively or concurrently at the sole discretion of Holder and may be exercised as often as occasion therefor shall occur.  The failure to exercise, or any delay in the exercise of, any right or remedy shall in no event be construed as a waiver, release or exhaustion of any such remedies.

8.    <u>Collection Costs</u>.  In addition to the Principal, Interest, Prepayment Premium (if any), and late payment charges (if any), Maker shall pay Holder on demand, and Holder shall be entitled to collect all costs and expenses of collection, including, without limitation, reasonable attorneys' fees, incurred in connection with enforcement of its rights and remedies hereunder and under the other Loan Documents, the protection or realization of the Collateral or in connection with Holder's collection efforts, or in connection with any bankruptcy or other judicial proceeding, whether or not suit on this Note or any foreclosure proceeding is filed.  All such costs and expenses shall be payable on demand and, until paid, shall be Secured Obligations secured by the security interest granted under the Security Agreement and all other collateral, if any, held by Holder as security for Maker's obligations under this Note.

9.    <u>Governing Law; Binding Agreement</u>.  The provisions of this Note shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.  THIS NOTE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR

ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

10.    More than One Signer.  If more than one person or entity signs this Note as a Maker, the obligations contained herein shall be deemed joint and several and all references to "Maker" shall apply both jointly and severally.

11.    General.  Maker represents and warrants that this Note evidences a loan for business or commercial purposes.  Prior to signing this Note, Maker read and understood the provisions hereof, and agrees to all terms and conditions contained herein.

12.    Waiver.  MAKER AND ALL ENDORSERS, SURETIES, AND GUARANTORS HEREOF HEREBY JOINTLY AND SEVERALLY WAIVE PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NON-PAYMENT OR DISHONOR, NOTICE OF INTENTION TO ACCELERATE THE MATURITY, NOTICE OF PROTEST AND PROTEST OF THIS NOTE. HOLDER AND MAKER HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH HOLDER OR MAKER MAY BE PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THIS NOTE OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY HOLDER AND THE MAKER WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE AND THE OTHER LOAN DOCUMENTS.

13.    Usury; Partial Invalidity.  (a)  At no time shall the Interest Rate (or the Default Rate or other amounts paid or collected hereunder) exceed the highest rate allowed by applicable law for this type of loan.  Should Holder ever collect interest at a rate that exceeds such applicable legal limit, such excess will be credited to the Principal.

(b)  Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under the laws of any applicable jurisdiction, such provision, as to such jurisdiction, shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note in any other jurisdiction.

14.    Notices.  All notices and other communications under this Note shall be in writing and shall be addressed: (a) if to Maker, Route 3 Box 15, Headland, Alabama 36345; and (b) if to Holder, KeyCorp Leasing, a Division of Key Corporate Capital Inc., 54 State Street, Albany, New York 12207, Attention: Account Manager, or such other address as either party hereto shall communicate to the other party at its address specified above.  All such notices and other communications shall be deemed to have been duly given if delivered by hand, overnight courier or if sent by certified mail, return receipt requested, to the party to whom such notice is intended to be given, and shall be effective upon receipt.

15.    Funding Date.  The Funding Date for this Note shall be the date on which Holder disburses funds hereunder. TO THE EXTENT THE FUNDING DATE IS LEFT BLANK ABOVE, OR DOES NOT REFLECT THE ACTUAL DATE THAT HOLDER DISBURSES FUNDS HEREUNDER, MAKER HEREBY AUTHORIZES HOLDER TO WRITE IN THE CORRECT DATE AT THE TIME OF DISBURSEMENT.

IN WITNESS WHEREOF, Maker, intending to be legally bound, has caused this Note to be duly executed on the day and year first above written.

MAKER:

Clark Construction Company, Inc.

x *(signature)*

Name: Colby Clark

Title: President

STATE OF  Alabama            )
                             ) ss.:
COUNTY OF  Henry             )

On this ___7___ (Day) day of __February__ (Month), __2001__ (Year), before me the subscriber personally appeared __Colby Clark__, who being by me duly sworn, did depose and say; that (s)he resides at __Houston__ County, State of __Alabama__: that (s)he is a __President__ of __Clark Construction Co., Inc.__, the corporation described in and which executed the foregoing instrument; and that (s)he signed his/her name thereto by order of the Board of Directors of said corporation.

*(signature)*

NOTARY PUBLIC

My Commission Expires:  12-10-03

# EXHIBIT "H"



C#: 32567
L#: 34415

# Master Equipment Lease Agreement

THIS MASTER EQUIPMENT LEASE AGREEMENT dated as of February 13, 2001 is made by and between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC., having an address at 54 State Street, Albany, New York 12207 ("Lessor"), and CLARK CRANE, L.L.C, an Alabama limited liability company with its principal place of business at P.O. Box 190, Headland, Alabama 36345 ("Lessee").

## TERMS AND CONDITIONS OF LEASE

1.    <u>Lease</u>. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Equipment, subject to and upon the terms set forth herein. Each Equipment Schedule shall constitute a separate and enforceable lease incorporating all the terms of this Master Equipment Lease Agreement as if such terms were set forth in full in such Equipment Schedule. In the event that any term of any Equipment Schedule conflicts with or is inconsistent with any term of this Master Equipment Lease Agreement, the terms of the Equipment Schedule shall govern.

2.    <u>Disclaimer of Warranties</u>. LESSOR MAKES NO (AND SHALL NOT BE DEEMED TO HAVE MADE ANY) WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, OPERATION OR CONDITION OF, OR THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE STATE OF TITLE THERETO OR OF ANY COMPONENT THEREOF, THE ABSENCE OF LATENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AND LESSOR HEREBY DISCLAIMS THE SAME; IT BEING UNDERSTOOD THAT THE EQUIPMENT IS LEASED TO LESSEE "AS IS" AND ALL SUCH RISKS, IF ANY, ARE TO BE BORNE BY LESSEE. NO DEFECT IN, OR UNFITNESS OF, THE EQUIPMENT, OR ANY OF THE OTHER FOREGOING MATTERS, SHALL RELIEVE LESSEE OF THE OBLIGATION TO PAY RENT OR OF ANY OTHER OBLIGATION HEREUNDER. LESSEE HAS MADE THE SELECTION OF THE EQUIPMENT FROM THE SUPPLIER BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR. LESSOR IS NOT RESPONSIBLE FOR ANY REPAIRS, SERVICE, MAINTENANCE OR DEFECT IN THE EQUIPMENT OR THE OPERATION THEREOF. IN NO EVENT SHALL LESSOR BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES (WHETHER UNDER THE UCC OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, ANY LOSS, COST OR DAMAGE TO LESSEE OR OTHERS ARISING FROM ANY OF THE FOREGOING MATTERS, INCLUDING, WITHOUT LIMITATION, DEFECTS, NEGLIGENCE, DELAYS, FAILURE OF DELIVERY OR NON-PERFORMANCE OF THE EQUIPMENT. ANY WARRANTY BY THE SUPPLIER IS HEREBY ASSIGNED TO LESSEE BY LESSOR FOR THE TERM OF THE LEASE WITHOUT RECOURSE. SUCH WARRANTY SHALL NOT RELEASE LESSEE FROM ITS OBLIGATION TO LESSOR TO PAY RENT, TO PERFORM ALL OTHER OBLIGATIONS HEREUNDER AND TO KEEP, MAINTAIN AND SURRENDER THE EQUIPMENT IN THE CONDITION REQUIRED BY SECTIONS 12 AND 13 HEREOF. Lessee's execution and delivery of a Certificate of Acceptance shall be conclusive evidence as between Lessor and Lessee that the Items of Equipment described therein are in all of the foregoing respects satisfactory to Lessee, and Lessee shall not assert any claim of any nature whatsoever against Lessor based on any of the foregoing matters; <u>provided</u>, <u>however</u>, that nothing contained herein shall in any way bar, reduce or defeat any claim that Lessee may have against the Supplier or any other person (other than Lessor).

3.    <u>Non-Cancelable Lease</u>. THIS LEASE IS A NET LEASE AND LESSEE'S OBLIGATION TO PAY RENT AND PERFORM ITS OBLIGATIONS HEREUNDER ARE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL UNDER ANY AND ALL CIRCUMSTANCES WHATSOEVER (INCLUDING WITHOUT LIMITATION THE BANKRUPTCY OF LESSOR) AND SHALL NOT BE SUBJECT TO ANY RIGHT OF SET OFF, COUNTERCLAIM, DEDUCTION, DEFENSE OR OTHER RIGHT WHICH LESSEE MAY HAVE AGAINST THE SUPPLIER, LESSOR OR ANY OTHER PARTY. LESSEE SHALL HAVE NO RIGHT TO TERMINATE (EXCEPT AS EXPRESSLY PROVIDED HEREIN) OR CANCEL THIS LEASE OR TO BE

RELEASED OR DISCHARGED FROM ITS OBLIGATION HEREUNDER FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DEFECTS IN, DESTRUCTION OF, DAMAGE TO OR INTERFERENCE WITH ANY USE OF THE EQUIPMENT (FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WAR, ACT OF GOD, STRIKE OR GOVERNMENTAL REGULATION), THE INVALIDITY, ILLEGALITY OR UNENFORCEABILITY (OR ANY ALLEGATION THEREOF) OF THIS LEASE OR ANY PROVISION HEREOF, OR ANY OTHER OCCURRENCE WHATSOEVER, WHETHER SIMILAR OR DISSIMILAR TO THE FOREGOING, WHETHER FORESEEN OR UNFORESEEN.

4.    <u>Definitions</u>. Unless the context otherwise requires, as used in this Lease, the following terms shall have the respective meanings indicated below and shall be equally applicable to both the singular and the plural forms thereof:

"<u>Applicable Law</u>" shall mean all applicable Federal, state, local and foreign laws, ordinances, judgments, decrees, injunctions, writs, rules, regulations, orders, licenses and permits of any Governmental Authority.

"<u>Appraisal Procedure</u>" shall mean the following procedure for obtaining an appraisal of the Fair Market Sales Value or the Fair Market Rental Value. Lessor shall provide Lessee with the names of three independent Appraisers. Within ten (10) business days thereafter, Lessee shall select one of such Appraisers to perform the appraisal. The selected Appraiser shall be instructed to perform its appraisal based upon the assumptions specified in the definition of Fair Market Sales Value or Fair Market Rental Value, as applicable, and shall complete its appraisal within twenty (20) business days after such selection. Any such appraisal shall be final, binding and conclusive on Lessee and Lessor and shall have the legal effect of an arbitration award. Lessee shall pay the fees and expenses of the selected Appraiser.

"<u>Appraiser</u>" shall mean a person engaged in the business of appraising property who has at least ten (10) years' experience in appraising property similar to the Equipment.

"<u>Authorized Signer</u>" shall mean any officer of Lessee, set forth on an incumbency certificate (in form and substance satisfactory to Lessor) delivered by Lessee to Lessor, who is authorized and empowered to execute the Lease Documents.

"<u>Certificate of Acceptance</u>" shall mean a certificate of acceptance, in form and substance satisfactory to Lessor, executed and delivered by Lessee in accordance with Section 7 hereof.

"<u>Default</u>" shall mean any event or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall mean an annual interest rate equal to the lesser of 18% or the maximum interest rate permitted by Applicable Law.

"<u>Equipment</u>" shall mean an item or items of property designated from time to time by Lessee which are described on an Equipment Schedule and which are being or will be leased by Lessee pursuant to this Lease, together with all replacement parts, additions and accessories incorporated therein or affixed thereto including, without limitation, any software that is a component or integral part of, or is included or used in connection with, any Item of Equipment, but with respect to such software, only to the extent of Lessor's interest therein, if any.

"<u>Equipment Group</u>" shall consist of all Items of Equipment listed on a particular Equipment Schedule.

"<u>Equipment Location</u>" shall mean the location of the Equipment, as set forth on an Equipment Schedule, or such other location (approved in writing by Lessor) as Lessee shall from time to time specify in writing.

"<u>Equipment Schedule</u>" shall mean each equipment lease schedule from time to time executed by Lessor and Lessee with respect to an Equipment Group, pursuant to and incorporating by reference all of the terms of this Master Equipment Lease Agreement.

"<u>Event of Default</u>" shall have the meaning specified in Section 22 hereof.

"<u>Fair Market Rental Value</u>" or "<u>Fair Market Sale Value</u>" shall mean the value of each Item of Equipment for lease or sale, unless otherwise specified herein as determined between Lessor and Lessee, or, if Lessor and Lessee are unable to agree, pursuant to the Appraisal Procedure, which would be obtained in an arms-length transaction between an informed and willing lessor or seller (under no compulsion to lease or sell) and an informed and willing lessee or buyer (under no compulsion to lease or purchase). In determining the Fair Market Rental Value or Fair Market Sale Value of the Equipment, (a) such Fair Market Rental Value or Fair Market Sale Value shall be calculated on the assumption that the Equipment is in the condition and repair required by Sections 12 and 13 hereof, and (b) there shall be excluded from the calculation thereof the value of any Upgrade made pursuant to Section 14 hereof in which the Lessor does not hold an interest.

"GAAP" shall have the meaning specified in Section 31 hereof.

"Governmental Action" shall mean all authorizations, consents, approvals, waivers, filings and declarations of any Governmental Authority, including, without limitation, those environmental and operating permits required for the ownership, lease, use and operation of the Equipment.

"Governmental Authority" shall mean any foreign, Federal, state, county, municipal or other governmental authority, agency, board or court.

"Guarantor" shall mean any guarantor of Lessee's obligations hereunder.

"Initial Term Expiration Date" shall have the meaning set forth in the Equipment Schedule associated therewith.

"Item of Equipment" shall mean each Item of the Equipment.

"Lease", "hereof", "herein" and "hereunder" shall mean, with respect to an Equipment Group, this Master Equipment Lease Agreement and the Equipment Schedule on which such Equipment Group is described, including all addenda attached thereto and made a part thereof.

"Lease Documents" shall mean this Lease and all other documents prepared by Lessor and now or hereafter executed in connection therewith.

"Lessor Assignee" shall have the meaning specified in Section 15 hereof.

"Lessor Expense" shall have the meaning specified in Section 26 hereof.

"Lessor Transfer" shall have the meaning specified in Section 15 hereof.

"Liability" shall have the meaning specified in Section 24 hereof.

"Lien" shall mean all mortgages, pledges, security interests, liens, encumbrances, claims or other charges of any kind whatsoever.

"Loss" shall have the meaning specified in Section 16 hereof.

"Purchase Agreement" shall mean any purchase agreement or other contract entered into between the Supplier and Lessee for the acquisition of the Equipment to be leased hereunder.

"Related Equipment Schedule" shall have the meaning specified in Section 27 hereof.

"Remedy Date" shall have the meaning specified in Section 22 hereof.

"Rent" shall mean the periodic rental payments due hereunder for the leasing of the Equipment, as set forth on the Equipment Schedules, and, where the context hereof requires, all such additional amounts as may from time to time be payable under any provision of this Lease.

"Rent Commencement Date" shall mean, with respect to an Equipment Group, (a) the date on which Lessor receives an executed Certificate of Acceptance for such Equipment from Lessee or (b) the date on which Lessor disburses funds for the purchase of such Equipment Group, as determined by Lessor in its sole discretion.

"Rent Payment Date" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith.

"Required Alteration" shall have the meaning specified in Section 11 hereof.

"Stipulated Loss Value" shall mean, as of any Rent Payment Date and with respect to an Item of Equipment, the amount determined by multiplying the Total Cost for such Item of Equipment by the percentage specified in the applicable Stipulated Loss Value Supplement opposite such Rent Payment Date.

"Stipulated Loss Value Supplement" with respect to an Equipment Group, shall have the meaning set forth in the Equipment Schedule associated therewith.

"Supplier" shall mean the manufacturer or the vendor of the Equipment, as set forth on each Equipment Schedule.

"Term" shall mean the Initial Term or any Renewal Term, each as defined in Section 8 hereof, and any Extended Lease Term or Interim Term as defined in an Equipment Schedule.

"Total Cost" shall mean, with respect to an Item of Equipment, (a) the acquisition cost of such Item of Equipment (including Lessor's capitalized costs), as set forth on the Equipment Schedule on which such Item of Equipment is described, or (b) if no such acquisition cost is specified, the Supplier's invoice price for such Item of Equipment plus Lessor's capitalized costs, or (c) if no such acquisition cost is specified and no such invoice price is obtainable, an allocated price for such Item of Equipment based on the Total Cost of all Items of Equipment set forth on the Equipment Schedule on which such Item of Equipment is described, as determined by Lessor in its sole discretion.

"Upgrade" shall have the meaning specified in Section 14 hereof.

5.    **Supplier Not an Agent.** LESSEE UNDERSTANDS AND AGREES THAT (a) NEITHER THE SUPPLIER, NOR ANY SALES REPRESENTATIVE OR OTHER AGENT OF THE SUPPLIER, IS (1) AN AGENT OF LESSOR OR (2) AUTHORIZED TO MAKE OR ALTER ANY TERM OR CONDITION OF THIS

LEASE, AND (b)·NO SUCH WAIVER OR ALTERATION SHALL VARY THE TERMS OF THIS LEASE UNLESS EXPRESSLY SET FORTH HEREIN.

6.    Ordering Equipment.  Lessee has selected and ordered the Equipment from the Supplier and, if appropriate has entered into a Purchase Agreement with respect thereto.  Lessor may accept an assignment from Lessee of Lessee's rights, but none of Lessee's obligations, under any such Purchase Agreement.  Lessee shall arrange for delivery of the Equipment so that it can be accepted in accordance with Section 7 hereof.  If an Item of Equipment is subject to an existing Purchase Agreement between Lessee and the Supplier, Lessee warrants that such Item of Equipment has not been delivered to Lessee as of the date of the Equipment Schedule applicable thereto.  If Lessee causes the Equipment to be modified or altered, or requests any additions thereto prior to the Rent Commencement Date, Lessee (a) acknowledges that any such modification, alteration or addition to an Item of Equipment may affect the Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent with respect to such Item of Equipment, and (b) hereby authorizes Lessor to adjust such Total Cost, taxes, purchase and renewal options (if any), Stipulated Loss Value and Rent as appropriate.  Lessee hereby authorizes Lessor to complete each Equipment Schedule with the serial numbers and other identification data of the Equipment Group associated therewith, as such data is received by Lessor.

7.    Delivery and Acceptance.  Upon Lessee's acceptance for lease of any Equipment delivered to Lessee and described in any Equipment Schedule, Lessee shall execute and deliver to Lessor a Certificate of Acceptance.  LESSOR SHALL HAVE NO OBLIGATION TO ADVANCE FUNDS FOR THE PURCHASE OF THE EQUIPMENT UNLESS AND UNTIL LESSOR SHALL HAVE RECEIVED A CERTIFICATE OF ACCEPTANCE RELATING THERETO EXECUTED BY LESSEE.  Such Certificate of Acceptance shall constitute Lessee's acknowledgment that such Equipment (a) was received by Lessee, (b) is satisfactory to Lessee in all respects and is acceptable to Lessee for lease hereunder, (c) is suitable for Lessee's purposes, (d) is in good order, repair and condition, (e) has been installed and operates properly, and (f) is subject to all of the terms  of this Lease (including, without limitation, Section 2 hereof).

8.    Term; Survival.  With respect to any Item of Equipment, unless otherwise specified on an Equipment Schedule, the initial term of this Lease (the "Initial Term") shall commence on the date on which such Item of Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on the Initial Term Expiration Date for such Item of Equipment.  With respect to an Item of Equipment, any renewal term of this Lease (individually, a "Renewal Term"), as contemplated hereby, shall commence immediately upon the expiration of the Initial Term or any prior Renewal Term, as the case may be, and, unless earlier terminated as provided herein, shall expire on the date on which the final payment of Rent is due and paid hereunder.  All obligations of Lessee hereunder shall survive the expiration, cancellation or other termination of the Term hereof.

9.    Rent.  Lessee shall pay the Rent set forth on the Equipment Schedule commencing on the Rent Commencement Date, and, unless otherwise set forth on such Equipment Schedule, on the same day of each payment period thereafter for the balance of the Term.  Rent shall be due whether or not Lessee has received any notice that such payments are due.  All Rent shall be paid to Lessor at its address set forth on the Equipment Schedule, or as otherwise directed by Lessor in writing.

10.    Location; Inspection; Labels.  The Equipment shall be delivered to the Equipment Location and shall not be removed therefrom without Lessor's prior written consent.  Lessor shall have the right to enter upon the Equipment Location and inspect the Equipment at any reasonable time.  Lessor may, without notice to Lessee, remove the Equipment if the Equipment is, in the opinion of Lessor, being used beyond its capacity or is in any manner improperly cared for, abused or misused.  At Lessor's request, Lessee shall affix permanent labels indicating Lessor's interest in the Equipment in a prominent place on the Equipment and shall keep such labels in good repair and condition.

11.    Use; Alterations.  Lessee shall use the Equipment lawfully and only in the manner for which it was designed and intended and so as to subject it only to ordinary wear and tear.  Lessee shall comply with all Applicable Law.  Lessee shall immediately notify Lessor in writing of any existing or threatened investigation, claim or action by any Governmental Authority in connection with any Applicable Law or Governmental Action

which could adversely affect the Equipment or this Lease. Lessee, at its own expense, shall make such alterations, additions or modifications or improvements (each, a "Required Alteration") to the Equipment as may be required from time to time to meet the requirements of Applicable Law or Governmental Action. All such Required Alterations shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens. Except as otherwise permitted herein, Lessee shall not make any alterations to the Equipment without Lessor's prior written consent.

12.    Repairs and Maintenance. Lessee, at Lessee's own cost and expense, shall (a) keep the Equipment in good repair, good operating condition and working order and in compliance with the manufacturer's specifications and Lessee's standard practices (but with respect to the latter, in no event less than industry practices), and (b) enter into and keep in full force and effect during the Term hereof a maintenance agreement with the manufacturer of the Equipment, or a manufacturer-approved maintenance organization, to maintain, service and repair the Equipment as otherwise required herein. Upon Lessor's request, Lessee shall furnish Lessor with an executed copy of any such maintenance agreement. An alternate source of maintenance may be used by Lessee with Lessor's prior written consent. Lessee, at its own cost and expense and within a reasonable period of time, shall replace any part of any Item of Equipment that becomes unfit or unavailable for use from any cause (whether or not such replacement is covered by the aforesaid maintenance agreement), with a replacement part of the same manufacture, value, remaining useful life and utility as the replaced part immediately preceding the replacement (assuming that such replaced part was in the condition required by this Lease). Such replacement part shall immediately, and without further act, be deemed to constitute an Item of Equipment and be fully subject to this Lease as if originally leased hereunder, and shall be free and clear of all Liens.

13.    Return of Equipment. Upon the expiration (subject to Section 32 hereof and except as otherwise provided in an Equipment Schedule) or earlier termination of this Lease, Lessee, at its sole expense, shall assemble and return the Equipment to Lessor by delivering such Equipment F.A.S. or F.O.B. to such location or such carrier (packed for shipping) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be in the condition required by Section 12 hereof. All components of the Equipment shall have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any Item of Equipment fails to meet the standards set forth above, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing such Item of Equipment and restoring it so as to meet such standards. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

14.    Equipment Upgrades/Attachments. In addition to the requirements of Section 11 hereof, Lessee, at its own expense, may from time to time add or install upgrades or attachments (each an "Upgrade") to the Equipment during the Term; provided, that such Upgrades (a) are readily removable without causing material damage to the Equipment, (b) do not materially adversely affect the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of the Equipment, and (c) do not cause such Equipment to become "limited use property" within the meaning of Revenue Procedure 76-30, 1976-2 C.B. 647 (or such other successor tax provision), as of the date of installation of such Upgrade. Any such Upgrades which can be removed without causing damage to or adversely affecting the condition of the Equipment, or reducing the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of the Equipment shall remain the property of Lessee; and upon the expiration or earlier termination of this Lease and provided that no Event of Default exists, Lessee may, at its option, remove any such Upgrades and, upon such removal, shall restore the Equipment to the condition required hereunder.

15.    Sublease and Assignment. (a) WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, LESSEE SHALL NOT (1) ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT OR ANY INTEREST THEREIN, OR (2) SUBLET OR LEND THE EQUIPMENT TO, OR PERMIT THE EQUIPMENT TO BE USED BY, ANYONE OTHER THAN LESSEE.

(b) Lessor, at any time with or without notice to Lessee, may sell, transfer, assign and/or grant a security interest, in all or any part of Lessor's interest in this Lease, any Equipment Schedule or any Item of Equipment (each, a "Lessor Transfer"), provided that no such Lessor Transfer will materially increase Lessee's burdens or risks hereunder. In the event of a Lessor Transfer, any purchaser, transferee, assignee or secured party (each a "Lessor Assignee") shall have and may exercise all of Lessor's rights hereunder with respect to the items to which any such Lessor Transfer relates, and LESSEE SHALL NOT ASSERT AGAINST ANY SUCH LESSOR ASSIGNEE ANY DEFENSE, COUNTERCLAIM OR OFFSET THAT LESSEE MAY HAVE AGAINST LESSOR. Lessee acknowledges that no such sale, transfer, assignment and/or security interest will materially change Lessee's duties hereunder or materially increase its burdens or risks hereunder. Lessee agrees that upon written notice to Lessee of any such sale, transfer, assignment and/or security interest, Lessee shall acknowledge receipt thereof in writing and shall comply with the directions and demands of any such Lessor Assignee.

16.    **Risk of Loss; Damage to Equipment**.  (a) Lessee shall bear the entire risk of loss (including without limitation, theft, destruction, disappearance of or damage to any and all Items of Equipment ("Loss") from any cause whatsoever), whether or not insured against, during the Term hereof until the Equipment is returned to Lessor in accordance with Section 13 hereof. No Loss shall relieve Lessee of the obligation to pay Rent or of any other obligation under this Lease.

(b) In the event of Loss to any Item of Equipment, Lessee shall immediately notify Lessor of same, and at the option of Lessor, Lessee shall within thirty (30) days following such Loss: (1) place such Item of Equipment in good condition and repair, in accordance with the terms hereof; (2) replace such Item of Equipment with replacement equipment (acceptable to Lessor) in as good condition and repair, and with the same value, remaining useful economic life and utility, as such replaced Item of Equipment immediately preceding the Loss (assuming that such replaced Item of Equipment was in the condition required by this Lease), which replacement equipment shall immediately, and without further act, be deemed to constitute Items of Equipment and be fully subject to this Lease as if originally leased hereunder and shall be free and clear of all Liens; or (3) pay to Lessor the sum of (i) all Rent due and owing hereunder with respect to such Item of Equipment (at the time of such payment) plus (ii) the Stipulated Loss Value as of the Rent Payment Date next following the date of such Loss with respect to such Item of Equipment. Upon Lessor's receipt of the payment required under subsection (3) above, Lessee shall be entitled to Lessor's interest in such Item of Equipment, in its then condition and location, "as is" and "where is", without any warranties, express or implied.

17.    **Insurance**.  (a) Lessee shall, at all times during the Term hereof (until the Equipment shall have been received by Lessor) and at Lessee's own cost and expense, maintain (1) insurance against all risks of physical loss or damage to the Equipment (which shall include theft and collision for Equipment consisting of motor vehicles, but shall not exclude loss resulting from flood or earthquake) in an amount not less than the greater of the full replacement value thereof or the Stipulated Loss Value thereof if applicable, and (2) commercial general liability insurance (including blanket contractual liability coverage and products liability coverage) for personal and bodily injury and property damage in an amount satisfactory to Lessor.

(b) All insurance policies required hereunder shall (1) require thirty (30) days' prior written notice of cancellation or material change in coverage to Lessor (any such cancellation or change, as applicable, not being effective until the thirtieth (30th) day after the giving of such notice); (2) name "KeyCorp and its subsidiaries and affiliated companies, including Key Corporate Capital Inc., their successors and assigns" as an additional insured under the public liability policies and name Lessor as sole loss payee under the property insurance policies; (3) not require contributions from other policies held by Lessor; (4) waive any right of subrogation against Lessor; (5) in respect of any liability of Lessor, except for the insurers' salvage rights in the event of a loss, waive the right of such insurers to set-off, to counterclaim or to any other deduction, whether by attachment or otherwise, to the extent of any monies due Lessor under such policies; (6) not require that Lessor pay or be liable for any premiums with respect to such insurance covered thereby; (7) be in full force and effect throughout any geographical areas at any time traversed by any Item of Equipment; and (8) contain breach of warranty provisions providing that, in respect of the interests of Lessor in such policies, the insurance shall not be invalidated by any action or inaction of Lessee or any other person (other than Lessor) and shall insure Lessor regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee or by any other person (other than Lessor). Prior to the first date of delivery of any Item of Equipment hereunder, and thereafter not less than 15 days prior to the expiration dates of the expiring policies theretofore delivered pursuant to this Section, Lessee

shall deliver to Lessor a duplicate original of all policies (or in the case of blanket policies, certificates thereof issued by the insurers thereunder) for the insurance maintained pursuant to this Section.

18.    General Tax Indemnification.  Lessee shall pay when due and shall indemnify and hold Lessor harmless from and against (on an after-tax basis) any and all taxes, fees, withholdings, levies, imposts, duties, assessments and charges of any kind and nature arising out of or related to this Lease (together with interest and penalties thereon and including, without limitation, sales, use, gross receipts, personal property, real property, real estate excise, ad valorem, business and occupational, franchise, value added, leasing, leasing use, documentary, stamp or other taxes) imposed upon or against Lessor, any Lessor Assignee, Lessee or any Item of Equipment by any Governmental Authority with respect to any Item of Equipment or the manufacturing, ordering, sale, purchase, shipment, delivery, acceptance or rejection, ownership, titling, registration, leasing, subleasing, possession, use, operation, removal, return or other dispossession thereof or upon the rents, receipts or earnings arising therefrom or upon or with respect to this Lease, excepting only all Federal, state and local taxes on or measured by Lessor's net income (other than income tax resulting from making any alterations, improvements, modifications, additions, upgrades, attachments, replacements or substitutions by Lessee).  Whenever this Lease terminates as to any Item of Equipment, Lessee shall, upon written request by Lessor, advance to Lessor the amount estimated by Lessor to be the personal property or other taxes on said item which are not yet payable, but for which Lessee is responsible. Lessor shall, at Lessee's request, provide Lessee with Lessor's method of computation of any estimated taxes.

19.    Lessor's Right to Perform for Lessee.  If Lessee fails to perform  any of its obligations contained herein, Lessor may (but shall not be obligated to) perform such obligations, and the amount of the reasonable costs and expenses of Lessor incurred in connection with such performance, together with interest on such amount at the Default Rate, shall be payable by Lessee to Lessor upon demand.  No such performance by Lessor shall be deemed a waiver of any rights or remedies of Lessor, or be deemed to cure the default of Lessee hereunder .

20.    Delinquent Payments.  If Lessee fails to pay any Rent or other sums under this Lease on or before the date when the same becomes due, Lessee shall pay to Lessor a late charge equal to the lesser of five percent (5%) of such delinquent amount or the maximum amount permitted under Applicable Law. Such late charge shall be payable by Lessee upon demand by Lessor and shall be deemed Rent hereunder.

21.    Personal Property; Liens.  Lessor and Lessee hereby agree that the Equipment is, and shall at all times remain, personal property notwithstanding the fact that any Item of Equipment may now be, or hereafter become, in any manner affixed or attached to real property or any improvements thereon.  Lessee shall at all times keep the Equipment free and clear from all Liens.  Lessee shall (a) give Lessor immediate written notice of any such Lien, (b) promptly, at Lessee's sole cost and expense, take such action as may be necessary to discharge any such Lien, and (c) indemnify and hold Lessor, on an after-tax basis, harmless from and against any loss or damage caused by any such Lien.

22.    Events of Default; Remedies.  (a) As used herein, the term "Event of Default" shall mean any of the following events:  (1) Lessee fails to pay any Rent within ten (10) days after the same shall have become due; (2) Lessee or any Guarantor becomes insolvent or makes an assignment for the benefit of its creditors; (3) a receiver, trustee, conservator or liquidator of Lessee or any Guarantor or of all or a substantial part of Lessee's or such Guarantor's assets is appointed with or without the application or consent of Lessee or such Guarantor, respectively; (4) a petition is filed by or against Lessee or any Guarantor under any bankruptcy, insolvency or similar legislation; (5) Lessee or any Guarantor violates or fails to perform any provision of either this Lease or any other loan, lease or credit agreement or any acquisition or purchase agreement with Lessor or any other party; (6) Lessee violates or fails to perform any covenant or representation made by Lessee herein; (7) any representation or warranty made herein or in any certificate, financial statement or other statement furnished to Lessor (or Lessor's parent, subsidiaries or affiliates) shall prove to be false or misleading in any material respect as of the date on which the same was made; (8) Lessee makes a bulk transfer of furniture, furnishings, fixtures or other equipment or inventory; (9) there is a material adverse change in Lessee's or any Guarantor's financial condition since the first Rent Commencement Date of any Equipment Schedule executed in connection herewith; (10) Lessee merges or consolidates with any other corporation or entity, or sells, leases or disposes of all or

substantially all of its assets without the prior written consent of Lessor; (11) a change in control occurs in Lessee or any Guarantor; or (12) the death or dissolution of Lessee or any Guarantor. An Event of Default with respect to any Equipment Schedule hereunder shall, at Lessor's option, constitute an Event of Default for all Equipment Schedules hereunder and any other agreements between Lessor and Lessee.

(b) Upon the occurrence of an Event of Default, Lessor may do one or more of the following as Lessor in its sole discretion shall elect: (1) proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof; (2) sell any Item of Equipment at public or private sale; (3) hold, keep idle or lease to others any Item of Equipment as Lessor in its sole discretion may determine; (4) by notice in writing to Lessee, cancel or terminate this Lease, without prejudice to any other remedies hereunder; (5) demand that Lessee, and Lessee shall, upon written demand of Lessor and at Lessee's expense forthwith return all Items of Equipment to Lessor in the manner and condition required by Section 13 hereof, provided, however, that Lessee shall remain and be liable to Lessor for any amounts provided for herein or other damages resulting from the Equipment not being in the condition required by Section 12 hereof, and otherwise in accordance with all of the provisions of this Lease, except those provisions relating to periods of notice; (6) enter upon the premises of Lessee or other premises where any Item of Equipment may be located and, without notice to Lessee and with or without legal process, take possession of and remove all or any such Items of Equipment without liability to Lessor by reason of such entry or taking possession, and without such action constituting a cancellation or termination of this Lease unless Lessor notifies Lessee in writing to such effect; (7) by written notice to Lessee specifying a payment date (the "Remedy Date"), demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Remedy Date, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Rent due prior to the Remedy Date plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice (together with interest on such amount at the Default Rate from the Remedy Date to the date of actual payment): (i) an amount, with respect to an Item of Equipment, equal to the Rent payable for such Item of Equipment for the remainder of the then current Term thereof, after discounting such Rent to present worth as of the Remedy Date on the basis of a per annum rate of discount equal to three percent (3%) from the respective dates upon which such Rent would have been paid had this Lease not been canceled or terminated; or (ii) the Stipulated Loss Value, computed as of the Remedy Date or, if the Remedy Date is not a Rent Payment Date, the Rent Payment Date next following the Remedy Date (provided, however, that, with respect to any proceeds actually received by Lessor for any Item of Equipment returned to or repossessed by Lessor, Lessor agrees that it shall first apply such proceeds to satisfy Lessee's obligation to pay the Stipulated Loss Value or, if Lessor has received payment in full of the Stipulated Loss Value from Lessee, Lessor shall remit such proceeds to Lessee (after first deducting any Lessor Expense) up to the amount of the Stipulated Loss Value; (8) cause Lessee, at its expense, to promptly assemble any and all Items of Equipment and return the same to Lessor at such place as Lessor may designate in writing; and (9) exercise any other right or remedy available to Lessor under Applicable Law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof or to rescind this Lease. In addition, Lessee shall be liable, except as otherwise provided above, for any and all unpaid Rent due hereunder before or during the exercise of any of the foregoing remedies, and for reasonable legal fees and other costs and expenses incurred by reason of the occurrence of any Event of Default or the exercise of Lessor's remedies with respect thereto. If an Event of Default occurs, Lessee hereby agrees that ten (10) days prior notice to Lessee of (A) any public sale or (B) the time after which a private sale may be negotiated shall be conclusively deemed reasonable and, to the extent permitted by Applicable Law, Lessee waives all rights and defenses with respect to such disposition of the Equipment. None of Lessor's rights or remedies hereunder are intended to be exclusive of, but each shall be cumulative and in addition to any other right or remedy referred to hereunder or otherwise available to Lessor at law or in equity, and no express or implied waiver by Lessor of any Event of Default shall constitute a waiver of any other Event of Default or a waiver of any of Lessor's rights.

23.    Notices. All notices and other communications hereunder shall be in writing and shall be transmitted by hand, overnight courier or certified mail (return receipt requested), postage prepaid. Such notices and other communications shall be addressed to the respective party at the address set forth above or at such other address as any party may from time to time designate by notice duly given in accordance with this Section. Such notices and other communications shall be effective upon the earlier of receipt or three (3) days after mailing if mailed in accordance with the terms of this Section.

24.   General Indemnification.  (a) Lessee shall pay, and shall indemnify and hold Lessor harmless on an after-tax basis from and against, any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, liabilities, demands and judgments, and Liens, of any nature whatsoever (collectively, a "Liability") arising out of or in any way related to: (1) the Lease Documents, (2) the manufacture, purchase, ownership, selection, acceptance, rejection, possession, lease, sublease, operation, use, maintenance, documenting, inspection, control, loss, damage, destruction, removal, storage, surrender, sale, use, condition, delivery, nondelivery, return or other disposition of or any other matter relating to any Item of Equipment or any part or portion thereof (including, in each case and without limitation, latent or other defects, whether or not discoverable, any claim for patent, trademark or copyright infringement) and any and all Liabilities in any way relating to or arising out of injury to persons, properties or the environment or any and all Liabilities based on strict liability in tort, negligence, breach of warranties or violations of any regulatory law or requirement, (3) a failure to comply fully with Applicable Law and (4) Lessee's failure to perform any covenant, or Lessee's breach of any representation or warranty, hereunder; provided, that the foregoing indemnity shall not extend to the Liabilities to the extent resulting solely from the gross negligence or willful misconduct of Lessor.

(b)  Lessee shall promptly deliver to Lessor (1) copies of any documents received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency and (2) copies of any documents submitted by Lessee or any of its subsidiaries to the United States Environmental Protection Agency or to any state, county or municipal environmental or health agency concerning the Equipment or its operation.

25.   Severability; Captions.  Any provision of this Lease or any Equipment Schedule which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction. Captions are intended for convenience or reference only, and shall not be construed to define, limit or describe the scope or intent of any provisions hereof.

26.   Lessor's Expense.  Lessee shall pay all costs and expenses of Lessor, including, without limitation, reasonable attorneys' and other professional fees, the fees of any collection agencies and appraisers and all other costs and expenses related to any sale or re-lease of the Equipment (including storage costs), incurred by Lessor in enforcing any of the terms, conditions or provisions hereof or in protecting Lessor's rights hereunder (each a "Lessor Expense").

27.   Related Equipment Schedules.  In the event that any Item of Equipment covered under any Equipment Schedule hereunder may become attached or affixed to, or used in connection with, Equipment covered under another Equipment Schedule hereunder (a "Related Equipment Schedule"), Lessee agrees that, if Lessee elects to exercise a purchase or renewal option under any such Equipment Schedule, or if Lessee elects to return the Equipment under any such Equipment Schedule pursuant to Section 13 hereof, then Lessor, in its sole discretion, may require that all Equipment leased under all Related Equipment Schedules be similarly disposed of.

28.   Financial and Other Data.  During the Term hereof, Lessee shall furnish Lessor (a) as soon as available, and in any event within 120 days after the last day of each fiscal year, financial statements of Lessee and each Guarantor and (b) from time to time as Lessor may reasonably request, other financial reports, information or data (including federal and state income tax returns) and quarterly or interim financial statements of Lessee and each Guarantor. All such information shall be audited (or if audited information is not available, compiled or reviewed) by an independent certified public accountant.

29.   [RESERVED]

30.   [RESERVED]

31.   Representations and Warranties of Lessee. Lessee represents and warrants that: (a) Lessee is a Limited Liability Company duly organized and validly existing in good standing under the laws of the state of its organization and the manager or member executing this Lease has the full authority to represent, sign for and

bind Lessee in all respects; (b) the execution, delivery and performance of this Lease and all related documents: (1) have been duly authorized by all necessary action on the part of Lessee's members, (2) do not require the approval of any member, manager, trustee, or holder of any obligations of Lessee except such as have been duly obtained, and (3) do not and will not contravene any law, governmental rule, regulation or order now binding on Lessee, or the articles of organization or operating agreement of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien or encumbrance upon the property of Lessee under, any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its property is bound; (c) the Lease Documents, when entered into, will constitute legal, valid and binding obligations of Lessee enforceable against Lessee in accordance with the terms thereof; (d) there are no actions or proceedings to which Lessee is a party, and there are no other threatened actions or proceedings of which Lessee has knowledge, before any Governmental Authority, which, either individually or in the aggregate, would adversely affect the financial condition of Lessee, or the ability of Lessee to perform its obligations hereunder; (e) Lessee is not in default under any obligation for the payment of borrowed money, for the deferred purchase price of property or for the payment of any rent under any lease agreement which, either individually or in the aggregate, would have the same such effect; (f) under the laws of the state(s) in which the Equipment is to be located, the Equipment consists solely of personal property and not fixtures; (g) the financial statements of Lessee (copies of which have been furnished to Lessor) have been prepared in accordance with generally acceptable accounting principles consistently applied ("GAAP"), and fairly present Lessee's financial condition and the results of its operations as of the date of and for the period covered by such statements, and since the date of such statements there has been no material adverse change in such conditions or operations; (h) the address stated above is the chief place of business and chief executive office, or in the case of individuals, the primary residence, of Lessee; (i) Lessee does not conduct business under a trade, assumed or fictitious name; (j) the Equipment is being leased hereunder solely for business purposes and that no item of Equipment will be used for personal, family or household purposes; and (k) except as previously disclosed in writing to Lessor, neither Lessee nor any of its officers or directors (if a corporation), partners (if a partnership) or members (if a limited liability company) has, directly or indirectly, any financial interest in the Supplier.

32.    <u>Renewal And Purchase Options.</u> With respect to an Equipment Schedule and the Equipment Group set forth thereon, Lessee shall have the purchase and renewal options set forth in such Equipment Schedule.

33.    <u>Lessee's Waivers</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE (a) WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY SECTIONS 2A-508 THROUGH 2A-522 OF THE UNIFORM COMMERCIAL CODE AND (b)  ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE TO RECOVER INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM LESSOR FOR ANY BREACH OF WARRANTY OR FOR ANY OTHER REASON OR TO SETOFF OR DEDUCT ALL OR ANY PART OF ANY CLAIMED DAMAGES RESULTING FROM LESSOR'S DEFAULT, IF ANY, UNDER THIS LEASE *PROVIDED, HOWEVER*, THAT NO SUCH WAIVER SHALL PRECLUDE LESSEE FROM ASSERTING ANY SUCH CLAIM AGAINST LESSOR IN A SEPARATE CAUSE OF ACTION INCLUDING ANY CLAIM ARISING AS A RESULT OF LESSOR'S BREACH OF SECTION 38 HEREOF.

34.    <u>UCC Filings</u>. LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE DEEMED NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

35.    <u>Miscellaneous</u>. Time is of the essence with respect to this Lease.  ANY FAILURE OF LESSOR TO REQUIRE STRICT PERFORMANCE BY LESSEE OR ANY WAIVER BY LESSOR OF ANY PROVISION HEREIN SHALL NOT BE CONSTRUED AS A CONSENT OR WAIVER OF ANY PROVISION OF THIS LEASE. This Lease and each Equipment Schedule shall be binding upon, and inure to the benefit of, the parties hereto, their permitted successors and assigns. This Lease will be binding upon Lessor only if executed by a duly

authorized officer or representative of Lessor at Lessor's address set forth above. The Lease Documents shall be executed on Lessee's behalf by an Authorized Signer of Lessee. THIS LEASE IS BEING DELIVERED IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

36.    <u>Jury Trial Waiver</u>. LESSOR AND LESSEE HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THE LEASE, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH LESSOR OR LESSEE MAY BE PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. LESSEE AND LESSOR AGREE THAT THEIR RESPECTIVE RIGHT TO JURY TRIAL IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THIS AGREEMENT OR THE OTHER LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY LESSOR AND LESSEE WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE LEASE AND THE LEASE DOCUMENTS.

37.    <u>More than One Lessee</u>. If more than one person or entity executes the Lease Documents as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

38.    <u>Quiet Enjoyment</u>. So long as no Default or Event of Default has occurred and is continuing, Lessee shall peaceably hold and quietly enjoy the Equipment without interruption by Lessor or any person or entity claiming through Lessor.

39.    <u>Entire Agreement</u>.    This Lease, together with all other Lease Documents constitute the entire understanding or agreement between Lessor and Lessee with respect to the leasing of the Equipment, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. Neither this Lease nor any Equipment Schedule may be amended except by a writing signed by Lessor and Lessee.

Lessee's Initials: _____

40.    <u>Execution in Counterparts</u>. This Master Equipment Lease Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease as of the day and year first above written.

Lessor:

KEYCORP LEASING,
A DIVISION OF KEY CORPORATE CAPITAL INC.

By: _____

Name: _Scott D Ford_

Title: _Regional lease Contracts manager_

Lessee:

CLARK CRANE, L.L.C

x _____

Name: _Colby Clark_

Title: Member ____ ✓ Manager ____

FEB-22-2001 THU 09:48 AM FROM: ARK CONSTRUCTION FAX: 334C 9662 Case 1:05-mc-03274-WHA Document 1-2 Filed 12/20/2005 Page 78 of 100 PAGE 2

02/22/2001 01:58 FAX ☒002



C#: 32567
L#: 34415

# Amendment No. 01
## To Master Equipment Lease Agreement

THIS AMENDMENT No. 01 dated as of February 22, 2001 amends that certain Master Equipment Lease Agreement dated as of February 13, 2001 between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC., as Lessor, and CLARK CRANE, L.L.C., as Lessee (the "Master Lease"). Unless otherwise specified herein, all capitalized terms shall have the meanings ascribed to them in the Master Lease.

### *Permitted SubLease*

Lessor and Lessee hereby agree that the Master Lease will be amended, with respect to each Equipment Schedule executed in connection therewith, to add the following section:

(a) Section 4 of the Master Lease ("Definitions") is hereby amended to add the following definitions:

(1) "Permitted Lease" shall mean the use of the Equipment by a Permitted Lessee.

(2) "Permitted Lessee" shall mean those entities to which Borrower leases the Equipment to in its ordinary course of business.

(b) Section 15 of the Master Lease ("Sublease and Assignment") is hereby deleted in its entirety and the following is substituted in its place:

SubLease and Assignment. (a) So long as no Event of Default under this Agreement has occurred and is continuing, Borrower may permit any Items of Equipment to be used by a Permitted Lessee; *provided, however,* that, notwithstanding the foregoing, (1) any Permitted Lease shall be expressly subject and subordinate to this Agreement and the interests of KCL hereunder, (2) Borrower shall remain primarily liable hereunder for the performance of all of the terms and conditions of this Agreement, (3) the term of the Permitted Lease shall not extend beyond the Initial Term or any Renewal Term then in effect, (4) the Permitted Lessee shall not be permitted to further Lease the Equipment or to remove the Equipment from the Equipment Location, and (5) if at any time there is a written agreement with respect to the subleasing of the Equipment by Borrower to Permitted Lessee, Borrower shall immediately deliver all originals of such agreement to KCL.

(b) OTHER THAN AS SET FORTH IN THIS SECTION, BORROWER SHALL NOT, WITHOUT KCL'S PRIOR WRITTEN CONSENT, (i) ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS AGREEMENT, THE EQUIPMENT OR ANY INTEREST THEREIN, OR (ii) SUBLET OR LEND THE EQUIPMENT TO, OR PERMIT THE EQUIPMENT TO BE USED BY, ANYONE OTHER THAN BORROWER OR BORROWER'S QUALIFIED EMPLOYEES.

(c) KCL, at any time with or without notice to Borrower, may sell, transfer, assign and/or grant a security interest in this Agreement, any Equipment Schedule or any Item of Equipment. In any such event, any such purchaser, transferee, assignee or secured party shall have and may exercise all of KCL's rights hereunder with respect to the items to which any such sale, transfer, assignment and/or security interest relates, and BORROWER SHALL NOT ASSERT AGAINST ANY SUCH PURCHASER, TRANSFEREE, ASSIGNEE OR SECURED PARTY ANY DEFENSE, COUNTERCLAIM OR OFFSET

THAT BORROWER MAY HAVE AGAINST KCL. Borrower acknowledges that no such sale, transfer, assignment, and/or security interest will materially change Borrower's duties hereunder or materially increase its burdens or risks hereunder. Borrower agrees that upon written notice to Borrower of any such sale, transfer, assignment and/or security interest, Borrower shall acknowledge receipt thereof in writing and shall comply with the directions and demands of KCL's successor or assign.

Except as modified hereby, all of the terms, covenants and conditions of the Master Lease shall remain in full force and effect and are in all respects hereby ratified and affirmed.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment as of the date first above written.

Lessor:

KEYCORP LEASING,
A DIVISION OF KEY CORPORATE CAPITAL INC.

By: _____
Name: Scott D Fahd
Title: Regional lease Contract manager

Lessee:

CLARK CRANE, L.L.C.

X _____
Name: Corby Clark
Title: Member ✔ Manager

# EXHIBIT "I"



C#:32567
L#:34415
Ls#: 8800020466

# Equipment Schedule No. 01

EQUIPMENT SCHEDULE NO. 01 dated as of February 13, 2001 (this "Schedule") between KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("Lessor"), and CLARK CRANE, L.L.C, an Alabama limited liability company ("Lessee").

## INTRODUCTION:

Lessor and Lessee have heretofore entered into that certain Master Equipment Lease Agreement dated as of February 13, 2001 (the "Master Lease"; the Master Lease and this Schedule are hereinafter collectively referred to as, this "Lease"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings specified in the Master Lease. The Master Lease provides for the execution and delivery of a Schedule substantially in the form hereof for the purpose of confirming the acceptance and lease of the Equipment under this Lease as and when this Lease is delivered by Lessor to Lessee in accordance with the terms thereof and hereof.

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows:

## EQUIPMENT & INVOICING TERMS

1.     EQUIPMENT. Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the equipment listed on Exhibit A attached hereto (the "Equipment"). The aggregate Total Cost of such Equipment is $407,071.00.

2.     TERM. The Initial Term of this Lease with respect to the Equipment described on this Schedule shall commence on the date on which such Equipment is delivered to Lessee, and, unless earlier terminated as provided herein, shall expire on a date which is eighty-four (84) months after the Rent Commencement Date (the "Initial Term Expiration Date").

3.     RENT PAYMENT DATES; RENT. Lessee hereby agrees to pay Rent for the Equipment throughout the Initial Term in eighty-four (84) consecutive monthly installments payable in advance on the Rent Commencement Date and on the same day each month thereafter (each, a "Rent Payment Date"). Each such installment of Rent shall be in an amount equal to $5,618.32. In addition, Lessee hereby agrees to pay Rent for the period commencing on the Interim Rent Commencement Date (as defined below) and ending on the day before the Rent Commencement Date in an amount equal to $187.28 per day, and agrees that, with respect to the Equipment described on this Schedule, the following modifications are hereby made to the Master Lease: (a) "Rent Commencement Date" shall mean, with respect to an Equipment Group, the first (1st) day of the first month following the date of the Certificate of Acceptance for such Equipment Group, (b) "Interim Rent Commencement Date" shall mean, with respect to an Equipment Group, the date of the Certificate of Acceptance for such Equipment Group, or such later date (prior to the Rent Commencement Date) as determined by Lessor in its sole discretion, (c) Section 6 of the Master Lease ("Ordering Equipment") is hereby amended to delete the term "Rent Commencement Date" and to substitute the term "Interim Rent Commencement Date" in its place and (d) Section 22(a)(9) of the Master Lease ("Events of Default; Remedies") is hereby amended to delete the term "Rent Commencement Date" and to substitute the phrase "Rent Commencement Date or Interim Rent Commencement Date, as the case may be," in its place.

4.    EQUIPMENT LOCATION; BILLING ADDRESS.  The Equipment described on this Schedule shall be located at, and except as otherwise provided in this Lease, shall not be removed from, the following address: Route 3, Box 15, Headland, AL 36345.  The billing address of Lessee is as follows: CLARK CRANE, L.L.C, P.O. Box 190, Headland, AL 36345.

## TRANSACTION TYPE TERMS

5.    PURCHASE, RENEWAL AND OPTION TERMS. (a) FMV.  With respect to the Equipment described on this Schedule, Section 32 of the Master Lease ("Renewal and Purchase Options") is hereby deleted in its entirety and the following is substituted in its place:

So long as no Default or Event of Default shall have occurred and be continuing and Lessee shall have given Lessor at least ninety (90) days but not more than one hundred eighty (180) days prior written notice (the "Option Notice"), Lessee shall have the following purchase and renewal options at the expiration of the Initial Term, or any Renewal Term, to:

(i) purchase all, but not less than all, Items of Equipment for a purchase price (the "Purchase Option Price") equal to the then Fair Market Sale Value thereof; (ii) renew this Lease on a month to month basis at the same Rent payable at the expiration of such Initial Term or Renewal Term, as the case may be; (iii) renew this Lease for a minimum period of not less than twelve (12) consecutive months at the then current Fair Market Rental Value; or (iv) return such Equipment to Lessor pursuant to, and in the condition required by, the Lease.  If Lessee fails to give Lessor the Option Notice, Lessee shall be deemed to have chosen option (ii) above.

Payment of the Purchase Option Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) during such Initial Term and Renewal Term shall be made on the last day of the Initial Term or Renewal Term, as the case may be, in immediately available funds against delivery of a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.    LESSOR MAY SPECIFICALLY DISCLAIM ANY SUCH REPRESENTATIONS AND WARRANTIES.

(b) Early Buyout Option.  So long as no Default or Event of Default shall have occurred and be continuing, Lessee shall have the option to purchase all, but not less than all, Items of Equipment on the date which is Seventy-two (72) months after the Rent Commencement Date (the "EBO Date") at a price (the "EBO Price") equal to thirty-two percent (32%) of the Total Cost of the Equipment, plus any applicable sales taxes.  For Lessee to exercise its option hereunder, Lessee shall notify Lessor in writing of its desire to effect such option at least ninety (90) days (but not more than one hundred eighty (180) days) prior to the EBO Date.  Such notice shall be irrevocable.  The EBO Price represents the parties present best estimate of the fair market value of the Equipment on the EBO Date determined by using commercially reasonable methods, which are standard in the industry.  Payment of the EBO Price, applicable sales taxes, together with all other amounts due and owing by Lessee under the Lease (including, without limitation, Rent) on or before the EBO Date, shall be made on the EBO Date in immediately available funds.  Thereafter, upon Lessee's written request, Lessor shall deliver to Lessee a bill of sale transferring to Lessee all right, title and interest of Lessor in and to the Equipment ON AN "AS IS" "WHERE IS" BASIS, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER. If Lessee shall fail to pay all amounts required to be paid under the Lease on the EBO Date, the Lease shall continue in full force and effect and Lessee agrees to reimburse Lessor for all reasonable costs, expenses and liabilities incurred in connection therewith.

6.    NATURE OF TRANSACTION; TRUE LEASE. (a) It is the express intent of the parties that this Lease constitutes a true lease and not a sale of the Equipment.  Title to the Equipment shall at all times remain in Lessor, and Lessee shall acquire no ownership, title, property, right, equity, or interest in the Equipment other than its leasehold interest solely as Lessee subject to all the terms and conditions hereof.  To the extent that Article

2A ("Article 2A") of the Uniform Commercial Code ("UCC") applies to the characterization of this Lease, the parties hereby agree that this Lease is a "Finance Lease" as defined therein. Lessee acknowledges: (i) that Lessee has selected the "Supplier" (as defined in the UCC) and has directed Lessor to purchase the Equipment from the Supplier in connection with this Lease, and (ii) that Lessee has been informed in writing in this Lease, before Lessee's execution of this Lease, that Lessee is entitled under Article 2A to the promises and warranties, including those of any third party, provided to Lessor by the Supplier in connection with or as part of the Purchase Agreement, and that Lessee may communicate with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies. The filing of UCC financing statements pursuant to Section 34 of the Master Lease is precautionary and shall not be deemed to have any effect on the characterization of this Lease. NOTWITHSTANDING THE FOREGOING, LESSOR HAS NOT MADE, AND HEREBY DISCLAIMS ANY ADVICE, REPRESENTATIONS, WARRANTIES AND COVENANTS, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO ANY LEGAL, ECONOMIC, ACCOUNTING, TAX OR OTHER EFFECTS OF THE LEASE AND THE TRANSACTION(S) CONTEMPLATED THEREBY, AND LESSEE HEREBY DISCLAIMS ANY RELIANCE ON ANY SUCH WARRANTIES, STATEMENTS OR REPRESENTATIONS MADE BY LESSOR WITH RESPECT THERETO.

      (b) Notwithstanding the express intent of Lessor and Lessee that this agreement constitute a true lease and not a sale of the Equipment, should a court of competent jurisdiction determine that this agreement is not a true lease, but rather one intended as security, then solely in that event and for the expressly limited purposes thereof, Lessee shall be deemed to have hereby granted Lessor a security interest in the Equipment and all accessions, substitutions and replacements thereto and therefor, and proceeds (cash and non-cash), including, without limitation, insurance proceeds thereof (but without power of sale), to secure the prompt payment and performance as and when due of all obligations and indebtedness of Lessee, now existing or hereafter created, to Lessee pursuant to this Lease or otherwise. In furtherance of the foregoing, Lessee shall execute and deliver to Lessor, to be filed at Lessee's expense, Uniform Commercial Code financing statements, statements of amendment and statements of continuation as reasonably may be required by Lessor to perfect and maintain perfected such security interest.

      (c) In the event that the Supplier erroneously invoices Lessee for the Equipment, Lessee agrees to forward said invoice to Lessor immediately. Lessee acknowledges that the Equipment is, and shall at all times remain, the property of Lessor, and that Lessee has no right, title or interest therein or thereto except as expressly set forth in this Lease.

      7.     **TAX INDEMNIFICATION.** (a) Lessee acknowledges that Lessor has executed this Lease, and that the Rent payable by Lessee under this Lease has been computed, upon the assumptions that Lessor will (i) be entitled to depreciation or cost recovery deductions ("MACRS Deductions") for Federal income tax purposes under the Modified Accelerated Cost Recovery System provided for in Section 168 of the Internal Revenue Code of 1986, as amended (the "Code"), and depreciation or cost recovery deductions ("State Depreciation Deductions") for state income tax purposes for the Equipment Location, in each case on the basis that (1) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (2) the initial tax basis for each Item of Equipment will be equal to the Total Cost, (3) deductions for each Item of Equipment will be computed by using the method specified in Section 168(b)(1) of the Code over the 5-year recovery period described in Section 168(c) of the Code, and (4) the applicable convention for each Item of Equipment under Section 168(d) of the Code is the half-year convention; (ii) be entitled to deductions for Federal income tax purposes (available in the manner and as provided by Section 163 of the Code) for interest payable with respect to any indebtedness incurred by Lessor in connection with any financing by Lessor of any portion of the Total Cost of each Item of Equipment ("Interest Deductions"); and (iii) be subject to tax for each year at a composite Federal and New York corporate income tax rate equal to the then highest marginal rate for corporations provided for under the Code and the laws of New York (the "Highest Marginal Tax Rate"). The MACRS Deductions, State Depreciation Deductions and Interest Deductions are hereinafter collectively referred to as the "Tax Benefits".

      (b) Lessee represents and warrants to Lessor that (i) each Item of Equipment constitutes "5-year property" within the meaning of Section 168(e) of the Code, (ii) Lessee shall not attempt to claim such Tax Benefits, (iii) at and after the time of delivery of the Equipment to Lessee pursuant to this Lease the Lessee shall not claim any

Form No: 96-102.800

ownership or title in and to the Equipment, and (iv) Lessee has not, and will not, at any time after such delivery throughout the Term of this Lease, take any action or omit to take any action (whether or not the same is permitted or required hereunder) which will result in the loss by Lessor of all or any part of such Tax Benefits.

(c) If, as a result of any act, omission or misrepresentation of Lessee, (x) the Tax Benefits are lost, disallowed, deferred, eliminated, reduced, recaptured, compromised or otherwise unavailable to Lessor, (y) for Federal, foreign, state or local income tax purposes, any item of income, loss or deduction with respect to any Item of Equipment is treated as derived from, or allocable to, sources outside the United States, or (z) there shall be included in the gross income of Lessor for Federal, state or local income tax purposes any amount on account of any addition, modification, substitution or improvement to or in respect of any Item of Equipment made or paid for by Lessee (any of the foregoing being hereinafter a "Tax Loss"), then, within thirty (30) days of Lessee's receipt of written notice from Lessor that such a Tax Loss has occurred, Lessee shall pay to Lessor an amount which, after deduction therefrom of all taxes to be paid in respect of the receipt thereof, will enable Lessor to receive the same Net Economic Return (as hereinafter defined) that Lessor would have realized on this Lease had such Tax Loss (together with any interest, penalties or additions to tax) not occurred. Any event, which, by the terms of this Lease, requires payment by Lessee to Lessor of the Stipulated Loss Value of the Equipment, shall not constitute the act of Lessee for purpose of the foregoing sentence.

(d) As used in this Section, the term "Net Economic Return" shall mean Lessor's net after-tax yield, aggregate after-tax cash flow and return on assets, based on (i) the assumptions used by Lessor in originally calculating Rent and Stipulated Loss Value, including the assumptions set forth above (as such assumptions may have been revised pursuant to the last sentence of this subsection) and (ii) the Highest Marginal Tax Rate actually in effect during each year from the date of such original calculations to the date of such Tax Loss, both dates inclusive. In the event Lessor shall suffer a Tax Loss with respect to which Lessee is required to pay an indemnity hereunder, and the full amount of such indemnity has been paid or provided for hereunder, the aforesaid assumptions, without further act of the parties hereto, shall thereupon be and be deemed to be amended, if and to the extent appropriate, to reflect such Tax Loss.

(e) For purposes of this Section, the term "Lessor" shall include the entity or entities, if any, with which Lessor consolidates any tax return. Lessee acknowledges that it has neither sought nor received tax advice from Lessor as to the availability to Lessee of any tax benefits with respect to the Equipment. All of Lessor's rights and privileges arising from the indemnities contained in this Lease will survive the expiration or other termination or cancellation of this Lease. Such indemnities are expressly made for the benefit of, and are enforceable by, Lessor and its successors and assigns.

8.    STIPULATED LOSS VALUE; DISCOUNT RATE. (a) The Stipulated Loss Values applicable to the Equipment and this Lease are as set forth on a supplement (the "Stipulated Loss Value Supplement") prepared by Lessor.

(b) Any provision of this Lease to the contrary notwithstanding, all present value calculations to be made with respect to the Equipment described on this Schedule shall be made using a discount rate equal to three percent (3%).

9.    PERSONAL PROPERTY TAX. Unless otherwise directed in writing by Lessor or required by Applicable Law, Lessee will not list itself as owner of any Item of Equipment for property tax purposes. Upon receipt by Lessee of any property tax bill pertaining to such Item of Equipment from the appropriate taxing authority, Lessee will promptly forward such property tax bill to Lessor. Upon receipt by Lessor of any such property tax bill (whether from Lessee or directly from the taxing authority), Lessor will pay such tax and will invoice Lessee for the expense. Upon receipt of such invoice, Lessee will promptly reimburse Lessor for such expense.

10.    MODIFICATIONS TO MASTER LEASE. With respect to the Equipment described on this Schedule, the Master Lease shall be modified as follows:

---

Form No: 96-102.800

(a)      [RESERVED] :

<div style="background:black;color:white">MISCELLANEOUS TERMS & CONDITIONS</div>

11.    ADDITIONAL MAINTENANCE REQUIREMENTS. Section 13 of the Master Lease ("Return of Equipment") shall be deleted in its entirety and the following substituted in its place:

Return of Equipment. (a) Upon the expiration of the Term of any Lease or upon demand by Lessor pursuant to Section 22 hereof, Lessee, at its sole expense, shall return all of the Equipment leased under the Lease by delivering it in a manner consistent with the manufacturer's recommendations and practices to such place or on board such carrier (packed properly and in accordance with the manufacturer's instructions) as Lessor shall specify. Lessee agrees that the Equipment, when returned, shall be free and clear of all Liens, and in the same condition as when delivered to Lessee, reasonable wear and tear excepted. Reasonable wear and tear shall mean that each item of the Equipment has been maintained by Lessee in "Average Saleable Condition" (as hereinafter defined) and that all components of the Equipment have been properly serviced, following the manufacturer's written operating and servicing procedures, such that the Equipment is eligible for a manufacturer's standard, full service maintenance contract without Lessor's incurring any expense to repair or rehabilitate the Equipment. If, in the opinion of Lessor, any item of the Equipment fails to meet the standards set forth in this Section 13, Lessee agrees to pay on demand all costs and expenses incurred in connection with repairing the Equipment, restoring it to such condition so as to meet such standards and assembling and delivering such Item of Equipment pursuant to Lessor's instructions. If Lessee fails to return any Item of Equipment as required hereunder, then, all of Lessee's obligations under this Lease (including, without limitation, Lessee's obligation to pay Rent for such Item of Equipment at the rental then applicable under this Lease) shall continue in full force and effect until such Item of Equipment shall have been returned in the condition required hereunder.

(b)  Lessee shall give Lessor at least ninety (90), but not more than one hundred eighty (180) days written notice that Lessee is returning the Equipment as provided for above (the "Return Notice") and shall include with such notice, all of the following:

(i)      a detailed inventory of all components of the Equipment including without limitation all of the model and serial numbers of any components;
(ii)     a complete set of current and up to date service and operating manuals for each Item of Equipment;
(iii)    a complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment;
(iv)     an in-depth field service report (the "Report") detailing the results of an inspection conducted by a representative of the manufacturer or a qualified equipment maintenance provider acceptable to Lessor certifying that the Equipment has been properly inspected, examined, tested and is operating within the manufacturer's specifications and addressing, at a minimum the following areas:
(A)      comprehensive physical inspection;
(B)      testing of all material and workmanship of the Equipment; and
(C)      conformation of all Equipment operations to Applicable Law and confirming that the Equipment is otherwise in Average Saleable Condition (as hereinafter defined).
If the Report discloses that any of the material, workmanship or Equipment does not meet or, does not operate within, the manufacturer's specifications or any Applicable Law, Lessee shall, at its sole expense, take all necessary corrective measures and submit a second Report from the same inspector

evidencing that the Equipment has been brought into conformity with the manufacturer's specifications and Applicable Law.

(c) "Average Saleable Condition" shall mean that all of the following minimum standards have been met:

*Construction Equipment*

(i) The Equipment has been, or will be, disassembled according to manufacturer's recommendations and by a licensed rigger/erector specializing in the equipment, including the proper blueprinting, mapping, tagging and labeling of each individual part including cables, electrical components and wires, all process fluids and/or any hazardous materials have been removed from the Equipment and disposed of in accordance with Applicable Law.

(ii) The Equipment is complete with all manuals, maintenance records, log books, plans, drawings and schematics, inspection and overhaul records, operating requirements or other materials pertinent to the Equipment's operation, maintenance, assembly and disassembly.

(iii) There is no structural or mechanical damage, frame, and the structural members and accessories are structurally sound without breaks or cracks, in compliance with Applicable Law and the engine, hydraulics and transmission all operate properly at fully rated loads.

(iv) Transmissions shift properly at full rated loads and speeds, the mechanical drive train, differentials and final drives are in good condition and operate quietly without vibrations or leaks.

(v) Tires are matched by generic type and tread design and have at least 50% of tread life remaining with no flats, contain no dry rot on sidewalls, rims or disc wheels have no split base rims and are in recappable condition; track components have at least 50% wear remaining.

(vi) Equipment with predictable or scheduled replacements or overhaul lives including but not limited to tires, track components, power train assembly, transmissions, converters, engines hydraulics, axles, wheels, brakes, pumps, diggers, buckets, blades, rippers and other attachments (including cutting edges) have not less than 50% useful life remaining before the next such replacement or overhaul and all cutting edges and other wear points have at least 50% of their respective material design lives remaining.

(vii) All ground engaging tools (buckets, blades, rippers) and cabs, canopies, enclosures, lights and other accessories are in good condition and appearance.

(viii) Periodic adjustments and inspections have been performed, and all lubricants and hydraulic oils have been changed, Lessee has maintained written records of preventative maintenance and repairs indicating date and hour meter readings verified by parts invoices, copies of these records are available to Lessor on demand and all oil and hydraulic fluid samples are clean and with no dirt or other foreign substances in either the oil or any other operating fluids.

(ix) A complete set of current and up to date maintenance logs and other appropriate documentation detailing the Equipment's then current configuration (including a description of all replacements and additions thereto made during the Term of the Lease) and all operating requirements and technical data regarding the setup, use and operation of the Equipment are available to be returned with the Equipment.

(x) All Equipment has been cleaned and treated with respect to rust, corrosion and appearance in accordance with the manufacturer's recommendations and consistent with the best practices of dealers in similar used equipment, and the Equipment is painted in the same color scheme as when it was originally delivered to the Lessee.

(xi) Annual hour usage has not exceeded two thousand two hundred (2,200) hours, but Lessee agrees that additional hours used will be chargeable to Lessee at the rate of Twenty-Five Dollars ($25.00) per hour.

(d) In addition to all other rights of Lessor under the Lease, Lessor shall have the right to attempt to resell or auction the Equipment from Lessee's facility with the Lessee's full cooperation and assistance, for a period commencing with Lessor's receipt of the Return Notice and ending one hundred eighty (180) days after the Initial Term Expiration Date. Lessee agrees to pay the reasonable costs and expenses of such sale or auction (and all storage prior thereto), and agrees that the Equipment shall remain capable of operation during this period. Lessee

shall provide adequate electrical power, lighting, heat, water and all other requirements sufficient to allow for normal maintenance and for demonstrations of the Equipment to any potential buyer.

12.    GOVERNING LAW. This Schedule is being delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance without giving effect to any choice of law or conflict of laws provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

13.    COUNTERPARTS.  This Schedule may be executed in any number of counterparts, each executed counterpart constituting an original but all together one and the same instrument.

14.    MORE THAN ONE LESSEE.  If more than one person or entity executes this Schedule, or any other Lease Documents executed in connection herewith, as "Lessee," the obligations of "Lessee" contained herein and therein shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

15.    RELATIONSHIP TO MASTER LEASE; FURTHER ASSURANCES.  This Schedule shall be construed in connection with and as part of this Lease, and all terms contained in the Master Lease are hereby incorporated herein by reference with the same force and effect as if such terms were fully stated herein.  By execution of this Schedule, Lessee and Lessor reaffirm all terms of the Master Lease except as they may be modified hereby.  To the extent that any of the terms of this Schedule are contrary to or inconsistent with any terms of the Master Lease, the terms of this Schedule shall govern.  LESSEE HEREBY CERTIFIES TO LESSOR THAT THE REPRESENTATIONS AND WARRANTIES MADE BY LESSEE IN THE MASTER LEASE (INCLUDING, WITHOUT LIMITATION, SECTION 31 THEREOF) ARE TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS SCHEDULE WITH THE SAME EFFECT AS THOUGH MADE ON AND AS OF SUCH DATE.  Lessee shall take such additional actions and execute and deliver such additional documents as Lessor shall deem necessary from time to time to effectuate the terms of this Lease.

16.     POWER OF ATTORNEY. LESSEE HEREBY APPOINTS LESSOR OR ITS ASSIGNEE AS ITS TRUE AND LAWFUL ATTORNEY IN FACT, IRREVOCABLY AND COUPLED WITH AN INTEREST, TO EXECUTE AND FILE ON BEHALF OF LESSEE ALL UCC FINANCING STATEMENTS WHICH IN LESSOR'S SOLE DISCRETION ARE NECESSARY OR PROPER TO SECURE LESSOR'S INTEREST IN THE EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this paragraph.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Schedule to be duly executed and delivered on the day and year first above written.

Lessor:                                        Lessee:

KEYCORP LEASING,                               CLARK CRANE, L.L.C
A DIVISION OF KEY CORPORATE CAPITAL INC.

By: _____                 x _____
Name: Scott Fahl                               Name: Corey Clark
Title: Regional lease Contract manager         Title: Member __✓__ Manager ____

COUNTERPART NO. 1 OF 1 SERIALLY NUMBERED MANUALLY EXECUTED COUNTERPARTS. TO THE EXTENT THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST MAY BE CREATED THROUGH THE TRANSFER AND POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

# EXHIBIT "J"



C#: 32567
L#: 34415

# Corporate Guaranty
(Lease)

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in order to induce KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("KCL") to make loans and extend credit to CLARK CRANE, L.L.C. ("Lessee"), with its principal place of business at P.O. Box 190, Headland, Alabama 36345 providing for the financing of certain equipment (the "Equipment") the undersigned, Clark Construction Conpany, Inc. ("Guarantor"), with its principal place of business at Route 3, Box 15, Headland, AL 36345, hereby absolutely unconditionally and irrevocably guarantees to KCL the full and prompt payment and performance by Lessee of all Obligations (as that term is defined below), on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

1.    <u>Definitions</u>: The following words shall have the following meanings in this Guaranty:
"<u>Guaranty</u>" means this Corporate Guaranty made by Guarantor for the benefit of KCL.
"<u>Lease Documents</u>" shall have the meaning set forth in the Master Lease, or if not defined in the Master Lease, as used herein the term Lease Documents shall mean all documents prepared by Lessor and now or hereafter executed in connection with the Master Lease.
"<u>Obligations</u>" means the liability of Guarantor hereunder for the obligations of Lessee under the Lease Documents, including, without limitation, the payment when due of all Rent and all other sums currently or hereafter owing by Lessee to KCL thereunder, including costs, expenses and attorneys fees incurred by KCL in connection therewith.
"<u>Other Guarantor</u>" means any other guarantor of the Obligations.
"<u>Other Guarantees</u>" means any guaranty by any Other Guarantor.

Capitalized terms not otherwise defined herein have the meaning given in the Master Equipment Lease Agreement between KCL as Lessor and Lessee dated as of February 13, 2001 (the "Master Lease").

2.    <u>Nature of Guaranty</u>.  Guarantor's liability under this Guaranty shall be absolute, primary and direct. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Obligations.  KCL shall not be required to pursue any right or remedy it may have against Lessee under the Lease Documents or otherwise (and shall not be required first to commence any action or obtain any judgment against Lessee) before enforcing this Guaranty against Guarantor.

3.    <u>Guarantor's Representations and Warranties</u>.  Guarantor warrants and represents to KCL that (a) the execution, delivery and performance of this Guaranty will not result in a breach of, or constitute a default under, or result in the creation of any security interest, lien, charge or encumbrance upon any property or assets of Guarantor pursuant to any loan agreement, indenture or contract to which Guarantor is a party or by or under which it is bound; (b) this Guaranty is executed at Lessee's request and not at the request of KCL; (c) Lessee is an affiliated entity of Guarantor and the lease of Equipment to be made by KCL to Lessee will result in a direct or indirect economic benefit to Guarantor; (d) KCL has made no representation to Guarantor as to the creditworthiness of Lessee; (e) Guarantor has means to and shall keep adequately informed regarding Lessee's financial condition and KCL shall have no obligation to disclose to Guarantor any information regarding Lessee.

4.    <u>Guarantor Waivers</u>.  Guarantor expressly waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor or both, in any action or proceeding, in any court, arising on, out of, under, by virtue of, or in any way relating to the Lease Documents, this Guaranty or the transactions contemplated thereby or hereby.  Guarantor agrees that this Guaranty shall be valid, enforceable and unconditionally binding upon Guarantor regardless of: (a) the reorganization, merger or consolidation of Lessee into or with another entity, corporate or otherwise, or the sale or

other disposition of all or substantially all of the capital stock, business or assets of Lessee to any other person or party; (b) the death or dissolution of Lessee, Guarantor or any Other Guarantor; (c) the voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of Lessee, Guarantor or any Other Guarantor; (d) the granting by KCL of any indulgences or extensions to Lessee, Guarantor or any Other Guarantor; (e) the assertion by KCL against Lessee, Guarantor or any Other Guarantor of any of KCL's rights and remedies provided for under the Lease Documents or existing in its favor in law, equity or bankruptcy; (f) the release of Lessee, Guarantor or any Other Guarantor from any Obligations under the Lease Documents, this Guaranty or any Other Guarantees by KCL or by operation of law or otherwise; (g) any invalidity, irregularity, defect or unenforceability of any provision of the Lease Documents, this Guaranty or any Other Guarantees; (h) any defenses given to guarantors at law or in equity other than actual payment and performance of the Obligations; or (i) the destruction, sale, modification or alteration of any item of the Equipment.

   Guarantor hereby waives notice of and consents to (a) the financing by Lessee of the Equipment, and to any subleasing or other use of the Equipment permitted by KCL (regardless of who any such sublessee or user may be), (b) all of the provisions of the Lease Documents, and any amendments, qualifications and extensions thereof, and any actions taken thereunder, and (c) the execution by Lessee of the foregoing documents and of any other agreements, documents and instruments executed by Lessee in connection therewith. Guarantor further waives notice of KCL's acceptance of this Guaranty, of any default and non-payment and/or non-performance by Lessee under the Lease Documents, of presentment, protest and demand, and of all other matters to which Guarantor might otherwise be entitled. Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any renewal, modification or extension of the term of the Lease Documents or of the terms and conditions of the Lease Documents. Guarantor hereby expressly waives all notice of and consents to any such renewal, modification or extension, and to the execution by Lessee of any documents pertaining to any such renewal, modification or extension. GUARANTOR CONFIRMS THAT THE FOREGOING WAIVER IS INFORMED AND VOLUNTARY.

5.   <u>KCL Waiver</u>. KCL shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by KCL. No delay or omission on the part of KCL in exercising any right shall operate as a waiver of such right or any other right. Guarantor hereby agrees that the failure of KCL to insist in any one or more instances upon a strict performance or observance of any of the terms, provisions or covenants of this Guaranty or the Lease Documents, or to exercise any of its rights thereunder or hereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants or rights, but such terms, provisions, covenants and rights shall continue and remain in full force and effect and shall be enforceable under this Guaranty. No delay or failure by KCL to exercise any right or remedy against Lessee or any Other Guarantor will be construed as a waiver of that right or remedy or as a waiver of any right or remedy against Guarantor. All remedies of KCL against the Lessee, Guarantor and the Other Guarantors are cumulative. Receipt by KCL of any payments or other sums payable under the Lease Documents with knowledge that Lessee has breached any of the terms, provisions or covenants of the Lease Documents shall not be deemed to be a waiver by KCL of such breach, or a release or relinquishment of any claim for future performance under the Lease Documents or this Guaranty.

6.   <u>Subordination/Subrogation</u>.   Guarantor specifically waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Lessee or any other person or entity directly or contingently liable for the Obligations guaranteed hereunder, or against or with respect to the Lessee's property (including, without limitation, property collateralizing the Lease Documents), arising from the existence or performance of this Guaranty.

   The liability of Guarantor under this Guaranty, and of any Other Guarantors, if any, under Other Guarantees given in favor of KCL in connection with the Lease Documents, shall be joint and several and shall be irrevocable, unconditional and absolute, continuing in full force and effect according to its terms, until all of the Obligations hereby guaranteed have been fully satisfied. Guarantor covenants and agrees that any indebtedness of Lessee to Guarantor is hereby subordinated to the obligations of Lessee to KCL, and that after any default under the Lease Documents or any of the other documents evidencing the transactions contemplated hereby, Guarantor shall hold any funds received from Lessee in trust for KCL to satisfy the obligations of Lessee to KCL and shall forthwith

deliver such funds to KCL in the form received. This subordination of the indebtedness and other obligations shall continue until all of the Obligations have been paid, performed and satisfied in full.

7.    Assignment. This Guaranty is assignable by KCL without notice to Guarantor and Guarantor consents thereto. Guarantor's obligations under this Guaranty may not be delegated to any other person or entity without the prior written consent of KCL. Any assignee of KCL shall have all of the rights of KCL hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to such assignee in the first instance. This Guaranty shall inure to the benefit of KCL, and its successors and assigns, and shall be binding upon Guarantor and its heirs, administrators, successors and assigns.

8.    Severability/Governing Law. If any provision of this Guaranty is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent that it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be construed liberally in favor of KCL in order to effect the provisions hereof. This Guaranty shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflicts of law principles of such state. Guarantor agrees to pay upon demand all of KCL's costs and expenses, including reasonable attorneys' fees and court costs, in enforcing payment under this Guaranty, or in the prosecution or defense of any action or proceeding by or against KCL or the Guarantor concerning any matter arising out of or connected herewith, including without limitation any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code.

9.    Jury Trial Waiver. GUARANTOR HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR MAY BE A PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THE LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY GUARANTOR WHO ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE THIS GUARANTY OR THE LEASE DOCUMENTS.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the  _21_  (Day) day of ____FEBRUARY____  (Month), 2001 (Year).

Guarantor:
Clark Construction Company, Inc.

X _Corby Clark_ _____
Name: C_ _by C_ _rk_
Title: P _resident_

STATE OF  *Alabama*        )
                          ) ss.:
COUNTY OF  *Henry*         )


On this __21__ (Day) day of __February__ (Month), __2001__ (Year), before me the subscriber personally appeared _____*Corey Clarke*_____, who being by me duly sworn, did depose and say; that (s)he resides at __*Houston*__ County, State of __*Alabama*__; that (s)he is a _____*President*_____ of __*Clarke Construction Co. Inc.*__ the corporation described in and which executed the foregoing instrument; and that (s)he signed his/her name thereto by order of the Board of Directors of said corporation.


_____*Leigh Hughes*_____
NOTARY PUBLIC


My Commission Expires:        My Commission
                              Expires 9-7-20__

# EXHIBIT "K"



C#: 32567
L#: 34415

# Personal Guaranty
### (Lease)

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and in order to induce KEYCORP LEASING, A DIVISION OF KEY CORPORATE CAPITAL INC. ("KCL") to make loans and extend credit to CLARK CRANE, L.L.C. ("Lessee"), with its principal place of business at P.O. Box 190, Headland, Alabama 36345 providing for the financing of certain equipment (the "Equipment") the undersigned, Colbert F. Clark ("Guarantor"), residing at the address listed below, hereby absolutely unconditionally and irrevocably guarantees to KCL the full and prompt payment and performance by Lessee of all Obligations (as that term is defined below), on the terms and conditions set forth in this Guaranty.  Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

1.    <u>Definitions</u>:  The following words shall have the following meanings in this Guaranty:
    "<u>Guaranty</u>" means this Personal Guaranty made by Guarantor for the benefit of KCL.
    "<u>Lease Documents</u>" shall have the meaning set forth in the Master Lease, or if not defined in the Master Lease, as used herein the term Lease Documents shall mean all documents prepared by Lessor and now or hereafter executed in connection with the Master Lease.
    "<u>Obligations</u>" means the liability of Guarantor hereunder for the obligations of Lessee under the Lease Documents, including, without limitation, the payment when due of all Rent and all other sums currently or hereafter owing by Lessee to KCL thereunder, including costs, expenses and attorneys fees incurred by KCL in connection therewith.
    "<u>Other Guarantor</u>" means any other guarantor of the Obligations.
    "<u>Other Guarantees</u>"  means any guaranty by any Other Guarantor.

Capitalized terms not otherwise defined herein have the meaning given in the Master Equipment Lease Agreement between KCL as Lessor and Lessee dated as of February 13, 2001 (the "Master Lease").

2.    <u>Nature of Guaranty</u>.  Guarantor's liability under this Guaranty shall be absolute, primary and direct.  Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Obligations.  KCL shall not be required to pursue any right or remedy it may have against Lessee under the Lease Documents or otherwise (and shall not be required first to commence any action or obtain any judgment against Lessee) before enforcing this Guaranty against Guarantor.

3.    <u>Guarantor's Representations and Warranties</u>.  Guarantor warrants and represents to KCL that (a) the execution, delivery and performance of this Guaranty will not result in a breach of, or constitute a default under, or result in the creation of any security interest, lien, charge or encumbrance upon any property or assets of Guarantor pursuant to any loan agreement, indenture or contract to which Guarantor is a party or by or under which it is bound; (b) this Guaranty is executed at Lessee's request and not at the request of KCL; (c) Guarantor is a owner of Lessee and the lease of the Equipment to be made by KCL to Lessee will result in a direct or indirect material economic benefit to Guarantor; (d) KCL has made no representation to Guarantor as to the creditworthiness of Lessee; (e) Guarantor  has means to and shall keep adequately informed regarding Lessee's financial condition and KCL shall have no obligation to disclose to Guarantor any information regarding Lessee.

4.    <u>Guarantor Waivers</u>.  Guarantor expressly waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor or both, in any action or proceeding, in any court, arising on, out of, under, by virtue of, or in any way relating to the Lease Documents, this Guaranty or the transactions contemplated thereby or hereby.  Guarantor agrees that this Guaranty shall be valid, enforceable and unconditionally binding upon Guarantor regardless of: (a) the

reorganization, merger or consolidation of Lessee into or with another entity, corporate or otherwise, or the sale or other disposition of all or substantially all of the capital stock, business or assets of Lessee to any other person or party; (b) the death or dissolution of Lessee, Guarantor or any Other Guarantor; (c) the voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of Lessee, Guarantor or any Other Guarantor; (d) the granting by KCL of any indulgences or extensions to Lessee, Guarantor or any Other Guarantor; (e) the assertion by KCL against Lessee, Guarantor or any Other Guarantor of any of KCL's rights and remedies provided for under the Lease Documents or existing in its favor in law, equity or bankruptcy; (f) the release of Lessee, Guarantor or any Other Guarantor from any Obligations under the Lease Documents, this Guaranty or any Other Guarantees by KCL or by operation of law or otherwise; (g) any invalidity, irregularity, defect or unenforceability of any provision of any of the Lease Documents, this Guaranty or any Other Guarantees; (h) any defenses given to guarantors at law or in equity other than actual payment and performance of the Obligations; or (i) the destruction, sale, modification or alteration of any item of the Equipment.

Guarantor hereby waives notice of and consents to (a) the financing by Lessee of the Equipment, and to any subleasing or other use of the Equipment permitted by KCL (regardless of who any such sublessee or user may be), (b) all of the provisions of the Lease Documents, and any amendments, qualifications and extensions thereof, and any actions taken thereunder, and (c) the execution by Lessee of the foregoing documents and of any other agreements, documents and instruments executed by Lessee in connection therewith. Guarantor further waives notice of KCL's acceptance of this Guaranty, of any default and non-payment and/or non-performance by Lessee under the Lease Documents, of presentment, protest and demand, and of all other matters to which Guarantor might otherwise be entitled. Guarantor further agrees that this Guaranty shall remain and continue in full force and effect notwithstanding any renewal, modification or extension of the term of the Lease Documents or of the terms and conditions of the Lease Documents. Guarantor hereby expressly waives all notice of and consents to any such renewal, modification or extension, and to the execution by Lessee of any documents pertaining to any such renewal, modification or extension. GUARANTOR CONFIRMS THAT THE FOREGOING WAIVER IS INFORMED AND VOLUNTARY.

5.     KCL Waiver. KCL shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by KCL. No delay or omission on the part of KCL in exercising any right shall operate as a waiver of such right or any other right. Guarantor hereby agrees that the failure of KCL to insist in any one or more instances upon a strict performance or observance of any of the terms, provisions or covenants of this Guaranty or the Lease Documents, or to exercise any of its rights thereunder or hereunder, shall not be construed or deemed to be a waiver or relinquishment for the future of any such terms, provisions, covenants or rights, but such terms, provisions, covenants and rights shall continue and remain in full force and effect and shall be enforceable under this Guaranty. No delay or failure by KCL to exercise any right or remedy against Lessee or any Other Guarantor will be construed as a waiver of that right or remedy or as a waiver of any right or remedy against Guarantor. All remedies of KCL against the Lessee, Guarantor and the Other Guarantors are cumulative. Receipt by KCL of any payments or other sums payable under the Lease Documents with knowledge that Lessee has breached any of the terms, provisions or covenants of the Lease Documents shall not be deemed to be a waiver by KCL of such breach, or a release or relinquishment of any claim for future performance under the Lease Documents or this Guaranty.

6.     Subordination/Subrogation. Guarantor specifically waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Lessee or any other person or entity directly or contingently liable for the Obligations guaranteed hereunder, or against or with respect to the Lessee's property (including, without limitation, property collateralizing the Lease Documents), arising from the existence or performance of this Guaranty.

The liability of Guarantor under this Guaranty, and of any Other Guarantors, if any, under Other Guarantees given in favor of KCL in connection with the Lease Documents, shall be joint and several and shall be irrevocable, unconditional and absolute, continuing in full force and effect according to its terms, until all of the Obligations hereby guaranteed have been fully satisfied. Guarantor covenants and agrees that any indebtedness of Lessee to Guarantor is hereby subordinated to the obligations of Lessee to KCL, and that after any default under the Lease

Documents or any of the other documents evidencing the transactions contemplated hereby, Guarantor shall hold any funds received from Lessee in trust for KCL to satisfy the obligations of Lessee to KCL and shall forthwith deliver such funds to KCL in the form received. This subordination of the indebtedness and other obligations shall continue until all of the Obligations have been paid, performed and satisfied in full.

7.    Assignment. This Guaranty is assignable by KCL without notice to Guarantor and Guarantor consents thereto. Guarantor's obligations under this Guaranty may not be delegated to any other person or entity without the prior written consent of KCL. Any assignee of KCL shall have all of the rights of KCL hereunder and may enforce this Guaranty against Guarantor with the same force and effect as if this Guaranty were given to such assignee in the first instance. This Guaranty shall inure to the benefit of KCL, and its successors and assigns, and shall be binding upon Guarantor and its heirs, administrators, successors and assigns.

8.    Severability/Governing Law. If any provision of this Guaranty is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent that it is not prohibited or unenforceable, nor invalidate the other provisions hereof, all of which shall be construed liberally in favor of KCL in order to effect the provisions hereof. This Guaranty shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflicts of laws principles of such state. Guarantor agrees to pay upon demand all of KCL's costs and expenses, including reasonable attorneys' fees and court costs, in enforcing payment under this Guaranty, or in the prosecution or defense of any action or proceeding by or against KCL or the Guarantor concerning any matter arising out of or connected herewith, including without limitation any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code.

9.    Jury Trial Waiver. GUARANTOR HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LEASE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR MAY BE A PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY, OF THE LEASE DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY GUARANTOR WHO ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THE THIS GUARANTY OR THE LEASE DOCUMENTS.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the __21__ (Day) day of __February__ (Month), 2001 (Year).

Colbert F. Clark

Guarantor's Residence Address: 147 Muirfield Lane, Dothan, AL 36305

_Colbert F. Clark_

Guarantor's SS#: _____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_____

---

STATE OF __ALABAMA__ )
                                        ) ss.:
COUNTY OF __Henry__ )

On this __21__ (Day) day of __February__ (Month), __2001__ (Year), before me the subscriber personally appeared __Colbert F. Clark__, who being by me duly sworn, did depose and say; that he/she resides at __Dothan, AL__ _____, that he/she is the person described in and who executed the foregoing instrument; and that he/she signed his name thereto freely and of his/her own volition.

_Leigh Hughes_

NOTARY PUBLIC

My Commission Expires:

My Commission
Expires 9-7-2004

---

# EXHIBIT "L"



**JONATHAN A. BRAUN**
Vice President & Senior Workout Counsel
Law Group

VIA CERTIFIED FIRST CLASS MAIL

**Key Equipment Finance**
a division of Key Corporate Capital Inc.
1000 South McCaslin Boulevard,
Superior, CO  80027

Tel:  720 304-1247
Fax:  216 357-6323
Email:  jonathan_braun@key.com

February 18, 2005


Clark Construction Company, Inc.
c/o Colby F. Clark, President
Route 3, Box 15
Headland, Alabama  36345

Re:  Lease No. 8800020034

Dear Mr. Clark:

The referenced lease is in default, due to your failure to make the payments required thereunder.
Accordingly, Key Equipment Finance hereby accelerates the remaining installments under the
schedule(s), and demands payment in full.

Please attend to this matter immediately.  Unless we receive payment in full or reach some other
agreement with you in writing within 10 days after the date hereof, we will be compelled to
presume that you do not wish to resolve this matter amicably, and will pursue our lawful
remedies.

Please govern yourself accordingly.

Thank you.

Very truly yours,

Jonathan A. Braun

JAB:emp


LTR.ClarkConstruction.021805
04.0131